Avinoam Cohen, Esq.
A. COHEN LAW FIRM, P.C.
11 Sunrise Plaza, Suite # 304
Valley Stream, New York 11580
(516) 341-7770


IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

GODWIN BOATENG,

                Plaintiff,                    Case No.:  2:17-cv-00209

      v.                             **AMENDED VERIFIED COMPLAINT**

                                  JURY TRIAL DEMANDED

BAYERISCHE MOTOREN WERKE
AKTIENGESELLSCHAFT a German Corporation,
BMW OF NORTH AMERICA, LLC,
BMW MANUFACTURING COMPANY, LLC,
BMW OF NORTH AMERICA, INC.,
BMW GROUP, INC., BMW (US) HOLDING CORP.,
and KIEKERT AG,

                Defendants.
_____


        Plaintiff GODWIN BOATENG, by and through his attorneys of record, A. COHEN LAW FIRM, P.C., brings this Amended Complaint against Defendants BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT ("BMW AG"), BMW of North America, LLC ("BMW NA LLC"), BMW Manufacturing Company., LLC ("BMW Manufacturing" or "BMW MC"), BMW of North America, Inc. ("BMW NA INC."), BMW GROUP, INC. ("BMW GROUP"), BMW (US) Holding Corporation ("BMW Holding") (collectively "BMW Defendants" or "BMW"), and KIEKERT AG ("KIEKERT") (collectively "Defendants"), on

-1-

behalf of himself, and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

**I.**
**NATURE OF ACTION**

**A.    BMW'S SOFT-CLOSE AUTOMATIC DOOR**

1.    The within action arises out of the concerted efforts of the Defendants to deceive, conceal and fraudulently misrepresent to the public, and as it relates to the Plaintiff, the grave and serious dangers of the sensor technology sold in select packages for BMW vehicles, including the BMW X5, otherwise known as the "Soft-Close Automatic Doors" (hereinafter "SCAD" or "soft close") which was designed or manufactured by Defendant KIEKERT.

2.    Upon information and belief, the BMW Defendants incorporated the SCAD technology as a part of its manufacturing process and assembled said technology for use and distribution in those select featured-vehicles, at an added expense, with the admitted purpose of reducing and/or minimizing the undesirable sound of the slamming of car doors.

3.    Upon further information and belief, BMW's purpose and goal in implementing, manufacturing, assembling, marketing, and selling SCAD vehicles was to curtail, diminish and attenuate an individual from forcefully closing the BMW door.

4.    The SCAD sensor – installed on each door of purchased package – allegedly detects an individual's attempt to close the door, and once the latch catches the handle, an electric motor is switched on.  The electric motor then pulls the door firmly, with a noise that is barely noticeable.

5.    To illustrate, in its technology insight guide, BMW boasts about the SCAD as follows:

> Effortless and quiet: soft close automatic ensures that the doors of your BMW are securely closed with a minimum of exertion and without unpleasant noise.  In tight parking spaces or whenever a gentle closing of the door is appreciated, soft close automatic provides a helping hand: simply push the door until it is almost closed.  When the door is within approximately 6 mm of the lock, <u>a sensor activates an electric motor that pulls the door firmly and quietly closed and secures it</u>. The components of the door locks are automatically returned to their original position.  The door can be opened again at any time. The soft close <u>automatic process is also run whenever the door is manually closed, to ensure the door is properly shut</u>.

*See* "BMW Technology Guide," annexed hereto as "**Exhibit A**."  (emphasis added).

6.    As such, the SCAD feature operates through a BMW "sensor," which, as an aid to an individual intent on achieving maximum door closure, activates an electric motor to "pull the door <u>firmly</u>…and <u>secure[] it</u>."  *Id*. (emphasis added).

7.    Sadly, the SCAD feature does not come without the risk and peril of serious injury to an operator, driver, or passenger's limbs and body parts.

8.    In comparing BMW's SCAD technology with BMW's automatic power-windows and trunk doors.  The power-windows and trunk automatic doors are sensibly designed with a built-in sensor which intuitively and automatically prevents the risk of injury when an object or body part is lodged in its way by automatically reversing itself and rolling down upon impact, in the case of the power-windows, or raising back up in the case of the trunk doors, with the presumptive purpose of preventing injury.

9.    If only the same were true of the SCAD technology, which BMW hastily marketed without proper warning to its customers, including Mr. Boateng, about the inherent dangers other than stating in its handbook about the "DANGER OF PINCHING!"

10.    For over a decade, Defendant BMW intentionally and deceptively marketed and sold its SCAD-featured vehicles without any regard or due care for the obvious safety issues discussed herein.  Nor did BMW adopt or implement technology already internally available to

counter the SCAD risks, such as that associated with the BMW windows or associated with the automatic open and close trunk.

11.     Rather than include a sensor to detect when an object is in the way of the SCAD technology — and prevent the SCAD electric motor from pulling the car door shut — BMW chose to market these vehicles, containing inherently dangerous features, in the stream of commerce without regard to the possible injuries to its customers, such as Mr. Boateng.

12.     Moreover, the very same literature BMW provides to its customers, whereby the SCAD electric motor is triggered within "approximately 6 mm," the equivalent of approximately one-quarter (1/4) of an inch, is false and misleading, as the SCAD technology triggers at a distance greater than BMW's advertised materials.

13.     Designed and manufactured in Germany by KIEKERT in conjunction with Defendant BMW AG, upon information and belief, BMW AG company then ships the vehicles with its SCAD technology for assembly, or as assembled, for distribution to Defendants BMW NA and/or BMW MC.

14.     Axiomatically, the BMW Defendants and KIEKERT continue to market, promote and sell vehicles containing this dangerous SCAD feature, while knowingly doing so despite the inherent risks through studies, internal and external research, numerous complaints, and personal injury claims.  Yet, as to the specific danger cited herein, Defendants have taken no safety precautions, have issued no recalls, and have abstained from apprising the public of these egregious dangers.

15.     In fact, a number of lawsuits are presently pending against the BMW Defendants, including, in the Eastern District of New York, *Fields v. BMW of North America*, LLC., et. al.,

Case No.:  2:18-cv-02889, and in the Supreme Court of the State of New York, Rockland County, *Richter v. BMW of North America, LLC*., Index No. 034930/2015.

16.    A class-action suit in California identified individuals who were said to have been injured by the SCAD during SCAD closure.  The lawsuit, *Azoulai v. BMW of North America LLC*, Case No. 5:16-cv- 00589, in the U.S. District Court for the Northern District of California, has been dismissed, apparently due to the grounding of the suit in contract-based claims.  The instant matter, by comparison, is heavily grounded in tort.

17.    Similarly, in a case currently pending in the Munich District Court in Germany, a BMW owner/lessee and operator had most of her thumb amputated due to the grave risks and dangers of the SCAD technology.

18.    Kordula Schweineberg, a German resident, had her thumb amputated.  The 56-year old female got out of her car and reached behind her back while holding the door slightly ajar so that she could remove her bag and/or other items.  However, in holding the door slightly ajar to avoid oncoming traffic, the BMW SCAD technology severed her thumb as a result of the strong electric motor that pulled the door firmly and snapped her thumb as it securely shut itself, and as programmed by BMW.  A copy of the lawsuits and news reports is annexed hereto as "**Exhibit B**."

19.    Numerous other complaints and lawsuits have been similarly filed all around the world, including in Hungary, all alleging BMW's inherently defective SCAD technology.

20.    The aforementioned cases — and others which may subsequently be filed — demonstrate a pattern of recurring injuries by various individuals complaining that the BMW Defendants knew, or had to know, that the lack of sensors for the SCAD technology, at all times, is inherently dangerous; that BMW has known — or should have known — of the SCAD

dangers and potential for injuries; and that BMW was informed of injuries but took no action to rectify the dangers complained of herein.

21.    The SCAD feature is inherently defective in that it lacks basic safeguards, including sensors, to avert the likelihood of personal injuries when the SCAD electric motor is triggered and the sensor latches the BMW door shut.

22.    Axiomatically, SCAD-equipped BMW doors are equipped with inherently defective SCAD technology which can and has repeatedly caused injury over the years and, at present, remain capable of causing permanent injury.

23.    The BMW Defendants and KIEKERT have been aware of the inherent defects in the SCAD, but brazenly deny any culpability.  Rather, the BMW Defendants choose to blame the consumer – in this instance Mr. Boateng – ostensibly for his own negligence.  A copy of BMW's correspondence concerning Mr. Boateng's claim notice is annexed hereto as "**Exhibit C**."

24.    The BMW Defendants are no strangers to investigation by regulatory bodies and mandatory recalls, as the National Highway Traffic Safety Administration ("NHTSA") contacted BMW about vehicle owners complaining about the safety of the doors.  Upon information and belief, Safety regulators probed BMW concerning details as to how the SCAD BMW vehicles were allegedly fixed during one recall that occurred in 2012.  As such, BMW was tasked with reviewing all customer complaints sent to Defendants since the recall.

25.    Moreover, upon information and belief, multiple tests have been – and likely will continue to be – performed, which demonstrate how BMW's SCAD will not stop for any obstacle as delicate as a finger until it is crushed, pulverized, or severed.

26.    In essence, the SCAD technology falls nothing short of a modern-day guillotine with no possibility by the customer, let alone BMW, to manually disable the SCAD feature and

operation once the electric motor is triggered.  Much like a wide-spreading epidemic showing no mercy or relent, once the SCAD motor is triggered, it is incontrollable and, because it lacks basic safety sensors, will crush, sever and/or mangle body limbs such as a human finger.

27.    BMW sweeps the details of this serious problem "under the rug" and intentionally conceals the hidden dangers they are aware of, which sadly, a consumer such as Mr. Boateng, only learned about during his moment of tragedy.

28.    Despite the plethora of notice, the BMW Defendants continue to manufacture, assemble, distribute, market and advertise the defective SCAD option on select BMW vehicles to the public without adequately disclosing, with clarity, the grave risks the SCAD technology poses to consumers such as Mr. Boateng.

29.    Other than a nebulous "warning" muddled smack in the middle of the owner's manual provided to the consumer, BMW has failed to warn Plaintiff and other consumers regarding the true dangers of the SCAD technology it knowingly assembles in its BMW vehicles.

30.    This so-called "warning" apprises consumers of the "danger of pinching" should a limb or body part get lodged in the way of the soft closing doors.  The utter lack of proper warning language is perplexing, considering that the last thing Mr. Boateng — or any other person previously injured by BMW's SCAD technology — experienced was a "<u>pinching</u>" feeling.

31.    Put simply, Defendants have known for years that its SCAD technology is inherently dangerous, defective and can — and has — harmed its consumers; whether through numerous reviews, its own research, complaints and/or lawsuits brought against it.

32.     However, BMW continues to misrepresent, conceal and deceive the public concerning the dangers of the SCAD technology. Moreover, Defendants wholly fail to warn or provide adequate or reasonable notice of the SCAD dangers.

33.     BMW is at the forefront of technology in every sense and prides itself on its ability to provide in-house and cutting-edge solutions. That the BMW conglomerate entity, consisting of the German parent company (BMW AG) and all its subsidiaries, at all levels of pre-production development and post-production monitoring, assessment and review, failed to detect the instant safety issue is unfathomable.  Equally far-fetched is the offered notion that BMW, having detected the instant safety issue, simply lacked the resources or expertise to properly address the issue.

34.     To stay ahead of the market, BMW maintains extensively comprehensive databases concerning developments throughout the automotive industries. At the very minimum, BMW was aware that safer alternatives had been developed by companies with far-less resources than available to BMW.

35.     This includes technology equipped with a sensor to prevent the door from closing on consumers' and passengers' fingers.  The sensor in these alternative technologies should detect any obstacle between the door and its frame.  Upon sensor detection, the alternative technologies act to stop the door from continuing to close.

36.     This was precisely the <u>kind of technology</u> BMW failed to implement in its SCAD vehicles which caused the Plaintiff's injuries!

**B.    <u>PLAINTIFF HAD NO KNOWLEDGE AND WAS NOT WARNED BY DEFENDANTS PRIOR TO PURCHASING HIS BMW X5 WITH "SCAD" OPTION</u>**

37.     Plaintiff GODWIN BOATENG ("Plaintiff" or "Boateng") was a successful software engineer and frequent presenter of system designs all over the country, earning approximately $250,000.00 per year.  Mr. Boateng immigrated to New York from Ghana, Africa in December 1983.

38.     In 1980, three years prior to his arrival in New York, Mr. Boateng obtained his bachelor's degree in geography and statistics from the University of Ghana.

39.     In 1983, he obtained his master's degree in geography from Carleton University in Ottawa, Canada.  Subsequently, in 1990, he successfully completed his master's degree in information systems from Baruch College.   To say the least, Mr. Boateng is a highly accomplished person who has worked hard and overachieved to get to where he is in life.

40.     Upon information and belief, to avoid diluting its brand, Defendants do not sell cars through distributors.  Rather, it does so through several authorized showroom dealers.  Upon further information and belief, Defendants had not, as of the date of Plaintiff's purchase, instructed its showroom dealers to inform or to demonstrate to potential consumers the safe methods and unsafe methods of utilizing the soft close doors.   As a result, Plaintiff was never informed nor shown the safe and unsafe methods of utilizing the soft close doors.  Nor, on information and belief, has BMW done so to date.

41.     Prior to his purchase, Plaintiff was provided with specifications and marketing materials from the dealership that the dealership had presumably received from BMW, or which the dealer had assembled from information provided courtesy of BMW.  Upon information and belief, BMW had not, as of the date of Plaintiff's purchase, informed its dealers of the dangers associated with the soft close doors.  Consequently, the dealer did not inform the Plaintiff of the

dangers associated with the soft close doors.  Plaintiff was therefore not aware of the latent dangers of the "soft close" doors.

42.    On July 6, 2016, Plaintiff drove the subject vehicle to his friend's home in Bellmore, NY.  Plaintiff was looking forward to meeting his friend for dinner.  Upon arriving at his friend's home, Plaintiff began to exit his vehicle.  As he was exiting his vehicle, his right hand rested on the driver's door column with his back facing the vehicle, in order to avoid oncoming traffic.

43.    With the front driver's door approximately one foot ajar, the SCAD sensor activated the electric motor, which pulled the driver's door firmly, and not "so softly" snapped through the flesh, nerves, blood vessels, tendons, musculature, and bone structure of Boateng's right thumb.

44.    Upon information and belief, Mr. Boateng - having seen his dismembered thumb on the car's floor mat - lost consciousness temporarily until a friend assisted him and called an ambulance on his behalf.

45.    Subsequently, Plaintiff was transported to St. Joseph's Hospital via ambulance, where the surgical staff prepared Mr. Boateng for emergency surgery to stop the excessive blood loss, as well as to attempt to salvage any portion of his right thumb which could be reattached. Sadly, by that time, it was too late and Mr. Boateng permanently lost approximately half of his thumb.  The arteries in his right thumb were so damaged that his doctors were unable to sew them back.  In fact, the attending doctor was left with no choice but to cut off and shave some of the bone that had already been dismembered.    Photos of Mr. Boateng's severed thumb are annexed hereto as "**Exhibit D**."

46.     As a result, Plaintiff has lost the use and enjoyment of his right thumb for life.  He frequently is unable to sleep due to the pain and emotional distress of losing his thumb.

47.     To date, Mr. Boateng is unable to work due to the limited use of his primary thumb, which he relies upon as a software engineer.  He is too embarrassed to face crowds, much less give presentations to crowds and clients as he was accustomed to doing.  Mr. Boateng undergoes extensive physical therapy, and is unable to hold on to ordinary objects (which he was able to do prior to the amputation).

48.     Plaintiff experiences daily pain and sensitivity to his surgically repaired right thumb and has no choice but to face the daily embarrassment of living life with a deformation which was caused solely – and which could have been prevented – by Defendants' had they included safety precautions in the design and/or manufacturing of the SCAD technology, or had they did other than conceal and/or fraudulently conceal the latent defects of which it knew for many years, but did nothing to cure, let alone inform its consumers.

49.     In addition to his daily pain and suffering, anxiety and embarrassment, Mr. Boateng is rendered economically crippled, as he can no longer work and earn approximately $250,000.00 per year as a self-employed software engineer for his company, GAB Consulting, Inc.

50.     Plaintiff had been regularly billing his clients at $117.00 per hour, and had recently been earning at least $4,500.00 per week while working on a project for Stango & Associates in New Jersey.  Sadly, Plaintiff had to give up his contract with Stango & Associates and has been rendered unable to work since his July 6, 2016 accident.

51.     It is anticipated, given his age and intention to work until the age of seventy (70), that Plaintiff has or will lose out on at least $3,000,000.00 in lost wages due to his injuries.

52.     When notified of Plaintiff's grave injuries, Defendants masqueraded their complaint "puppet" responder, Jay Hanson, to arrange for the Plaintiff's vehicle to be inspected on August 22, 2016.   After months of "buying time" and a purported full-examination of Plaintiff's vehicle, Defendants concluded on November 7, 2016, that they were "technically confident that there were no faults, defects or malfunctions present in the vehicle's soft-close system at the time of [its] inspection."   Accordingly, Defendants dismissed any culpability and denied "responsibility for any damage, injury or loss associated with [Plaintiff's] incident that occurred on or about July 6, 2016." *See* "**Exhibit C**."

53.     Plaintiff is aware that Defendants have dispersed and scattered their minions to tackle head-on public relations crises concerning similar SCAD complaints around the nation and the world, as well as complaints and mandatory product recalls from government agencies such as the National Highway Traffic Safety Administration ("NHTSA").

54.     Shockingly, and defying any basis in logic or reason, Defendants continue to falsely represent to the public that the SCAD feature is devoid of any defects.

55.     As will be proven throughout this action, Defendants have knowingly misrepresented and concealed the true dangers of SCAD it has known about since at least 2002; when the SCAD technology became available to the public.

56.     Defendants must be held accountable for their intentional misrepresentation, fraud, deception and concealment to the public and Plaintiffs of the dangerous SCAD "sensor" and lack of safety measures in its vehicles.

## II.
## PARTIES

57.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "56," inclusive, with the same force and effect as though set forth fully at length herein.

58.    Plaintiff GODWIN BOATENG ("BOATENG" or "PLAINTIFF") is a person who is, and at all times relevant hereto, was a resident of the County of Nassau in the State of New York.   Plaintiff resides in the Village of Valley Stream, located in the County of Nassau in the State of New York.

59.    Upon information and belief, Defendant BMW AG is a foreign corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business located at Petuelring 130, München, 80788 Germany, and is a member of and subject to the Hague Convention.  Upon further information and belief, BMW AG manufactures and designs, or is a party contributing to the manufacture and design of BMW vehicles such as the BMW X5 Plaintiff purchased, as well as BMW's SCAD technology.

60.    Upon information and belief, Defendant BMW NA LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677. BMW NA LLC operates under the New Jersey Entity Identification number: 0600105461.  BMW NA is, among other things, BMW AG's exclusive distributor for BMW X5-brand vehicles, manufactured by BMW AG, in the United States.

61.    Upon information and belief, Defendant BMW NA INC. (collectively "BMW NA") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey

07677. BMW NA Inc. operates under the New Jersey Entity Identification number: 0100034466. BMW NA is an indirect, wholly owned subsidiary of BMW AG.  BMW NA is, among other things, BMW AG's exclusive distributor for BMW X5-brand vehicles, manufactured by BMW AG, in the United States.

62.    Upon information and belief, Defendant BMW Manufacturing Company ("BMW MC") is a corporation organized and duly existing under the laws of the State of South Carolina, engaged in the assembly of vehicles as part and parcel of BMW's global manufacturing network and the BMW Group.  Upon further information and belief, BMW MC's principal place of business is located in Greer, South Carolina.

63.    Upon information and belief, Defendant BMW GROUP is a foreign corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business located at Petuelring 130, München, 80788 Germany.  Upon further information and belief, BMW Group is the umbrella and parent company along with BMW AG and oversees all subsidiaries responsible for the manufacture, design, sale and distribution of the vehicles subject to SCAD technology, or is a party contributing to the manufacture, distribution and design of BMW's SCAD technology.

64.    Upon information and belief, Defendant BMW Holding Company ("BMW Holding") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677. Upon further information and belief, BMW Holding operates as a subsidiary of the BMW Group, which, on information and belief, has its principal place of business located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677.

65.     Upon information and belief, the aforementioned Defendants are subsidiaries of Bayerische Motoren Werke AG ("BMW AG"), headquartered in Munich, Germany, where the Plaintiffs' subject vehicle along with its SCAD technology was manufactured. Upon further information and belief, BMW NA is the importer and exporter of BMW vehicles throughout the North American region, while BMW MC serves as the National Assembly plant.

66.     Also known as BMW Spartanburg, BMW MC is a vehicle assembly facility for the BMW Defendants, is located in Greer, South Carolina and is BMW's only assembly plant in the United States.  The plant is currently BMW's sole global production site for X4, X5, X6, and X7 crossover SUVs whose biggest market is the U.S., while other BMW models sold in the U.S. market are imported.  To date, BMW has expended more than $2 billion in renovations to make it a "state of the art" plant with more than 8,500 employees.

67.     By assembling and manufacturing vehicles out of the Spartanburg Plaint, Defendant BMW MC does not deny it places vehicles into the stream of commerce which are the subject of this Action; namely vehicles with the SCAD technology.

68.     Upon further information and belief, Defendants transact business throughout the United States, including within the State of New York and the County of Nassau.

69.     At all relevant times, for the purpose of selling automobiles, other motor vehicles, and vehicle parts in the United States, the State of New York, and Nassau County, Defendants have been engaged in the business of testing, planning, designing, modeling, manufacturing, constructing, assembling, marketing, distributing, selling, and servicing automobiles, other motor vehicles, and vehicle parts throughout the State of New York and throughout the United States.

70.    Upon information and belief, Defendants have significant contacts with the County of Nassau and the State of New York, and the activities complained of herein, in whole or in part, occurred in the County of Nassau and State of New York.

71.    Upon further information and belief, the aforementioned Defendants are wholly owned subsidiaries of BMW GROUP, which upon information and belief, is a wholly owned subsidiary of BMW AG.  BMW AG is a foreign corporation organized and existing under the laws of the Federal Republic of Germany.

72.    Upon information and belief, Defendant KIEKERT AG is a foreign corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business located at Höseler Platz 2, 42579 Heiligenhaus, and is a member of and subject to the Hague Convention.  Upon further information and belief, KIEKERT AG manufactures and designs, or is a party contributing to the manufacture and design of the SCAD technology utilized by the BMW Defendants in their automobiles, and the one to which Plaintiff lost his thumb.

73.    Plaintiff is further informed and believes, and based thereon, alleges that in doing the acts alleged herein, each of the Defendants an agent, principal or alter ego of one or more of the other Defendants, and acted with the other Defendants' knowledge, consent, and approval. As such, each of the Defendants is responsible for the liabilities of the other Defendants, as alleged herein.

### III.
### JURISDICTION AND VENUE

74.    Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1332 (a)(1).

75.    Furthermore, the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

76.    Plaintiff is completely diverse from the Defendants.

77.    Plaintiff BOATENG is a resident of New York with an address of 1023 Fenwood Drive, Valley Stream, NY 11580.

78.    Defendant BMW AG is a foreign corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business located at Petuelring 130, München, 80788 Germany.    BMW AG manufactures BMW vehicles including the BMW X5 Plaintiff owned and operated.

79.    This Court has personal jurisdiction over BMW AG pursuant to the Hague Convention and because BMW AG purposefully and voluntarily makes, offers for sale and sells BMW X5 vehicles to intermediaries, and places BMW X5 vehicles into the stream of commerce with the knowledge or expectation that they will be purchased and used by consumers in the State of New York, and this judicial district.

80.    Defendant BMW NA LLC is a foreign company duly registered in the State of Delaware and maintains a place of business located in the State of New Jersey.    BMW NA is an indirect, wholly owned subsidiary of BMW AG.

81.    Defendant BMW NA INC. is a foreign company duly registered in the State of Delaware and maintains a place of business located in the State of New Jersey.    BMW NA is an indirect, wholly owned subsidiary of BMW AG.

82.    This Court has personal jurisdiction over BMW NA because BMW NA is using, offering for sale and/or selling BMW X5 vehicles in the State of New York and this

-17-

judicial district, and/or importing the defective BMW X5 vehicles into the State of New York and this judicial district.

83.    Defendant BMW MC is a foreign company duly registered in the State of South Carolina and maintains its principal place of business located at 1400 Highway 101, South Greer, SC 29651.  BMW MC is an indirect, wholly owned subsidiary of BMW AG.

84.    This Court has personal jurisdiction over BMW MC because BMW MC assembles and offers for sale BMW X5 vehicles in the State of New York and this judicial district, and/or importing the defective BMW X5 vehicles into the State of New York and this judicial district.

85.    Defendant BMW GROUP is a foreign corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business located at Petuelring 130, München, 80788 Germany.  BMW GROUP is an indirect, wholly owned subsidiary of BMW AG.

86.    This Court has personal jurisdiction over BMW GROUP pursuant to the Hague Convention and because BMW GROUP purposefully and voluntarily makes, offers for sale and sells BMW X5 vehicles to intermediaries, and places BMW X5 vehicles into the stream of commerce with the knowledge or expectation that they will be purchased and used by consumers in the State of New York, and this judicial district.

87.    Defendant KIEKERT AG is a foreign corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business located at Höseler Platz 2, 42579 Heiligenhaus.

88.    This Court has personal jurisdiction over KIEKERT AG pursuant to the

Hague Convention and because KIEKERT AG, upon information and belief, designs, manufactures and exports SCAD components into the stream of commerce with the knowledge or expectation that they will be purchased and used by consumers in the State of New York, and this judicial district.

89.     Venue is proper in this District under 28 U.S.C. § 139l(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, and/or a substantial part of the property that is the subject of the action is situated in Nassau County, within the Eastern District of New York.

90.     Plaintiff was treated for his injuries at St. Joseph Hospital in Bethpage, New York and resides in Valley Stream, which is a village within this district.  Upon information and belief, the subject vehicle, subject vehicle doors, and the subject vehicle soft close automatic mechanism were purchased in this district and were purchased as a result of marketing efforts set forth by Defendants, to which the Plaintiff was exposed within this District.

91.     Upon information and belief, the subject vehicle, its doors, and the soft close automatic door mechanism and motor was either purchased or distributed within this district and purchased due to marketing efforts implemented by Defendants, the results of which the Plaintiff was exposed to within this District.

92.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction.

93.     Furthermore, this Court has personal jurisdiction over the BMW Defendants, and to each of them, pursuant to Federal Rules of Civil Procedure ("FRCP") § 4 and New

York Civil Practice Law ("CPLR") § 302(a) because: the Defendants conduct substantial business within the State of New York; and/or the Defendants contract to supply goods and services in New York; and/or the Defendants committed one or more tortious acts within New York; and/or the Defendants committed one or more tortious acts outside of New York which injured Plaintiff within the State of New York. The Defendants either regularly do business and derive substantial revenue from goods used in New York or should reasonably expect their tortious act to have consequences in New York and derive substantial revenue from interstate or international commerce; and/or the Defendants, and to each of them, own, use, or possess real property situated within the State of New York.

94.    Moreover, personal jurisdiction is proper under the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

95.    Plaintiff makes the allegations in this Complaint without any admission that, as to any particular allegation, they thereby bear the burden of pleading, proving, or persuading. Plaintiff reserves the right to plead in the alternative.

**IV.**
**CLAIMS FOR RELIEF**

**COUNT I**

**(STRICT PRODUCTS LIABILITY – FAILURE TO WARN)**

96.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "95," inclusive, with the same force and effect as though set forth fully at length herein.

97.    Pursuant to 49 U.S. Code § 30116, Defendants were required to ensure that the Plaintiff's vehicle – and other BMW models featuring the SCAD option – was reasonably safe and free of any defects Defendants knew existed in their SCAD featured vehicles.

98.    No later than 2014 – and consisting of 2013 manufactured vehicles such as the one Plaintiff purchased – the NHTSA notified BMW Defendants that certain of its vehicle mechanisms may have not been built to proper tolerances in accordance with the requirements set forth in 49 U.S. Code § 30118.

99.    Insofar as BMW Defendants were apprised of and required to respond to inquiries from the NHTSA concerning same, as well as to subsequently issue a recall on select models impacting tens of thousands of BMW automobiles, Defendants had notice, were fully aware of and had actual knowledge from the NHTSA that its SCAD vehicles could increase the risk of injury but chose to do nothing.  In fact, Defendants elected to conceal and misrepresent the true dangers of the SCAD and continued to market, sell and/or distribute same even though innocent consumers such as Mr. Boateng would not be sufficiently informed of the dangers.

100.    BMW Defendants trivialized, minimized and marginalized any such probes and inquiries by the NHTSA as trifling and inconsequential nuisance requests, perpetuated its concealment and misrepresentations, and intentionally failed to repair or notify Plaintiff or the public of the latent defects, as required to pursuant to 49 U.S. Code § 30120, 49 Code of Federal Regulations ("CFR") § 573.5, 49 CFR § 573.6 and 49 CFR § 573.11-12.

101.    Defendants had a duty to warn Plaintiff about the latent defects in and the dangers associated with using his vehicle, using the vehicle doors, and/or using the soft closing mechanism of which the Defendants were aware, or in the exercise of ordinary care, should have

been aware, at the time the vehicle, the vehicle doors, and/or the soft close mechanism left the Defendants' control.

102.    In their cavalier and apathetic response to Plaintiff's notice concerning his injuries, *see* "**Exhibit C**," BMW Defendants not only fail to acknowledge any culpability, but also brazenly shift the liability to Plaintiff and denied "responsibility for any damage, injury or loss associated with [Plaintiff's] incident that occurred on or about July 6, 2016." *See* "**Exhibit C**."

103.    Defendants designed, tested, manufactured, configured, assembled, marketed, advertised, sold for consideration, and/or provided at all relevant times, the vehicle, the soft close vehicle doors, the soft closed mechanism, and the related parts used by Plaintiff at the time of his injury.

104.    At all relevant times, and at the time Defendants designed, tested, manufactured, configured, assembled, marketed, advertised, sold for consideration, and/or provided the vehicle, the soft close vehicle doors, and/or the soft close mechanism, all of which contained defects and/or latent risks only Defendants fully knew about and capable of causing serious injury.  Such defects and/or risks were known or, through the use of scientific, engineering, and/or automotive knowledge then available to Defendants, should have been knowable to Defendants.

105.    At all times herein mentioned, said risks and defects presented a substantial danger of serious injury to consumers operating the vehicle, including Plaintiff.

106.    Defendants had a duty to warn Plaintiff; and Defendants breached their duty by failing to warn Plaintiff of this danger – that is, the danger that the latent defects in Defendants' products at issue could cause any of its SCAD car doors to automatically close – without any

sensor or other preventive safety measures to protect a finger, hand, or other body appendage, thereby causing serious injuries to the Plaintiff.

107.    Defendants knew or should have known that the vehicle would be purchased and used by the Plaintiff with no realistic possibility of inspection by him for any latent, or otherwise any concealed defects in the design of the product.

108.    The vehicle purchased and operated by Plaintiff at the time of his injury was defective when it left the control of each of the Defendants, in that one or more soft close vehicle doors was defective when the doors left the control of each of the defendants.

109.    The soft close mechanism in one or more doors of Plaintiff's vehicle was itself inherently defective when the mechanism left the control of these Defendants.

110.    As to the Plaintiff, the grave and now glaringly dangerous design of the SCAD involved a reasonably foreseeable use of the SCAD mechanism by Plaintiff (which mechanism was inherently dangerous by its defective design, defective manufacturing, and the lack of sufficient warnings), which caused the mechanism itself, one or more vehicle doors, and/or the vehicle as a whole to have an unreasonably dangerous propensity to cause injury to consumers such as Plaintiff.  Said dangers were known or knowable to Defendants, as they have been notified through: (a) consumer complaints and various lawsuits concerning serious injuries to limbs and body parts; (b) governmental probes by the NHTSA of the possible risks of danger and requested responses thereto; and, on information and belief, (c) Defendants' own research.

111.    The warnings in the Technology Guide and in marketing or other informational materials – if any – buried in fine print failed to reasonably warn Plaintiff, in light of the risks known or knowable to Defendants, of the danger and peril of serious injury associated with the vehicle, one or more soft close vehicle doors, and/or the soft close mechanism.

112.    The notices – if deemed as such – accompanying the vehicle failed to provide Plaintiff with the level of information that a reasonable consumer (much less a reasonable BMW consumer) would expect when using the vehicle and/or the vehicle door in a manner reasonably foreseeable to Defendants.

113.    In either event, Defendants negligently, recklessly or intentionally minimized and/or downplayed the notice and warning of risk of injury to Plaintiff.

114.    Defendants failed to provide Plaintiff with sufficiently adequate warnings of dangers which were known or knowable to Defendants, in that the door's sensor, once activated, would automatically activate the electric motor which pulled the door firmly and snapped the door shut, without regard for any object or limb placed in the door's path to maximum closure and with no adequate prevention for loss of limb or body parts.  Moreover, insomuch as it expressly refutes the BMW Technology Guide, *see* "**Exhibit A**," the Plaintiff's dismembered finger was <u>farther</u> than the "approximately 6 mm [within] the lock" (effectively 1/5 of one inch), and thus supports the Plaintiff's allegations that Defendants' SCAD mechanism has a "mind of its own" and is recklessly designed and manufactured by Defendants without any preventive or precautionary measures to protect the Plaintiff or any consumer from serious injuries.

115.    Upon information and belief, Defendants also failed to report to regulatory authorities such as NHTSA, as required by federal law, the rising number of injuries both in the United States and abroad, reported to involve BMW's soft close mechanism.  By failing to publish or share such reported injuries with the public and/or NHTSA, Defendants effectively failed to warn Plaintiff concerning instances which could have possibly prevented his injuries and damages.

116.    Defendants knew or should have known that these substantial dangers were not readily recognizable to an ordinary consumer such as Plaintiff, and that consumers such as Plaintiff would purchase the vehicle without inspection or knowledge of the defective soft close mechanism.

117.    Defendants' failure to warn Plaintiff concerning said serious dangers and risk of harm rendered his vehicle, one or more vehicle doors, and/or the soft close mechanism unreasonably dangerous to Plaintiff and other like consumers.

118.    Had the Defendants provided Plaintiff with reasonable notice and warnings concerning his vehicle, one or more vehicle doors, and the soft close mechanism, said notices and warnings could have eliminated, diminished and/or minimized the risk of harm to Plaintiff and other like consumer.

119.    At the time of Plaintiff's injury, Plaintiff was using his vehicle, the vehicle doors, and/or the soft close mechanism in a reasonably foreseeable manner.

120.    Put simply, Plaintiff relied on Defendants' insubstantial warnings in operating his vehicle, and consequently, had no actual or direct knowledge by Defendants of the accurate safety risks related to them.

121.    As a direct and proximate result of one or more of the above-listed dangerous conditions and/or defects, and/or of Defendants' failure to warn and provide adequate notice of dangers to him, Plaintiff sustained serious injury on July 6, 2016.

122.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## <u>COUNT II</u>

### (STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT)

123.   Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "122," inclusive, with the same force and effect as though set forth fully at length herein.

124.   At all times herein mentioned, Defendants designed, distributed, manufactured, sold, tested and/or marketed the vehicle, the soft close doors, and the soft close technology to consumers, such as Plaintiff, in the United States.

125.   At all relevant times, Defendants designed, distributed, manufactured, marketed, and/or sold the vehicle, one or more of the vehicle doors, and/or the soft closed technology which was being utilized by Plaintiff at the time of his injury, in a condition such that the soft close mechanism, the vehicle soft close doors and/or the vehicle as a whole was rendered dangerous, unsafe, and defective in manufacture.

126.   At all relevant times, the vehicle, the soft close vehicle doors, and/or the soft close mechanism were expected to and did reach Plaintiff without substantial change in their condition or in the condition of the soft close mechanism, as manufactured, distributed, and sold by Defendants.

127.   At all relevant times, the vehicle, the soft close vehicle doors, and/or the soft close mechanism utilized by Plaintiff contained manufacturing defects in that they were materially different from Defendants' designs or specifications for the reasonably safe use of the vehicle.

128.   At all relevant times, the vehicle, the soft close vehicle doors, and/or the soft close mechanism contained manufacturing defects in that the vehicle, the soft close vehicle doors, and/or the soft close mechanism differed from other typical units of the same product lines,

thereby rendering the vehicle, the soft close vehicle doors, and/or the soft close mechanism unreasonably dangerous to consumers such as Plaintiff.

129.    At all relevant times, the vehicle, the soft close vehicle doors, and/or the soft close mechanism were used in a manner foreseeable and intended to by Defendants.

130.    As a direct and proximate result of the manufacturing defects herein described, Plaintiff was caused to suffer and sustain the injuries, damages, losses, and harms as set forth herein.

131.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT III

### (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

132.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "131," inclusive, with the same force and effect as though set forth fully at length herein.

133.    Defendants marketed a product designed in a manner and way that it was not reasonably safe.

134.    Upon information and belief, it was feasible for Defendants to design the SCAD product in a safer manner.

135.    As such, Defendants' defective design was a substantial factor in causing Plaintiff's injury.

136.    At all relevant times herein mentioned, Defendants designed, fabricated, manufactured, tested, distributed and marketed to Plaintiff and consumers situated in the United States, the State of New York, and in the County of Nassau within the Eastern District of New

York, the BMW X5 vehicle model with soft close doors, and/or the soft close sensor mechanism; and more specifically, the Plaintiff's vehicle, his driver door, and/or the soft close mechanism associated with the Plaintiff's vehicle's driver door.

137.    Until the time of Plaintiff's injury, the subject vehicle, the vehicle doors, and the soft close mechanism were each in substantially the same condition as when they had left the possession of the Defendants.

138.    The SCAD was installed within the Plaintiff's door panel, and was designed to sense when the door was almost closed.  It then is designed to softly pull the door completely closed, and latch it securely.

139.    At the time of, and prior to Plaintiff's injury, the vehicle, the soft close vehicle doors, and/or the soft close mechanism were defective in their design in that, among other things, (i) the vehicle, the soft close vehicle doors, and/or the soft close mechanism would not, could not and/or did not perform in a manner as safely as an ordinary consumer would expect; and (ii) the vehicle, the soft close vehicle doors, and/or the soft close engine and sensor mechanism caused injury to Plaintiff by dismembering the Plaintiff's thumb given that Defendants' product failed to prevent the door from closing on Plaintiff's finger because it lacked the technology to sense whether anything – such as Plaintiff's finger – was lodged in between the door and its frame.

140.    A safer alternative was available on the market which would have ensured that when the mechanism manufactured by Defendants would release, the door will not finish closing and subsequently cause injury.

141.    For example, for the safety of Plaintiff, any driver or children passengers, the SCAD door should be able to retract if it was designed with and contained a sensor which would

detect whether an obstacle was in the way of the door's closing, so that Plaintiff's and children's fingers would be safe from being closed on.

142.    The benefits of the SCAD design is unquestionably outweighed by the risks this featured technology poses to consumers such as Plaintiff when used in the intended and foreseeable manner set forth by Defendants, and because BMW's design defect rendered the vehicle, one or more vehicle doors, and/or the soft close technology unreasonably dangerous to Plaintiff.

143.    At the time of, and prior to Plaintiff's injury, the subject vehicle, soft close doors, and/or soft close featured technology were further defective in their design because there existed one or more reasonably alternative designs that would have reduced the risk posed by the subject vehicle, soft close doors, and/or soft close mechanism.

144.    At the time of, and prior to Plaintiff's injury, the subject vehicle, soft close doors, and/or soft close mechanism were further defective in design because alternative designs were feasible and such alternative designs would have reduced the risk posed by the subject vehicle, the subject vehicle's driver door, and/or the subject vehicle driver door soft close mechanism.

145.    At and prior to Plaintiff's purchase of the subject vehicle, it was within Defendants' ability to alter the design of the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door such that: (i) the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door would be rendered safer; (ii) the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door would remain functional; and/or (iii) the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door would remain reasonably priced.

-29-

146.    At and prior to Plaintiff's injury, it was within Defendants' ability to provide a remedy for the defective design of the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door such that: (i) the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door would be rendered more safe; (ii) the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door would remain functional; and/or (iii) the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door would remain reasonably priced.

147.    As a direct and proximate result of the design defects herein described, Plaintiff was caused to suffer and sustain the injuries, damages, losses, and harms as set forth herein.

148.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT IV

### (NEGLIGENCE)

149.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "148," inclusive, with the same force and effect as though set forth fully at length herein.

150.    At all times herein mentioned, Defendants had a duty to properly manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings, prepare for use, and sell the aforementioned vehicle with its Soft Close Door-featured technology.

151.    At all times herein mentioned, Defendants knew, or in the exercise of reasonable care, should have known, that the aforesaid vehicle with its Soft Close Door-featured technology

was of such a nature that if not properly manufactured, compounded, tested, inspected, packaged, labeled, distributed, marketed, examined, sold, supplied, prepared, and provided with proper warnings, it was likely to injure the products' user: Mr. Boateng.

152.    Defendants so negligently and carelessly manufactured, compounded, tested, failed to test, inspected, failed to inspect, packaged, labeled, distributed, recommended, displayed, sold, examined, failed to examine, over promoted, and supplied the aforesaid vehicle with its Soft Close Door- featured technology, that it was dangerous and unsafe for the use and purpose for which it was intended.

153.    Defendants were aware of the probable consequences of the aforesaid conduct. Despite that fact that Defendants knew, or should have known that BMW's SCAD technology caused serious injuries, they failed to disclose the known or knowable risks associated with the vehicle as set forth above.   Defendants willfully and deliberately failed to avoid those consequences, and in doing so, Defendants acted with a conscious disregard of the safety of Plaintiff.

154.    As a result of the carelessness and negligence of Defendants, the SCAD designed technology caused Plaintiff to thereby sustain the damages and injuries as herein alleged.

155.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT V

## (NEGLIGENT MISREPRESENTATION)

156.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "155," inclusive, with the same force and effect as though set forth fully at length herein.

157.    Defendants had an absolute duty to disclose the true facts regarding the safety of the aforesaid vehicle with its Soft Close Door featured technology, as Defendants were the only entities capable of knowing and reporting the true facts regarding the safety and testing of their products in that its doors, and that of Plaintiff's vehicle, lacked a sensor that would have enabled the door to retract if the sensor detected Plaintiff's finger was in the way of the door closing.

158.    Yet the Defendants utterly failed to do so.  They wholly neglected to inform the Plaintiff and other consumers concerning the dangers of the SCAD technology, in addition to the fact that the vehicle did not contain a sensor preventing the dismemberment of bones and limbs.

159.    Rather, all Defendants could muster to inform its consumers – buried somewhere in its specification manuals in such a manner that a lay person would not read it – was that the SCAD may cause personal injuries.

160.    Furthermore, Defendants had a duty to ensure they had a reasonable basis for making the representations as set forth above.

161.    Defendants made the aforesaid representations with no reasonable ground for believing them to be true.  They did not have accurate or sufficient information.  Furthermore, Defendants were aware that without such information they could not accurately make the aforesaid representations.

162.    The aforesaid representations were made to the Plaintiff prior to the date he purchased the vehicle, and Plaintiff relied on the representations about the safety of the SCAD-featured technology.

163.    At the time the aforesaid representations were made, Defendants concealed from Plaintiff their lack of information on which to base their representations and their consequent inability to make the aforesaid representations accurately.

164.    The aforesaid representations were made by Defendants with the intent to induce Plaintiff to act in the manner herein alleged, that is, to exit the vehicle with the peace of mind that should his finger rest on the door-frame as the door was automatically closing, the door would not subsequently mutilate his hand and finger.

165.    Defendants falsely represented to Plaintiff, and members of the general public, that the SCAD-featured technology was safe for use.  The representations by Defendants were, in fact, false.  The true facts were that the SCAD-featured technology was not safe and was, in fact, dangerous to the hands, fingers and body of Plaintiff, and thereby caused injuries.

166.    Defendants made the aforesaid representations with no reasonable ground for believing them to be true.  They did not have accurate or sufficient information concerning the representations.  Furthermore, Defendants were aware that without such information they could not accurately make the aforesaid representation.

167.    At the time Defendants made the aforesaid representations, Plaintiff was ignorant of the falsity of these representations and reasonably believed them to be true.  In reliance upon said representations, Plaintiff acted in the manner alleged herein.  If Plaintiff had known the actual facts, he would not have taken such actions when exiting his vehicle.  The reliance of Plaintiff upon Defendants' representations was justified because the representations were made by individuals and entities that appeared to be in a position to know the true facts.

168.    As a result of Defendants' false representations and concealment, Plaintiff was caused to sustain the herein described injuries and damages.

169.    WHEREFORE, Plaintiff demands judgment against Defendants in such and amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT VI

### (FRAUDULENT CONCEALMENT)

170.     Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "169," inclusive, with the same force and effect as though set forth fully at length herein.

171.     At all times alleged herein, the Defendants concealed or suppressed a material fact, had a duty to disclose the fact to the Plaintiff, intentionally concealed or suppressed the fact with the intent to defraud the Plaintiff – that is, the Defendants concealed or suppressed the fact for the purpose of inducing the Plaintiff to act differently than he would have if he had known the fact – the Plaintiff was unaware of the fact and would have acted differently if he had known of the concealed or suppressed fact, and as a result of the concealment or suppression of the fact, the Plaintiff sustained damages.

172.     At all relevant times, Defendants knew that the vehicle model and the subject vehicle as distributed, marketed and sold was defective in their design and manufacture.

173.     Defendants knew that the defect posed a serious safety risk to Plaintiff, but purposefully concealed that information from Plaintiff.

174.     Defendants concealed material information regarding the defect.

175.     Defendants were and are under a duty to Plaintiff to disclose these facts because it had exclusive knowledge of material facts regarding the defect and the safety risk to Plaintiff, facts not known to Plaintiff.

176.     Defendants actively concealed from Plaintiff the fact that the vehicle, vehicle doors, and/or the SCAD technology was and is defective and posed a serious safety hazard to Plaintiff at the time Defendants placed the vehicle into the stream of commerce.

177.    Defendants' concealment continues today as Defendants have done nothing to warn Plaintiff or other consumers of the defect or of the serious safety risk associated with the vehicles, the vehicle doors, and/or the SCAD technology, and have done nothing to remove the vehicles, the vehicle doors, and/or the SCAD technology from the marketplace, even though they have been frequently investigated by the NHTSA.

178.    Defendants fraudulently and intentionally concealed from, or failed to disclose to, Plaintiff the facts described herein with the intent to defraud Plaintiff, and for the purpose of concealing from Plaintiff the latent dangers associated with the SCAD technology.

179.    Plaintiff was not aware of the defective nature of the vehicle and unaware that, because of those defects, the vehicle posed a serious safety hazard.

180.    Had Defendants disclosed the true unsafe and defective nature of the vehicle, Plaintiff would not have purchased or leased the vehicle.

181.    Axiomatically, the concealment pertains to matters that were exclusively within the Defendants' knowledge, and could only have been discovered by the Plaintiff through great difficulty.

182.    As a direct and proximate cause of Defendants' misconduct, Plaintiff has suffered actual damages.

183.    Defendants' acts were done deliberately and with intent to defraud Plaintiff and the general consuming public, and in reckless disregard of Plaintiff's rights and well-being and to enrich Defendants.

184.    Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

185.    WHEREFORE, Plaintiff demands judgment against Defendants in such and amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT VII

### (BREACH OF IMPLIED WARRANTY)

186.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "185," inclusive, with the same force and effect as though set forth fully at length herein.

187.    At all times alleged herein, Defendants manufactured, compounded, packaged, labeled, distributed, marketed, sold, supplied, prepared, and sold to Plaintiff the BMW X5 with soft close doors featured technology, and prior thereto, Defendants impliedly warranted to Plaintiff, that the SCAD technology was of merchantable quality and safe for the use for which it was intended.

188.    Plaintiff relied on the skill and judgment of Defendants in using the aforesaid SCAD-featured technology.

189.    Defendants' SCAD-featured technology was unsafe for its intended use and was not of merchantable quality as warranted by Defendants in the vehicles and SCAD-featured technology had very dangerous propensities when put to their intended use and would cause severe injury to the user.   The aforesaid vehicles and SCAD-featured technology were unaccompanied by warnings of their dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution.  The aforesaid vehicles and SCAD-featured technology did cause Plaintiff to sustain damages and injuries as herein alleged.

190.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT VIII

### (BREACH OF EXPRESS WARRANTY)

191.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "190," inclusive, with the same force and effect as though set forth fully at length herein.

192.    The aforementioned manufacturing, compounding, packaging, designing, distributing, testing, constructing, fabricating, analyzing, recommending, merchandising, advertising, promoting, supplying and selling of the aforesaid vehicles and SCAD-featured technology were expressly warranted to be safe for use by Plaintiff and other members of the general public.

193.    At the time of making of the express warranties, Defendants had knowledge of the purpose for which the aforesaid products were to be used and warranted the same to be, in all respects, fit, safe, and effective and proper for such purpose.  The aforesaid vehicles and SCAD-featured technology were unaccompanied by warnings of their dangerous propensities that were either known or knowable at the time of distribution.

194.    Plaintiff reasonably relied upon the skill and judgment of Defendants and upon said express warranty in using the aforesaid vehicles and SCAD-featured technology.  The warranties and representations were untrue in that the SCAD-featured technology caused severe injury to Plaintiff and was unsafe and, therefore, unsuited for the use for which it was intended.  The aforesaid SCAD-featured technology could and did thereby cause Plaintiff to sustain damages and injuries as herein alleged.

195.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT IX

### (BREACH OF WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT AS SET FORTH IN 15 U.S.C. CHAPTER 50)

196.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "195," inclusive, with the same force and effect as though set forth fully at length herein.

197.    The subject vehicle, the subject vehicle doors, and the soft close mechanism utilized in connection with the subject vehicle doors are "consumer products," as that term is defined pursuant to 15 U.S.C. Section 2301(1).

198.    Plaintiff is a "consumer" as that term is defined pursuant to 15 U.S.C. Section 2301(3).

199.    Defendants are a "supplier," as that term is defined pursuant to 15 U.S.C. Section 2301(4).

200.    Defendants are a "warrantor," as that term is defined pursuant to 15 U.S.C. Section 2301(5).

201.    Defendants provided Plaintiff with "written warranties" as that term is defined pursuant to 15 U.S.C. Section 2301(6).

202.    15 U.S.C. Section 2310(d)(1) expressly provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation… or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief."

203.    Defendants' written representations in the warranty manuals, sales brochures, pamphlets and other writings disseminated by Defendants in the advertising, promoting,

marketing, and sales of the vehicle and SCAD technology, constitute an express warranty or warranties to Plaintiff.

204.    Defendants' statements made in advertising, promoting, marketing and sales of the vehicle constitute implied warranties that the vehicle, the vehicle's soft closed doors, and/or the soft closed mechanism and technology were merchantable and fit for their intended purpose.

205.    Defendants had reason to know at the time of the sale and delivery of the vehicle to Plaintiff that the vehicle was required for a particular purpose, namely, as a means of transportation, and that on and within the roads, highways, parking/standing areas (including, without limitation, roadside parking, roadside standing, curbside parking, curbside standing) of New York and the United States on a daily basis with the reasonable expectation of doing so without a risk of injury during the ordinary and regular course of using a motor vehicle, and that the Plaintiff and other purchasers, owners, and/or lessees were relying on the Defendants' skill and judgment to develop, design, manufacture, distribute, and sell a safe and suitable vehicle and concomitant soft close door featured technology.

206.    Defendants had reason to know at the time of the sale and delivery of the vehicle that use of the vehicle for transportation necessitated a method of physically moving into and out of the vehicle with the reasonable expectation of doing so without a risk of injury during the ordinary and regular course of using a motor vehicle, and that the Plaintiff and other purchasers, owners, and/or lessees were relying on the Defendants' skill and judgment to develop, design, manufacture, distribute, and sell a safe and suitable vehicle and concomitant soft close door featured technology with a safe and suitable method of ingress and egress.

207.    Defendants had reason to know at the time of the sale and delivery of the vehicle that the soft close vehicle doors were required for a particular purpose, namely as a means

ingress and egress, as well as a means of securing the vehicle, with the reasonable expectation of doing so without the risk of injury during the ordinary and regular course of use of the vehicle doors, and that Plaintiff, and other purchasers, owners, and/or lessees were relying on the Defendant's skill and judgment to develop, design, manufacture, distribute, and sell a safe and suitable vehicle and concomitant soft close door featured technology with safe and suitable doors.

208.    Defendants breached these express and implied warranties by offering and selling the vehicle and SCAD technology that, by Defendants' design and construction, contained inherent defects which made the vehicle, the soft close doors, and the soft close mechanism inherently dangerous.

209.    Defendants also breached these express and implied warranties by failing to sufficiently warn Plaintiff of the defects alleged herein, that were, at all relevant times, known to the Defendants.

210.    Defendants breached and continue to breach the aforementioned express warranty, including, but not limited to, as follows:

i.      At the time of manufacture and sale, there existed an inherent defect in the soft close mechanism, the vehicle driver door, and/or the vehicle;

ii.     The vehicle's soft closed system was not free from defects;

iii.    The vehicle's soft closed system lacked a sensor that would have enabled the door to retract if the sensor detected Plaintiff's finger was in the way of the door's closing;

iv.     The vehicle's soft closed system was and is at all relevant times defective;

v.      Upon information and belief, although Plaintiff has, on several occasions, informed Defendants of the defect and the injury, Defendants have not undertaken a thorough investigation of the cause of the incident and of the safety of the soft close mechanism and the soft close doors.  Nor have Defendants issued any recall

or warning about the soft closed mechanism, even though they had numerous communications with and were investigated by the NHTSA.

vi.    Defendants continue to manufacture and sell vehicles with the same soft-closed technology without any sensors to prevent injury, much like the one sustained by Plaintiff.

211.    As a result of Defendants' breach of express warranties as set forth above, Plaintiff has suffered damages and other losses in an amount to be determined at trial.

212.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT X

## (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

213.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "212," inclusive, with the same force and effect as though set forth fully at length herein.

214.    Plaintiff purchased a vehicle from Defendants, who are defined as a "merchant" with respect to goods of the kind advertised, marketed and sold.

215.    The vehicle, the vehicle doors, and/or the vehicle automatic soft close mechanism was defectively designed or manufactured such that the vehicle, the vehicle doors, and/or the vehicle automatic soft close mechanism was not reasonably fit for its ordinary purpose or was not minimally safe for its expected purpose.

216.    When used in its usual and reasonably foreseeable manner, the vehicle, the vehicle soft closed doors, and/or the soft close mechanism associated with the soft close doors do not perform in accordance with reasonable expectations.

217.    The defect existed when the vehicle left the Defendants manufacturers, and was present when Plaintiff purchased the vehicle.

218.    Said defect is the proximate cause of the Plaintiff's injuries.

219.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT XI

**(FOR VIOLATIONS OF NEW YORK'S GENERAL BUSINESS LAW § 349)**

220.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "219," inclusive, with the same force and effect as though set forth fully at length herein.

221.    At all relevant times material hereto, Defendants conducted trade and commerce in New York and elsewhere within the meaning of NEW YORK'S GENERAL BUSINESS LAW ("NY GBL") § 349.

222.    Defendants' misleading and deceptive business practices adversely impacted Plaintiff and other New York purchasers pursuant to NY GBL § 349, which resulted in direct harm to the Plaintiff and other New York purchasers.

223.    Defendants knowingly, recklessly or negligently committed deceptive business practices by engaging in conduct that was and is likely to deceive customers acting reasonably under the circumstances.

224.    Specifically, Defendants were aware of and failed to inform Plaintiff and other consumers, or otherwise concealed that the doors of the subject vehicle posed a substantial safety hazard to the consumer in that the vehicle doors' soft closed system lacked a sensor that would have enabled the door to retract if the sensor detected Plaintiff's finger was in the way of the

door; that closing would engage even with the presence of an object in the path of closure; that the soft closing mechanism, once engaged, would not retract the door or suspend the progress of the closure to avoid an object in the path of the closure; that the soft closing mechanism, once engaged, would neither, upon meeting with physical resistance associated with an object in the path of closure, retract the door nor suspend the progress of the closure; that the soft closing mechanism, once engaged would close with great force until it was completely closed or until meeting with physical resistance in the path of closure sufficient to counter the force of the closing mechanism; that human thumbs and fingers in the closure path do not present sufficient resistance to mechanically halt the progress of the door closure and/or; that human thumbs and fingers in the path of closure are likely to incur serious physical injury.

225.    Defendants further concealed the following material facts: The subject vehicle, vehicle doors, and/or SCAD-feature technology was designed, manufactured, marketed, and sold with a defect that posed a substantial safety hazard to the Plaintiff consumer; that the subject vehicle was defective because it was designed or manufactured in such a way that the ordinary and reasonable use of the SCAD-featured technology may cause serious injury.

226.    In light of this obvious danger, Defendants provided insufficient warnings or advisories – or failed to provide such warnings at all – to the Plaintiff concerning the SCAD-featured technology or information concerning where the soft closed mechanism has been initiated or triggered by the sensor engine, the door closure process, and to avoid placing fingers or hands within that portion of the path of a soft close door that is six (6) millimeters nearest to the fully closed position.

227.    In fact, the "fiction" of the six (6) millimeters automatic close is patently false in that tests have demonstrated that this technology is initiated at a greater distance from the vehicle's door closing.

228.    Prior to the purchase of the subject vehicle, Defendants intentionally failed to inform Plaintiff of the aforementioned safety hazards.  Nor did Defendants inform the Plaintiff of the hazard at any time prior to the date of the injury.  Defendants' failure to inform was deceptive and misleading as defined within the meaning of NY GBL § 349.

229.    As a result of Defendants' intentional and willful deceptive practices, the Plaintiff lacked the pertinent information necessary to make decisions as to whether to purchase a vehicle with a driver door automatic soft close function, whether (post-purchase) to maintain, alter or disable the soft close function, and whether (post-purchase) to cease use of the vehicle in favor of an alternate vehicle.

230.    Additionally, as a result of Defendants' intentional and willful deceptive practices, Plaintiff was not aware of the need for a heightened level of care when utilizing the SCAD-featured technology.

231.    Due to Defendants' intentional and willful deceptive practices, Plaintiff did not take action sufficient to avoid the impact of the soft close door, and thus, incurred the injuries alleged herein.

232.    Defendants consciously failed to disclose material facts from Plaintiff with respect to the use and dangers associated with the vehicle and SCAD-featured technology.

233.    Defendants intended that Plaintiff rely on its acts of concealment and omissions so that Plaintiff would purchase or lease (and once purchased or leased, would maintain possession and not seek to return or alter at monetary or reputational cost to BMW) the subject

vehicle, the subject vehicle doors, and/or lease a vehicle with doors containing the SCAD-featured technology.

234.    The foregoing acts, omissions and practices proximately caused Plaintiff to suffer actual injuries.

235.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory, treble and punitive damages as a jury deems reasonable, plus costs.

## COUNT XII

### (FOR VIOLATIONS OF DISCLOSURE OF AUTOMOBILE INFORMATION PURSUANT TO 15 U.S.C. CHAPTER 28)

236.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "235," inclusive, with the same force and effect as though set forth fully at length herein.

237.    Pursuant to 15 U.S.C. § 1231(a), the term "manufacturer" refers to any person engaged in the manufacturing or assembling of new automobiles, including any person importing new automobiles for resale and any person who acts for and is under the control of such manufacturer, assembler, or importer in connection with the distribution of new automobiles.

238.    "Person," as defined by 15 U.S.C. § 1231(b), means an individual, partnership, corporation, business trust, or any organized group of persons, much like Defendants.

239.    In accordance with 15 U.S.C. § 1231(g), the term "ultimate purchaser" means, with respect to any new automobile, the first person, other than a dealer purchasing in his capacity as a dealer, who in good faith purchases such new automobile for purposes other than resale.

240.    15 U.S.C. § 1232(g) states in clear and unequivocal terms that each "manufacturer of new automobiles distributed in commerce shall, prior to the delivery of any new automobile to any dealer, or at or prior to the introduction date of new models delivered to a dealer prior to such introduction date, securely affix to the windshield, or side window of such automobile a label on which such manufacturer shall endorse clearly, distinctly and legibly true and correct entries disclosing the following information concerning such automobile…if one or more safety ratings for such automobile have been assigned and formally published or released by the National Highway Traffic Safety Administration under the New Car Assessment Program, information about safety ratings..." (emphasis added).

241.    Furthermore, 15 U.S.C. § 1232(h) requires that "if an automobile has not been tested by the National Highway Traffic Safety Administration under the New Car Assessment Program, or safety ratings for such automobile have not been assigned in one or more rating categories, a statement to that effect" shall be affixed.

242.    As early as 2008, Defendants have been subject to numerous investigations by the NHTSA concerning its soft-close automatic doors.

243.    As such, Defendants knew – or should have known – that they were required to disclose such information in its affixed label as to the safety concerns conveyed to them by the NHTSA.

244.    Upon information and belief, Defendants failed to disclose to Plaintiff and like consumers concerning the safety concerns the NHTSA conveyed to them on more than one (1) occasion.

245.    As a result, Plaintiff has suffered great injury due to the Defendants' failure to comply with the disclosure regulations contained in 15 U.S.C. Chapter 28.

246.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT XIII

### (FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

247.    Plaintiff repeats, realleges and reiterates the allegations contained in paragraphs "1" through "246," inclusive, with the same force and effect as though set forth fully at length herein.

248.    As set forth above, the Defendants were careless and negligent in regard to the design, manufacture, and/or marketing of the subject vehicle, the subject vehicle's SCAD doors, and/or the SCAD technology utilized in the subject vehicle.

249.     As set forth above, the Defendants were careless and negligent in regard to the publication and dissemination of information regarding the safety of the vehicle, the subject vehicle's SCAD doors, and/or the SCAD technology utilized in the subject vehicle.

250.    These negligent actions and omissions by the Defendants were a proximate cause of the Plaintiff's injuries and damages.

251.    As a result of the foregoing, Plaintiff sustained such injuries and damages as set forth above.

252.    The injuries and damages suffered by the Plaintiff was caused in whole or in part by the negligence and carelessness of the Defendants, and without any contributory negligence o the part of the Plaintiff.

253.    WHEREFORE, Plaintiff demands judgment against Defendants in such an amount of compensatory, treble and punitive damages as a jury deems reasonable, plus costs.

## XIV.
## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count I as alleged herein;

B. An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count II as alleged herein;

C. An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count III as alleged herein;

D. An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count IV as alleged herein;

E. An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count V as alleged herein;

F. An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count VI as alleged herein;

G. An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count VII as alleged herein;

H. An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count VIII as alleged herein;

I.   An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count IX as alleged herein;

J.   An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count X as alleged herein;

K.   An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count XI as alleged herein;

L.   An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count XII as alleged herein;

M.  An order or judgment in favor of Plaintiff and against Defendant in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count XIII as alleged herein;

N.   For such other further relief as this Court deems just and necessary.

Dated: December 4, 2018
        Valley Stream, New York

A. COHEN LAW FIRM, P.C.


_____

By:    Avinoam Cohen, Esq.
        11 Sunrise Plaza, Suite # 304
        Valley Stream, NY 11580
        Telephone: (516) 341-7770
        *Attorneys for Plaintiff*

## <u>ATTORNEY CERTIFICATION</u>

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____
AVINOAM COHEN