UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

GODWIN BOATENG,

                    *Plaintiff*,

     -against-

                                              **MEMORANDUM AND ORDER**

BAYERISCHE MOTOREN WERKE
AKTIENGESELLSCHAFT, a German                  17-cv-00209 (KAM)(SIL)
Corporation,
BMW OF NORTH AMERICA, LLC,
BMW MANUFACTURING CO., LLC,
BMW OF NORTH AMERICA, INC.,
BMW GROUP, INC., and BMW (US) HOLDING
CORPORATION,

                    *Defendants*.

-------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

          Plaintiff Godwin Boateng ("Plaintiff" or "Mr. Boateng")
suffered a partially severed thumb of his dominant right hand when
the soft-close automatic door ("SCAD") of his 2013 BMW X5 ("Subject
Vehicle") closed on his hand.  The Subject Vehicle was designed by
Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"),
assembled by Defendant BMW Manufacturing Co., LLC ("BMW MC"), and
distributed by Defendant BMW of North America, LLC ("BMW NA") (all
together, "Defendants" or "BMW").   Mr. Boateng brought this
diversity action against BMW asserting a number of claims including
products liability (design, manufacturing, and failure to warn
defects), negligence, breach of express and implied warranties,

1

negligent misrepresentation, fraudulent concealment, negligent infliction of emotional distress, in addition to violations of the federal Magnuson-Moss Warranty Act and New York General Business Law. (ECF No. 1, Complaint ("Compl.").) After discovery closed, BMW moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and to preclude testimony by Plaintiff's expert, Dr. James Pugh ("Dr. Pugh"). (ECF No. 120, Notice of BMW's Motion for Summary Judgment.)

For the reasons set forth below, Defendants' motion to preclude Dr. Pugh's testimony is DENIED. Defendants' motions for summary judgment are GRANTED as to Plaintiff's manufacturing defect, breach of express warranty, negligent misrepresentation, fraudulent concealment, the Automobile Information Disclosure Act, and negligent infliction of emotional distress claims. Defendants' motions for summary judgment are DENIED as to Plaintiff's design defect and failure to warn claims, as well as the breach of implied warranty, Magnuson-Moss Warranty Act, and New York General Business Law claims.

## Background

The Court has considered the facts set forth below from the parties' declarations and exhibits attached thereto, and the Rule 56.1 Statements of Facts and opposing 56.1 Statements.[1]   The

---

[1] (*See* ECF Nos. 121; BMW's Memorandum for Summary Judgment ("BMW Mot. for Summ. J."); 122, BMW's 56.1 Statement ("BMW 56.1"); 123-1-123-11, Joseph Park Declaration in Support of BMW's 56.1 Statement ("Park Decl.") and exhibits

Court must and will construe the facts in the light most favorable to the nonmoving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Unless otherwise noted, the parties consider the following facts undisputed or the opposing party has not proffered evidence in the record to dispute them.

### I.   Factual Background[2]

On July 6, 2016, Plaintiff Godwin Boateng suffered an injury to his right hand. (ECF No. 124, Pl. Resp. 56.1 at ¶¶ 1-17.) Plaintiff was exiting from the driver's side door of the Subject Vehicle, a 2013 BMW X5, on a narrow street when he moved back to avoid oncoming traffic. (*Id.*) His back was to the door, his right hand behind his back, and most of his fingers were resting on the exterior handle of the door as he positioned the door away from oncoming traffic. (*Id.*) Without warning, the door "just automatically closed" on Mr. Boateng's right thumb and amputated about half of it immediately. (*Id.*)

### A. The Subject Vehicle SCAD System

---

attached thereto; 124, Plaintiff's Response to BMW's 56.1 Statement ("Pl. Resp. 56.1"); 125-1-125-20, Avi Cohen Declaration in Response to BMW's 56.1 Statement ("Cohen Decl.") and exhibits attached thereto; 127, Plaintiff's Memorandum in Opposition to BMW's Summary Judgement ("Pl. Mot. in Opp'n."); 126, BMW's Reply to Plaintiff's 56.1 Statement of Additional Facts ("BMW 56.1 Reply"); 120, BMW's Reply in Support for Summary Judgment ("BMW Reply Mot.").)

[2] For purposes of summary judgment, statements in a movant's statement of undisputed material facts pursuant to Local Civil Rule 56.1(a) are deemed admitted to the extent that they are: (1) followed by citation to supporting evidence which may be considered on summary judgment pursuant to Federal Rule of Civil Procedure 56(c); and (2) not "specifically controverted by a correspondingly numbered paragraph" and/or evidence in the nonmovant's counterstatement under Local Civil Rule 56.1(b). See Local Civil Rule 56.1(c), (d).

The Subject Vehicle was designed by Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), assembled by Defendant BMW Manufacturing Co., LLC ("BMW MC"), distributed by Defendant BMW of North America, LLC ("BMW NA"), and sold by non-defendant Rallye BMW dealership (the "dealership").  (*Id.* ¶¶ 46-56.)  In other words, BMW AG designed the Subject Vehicle and the "soft-close automatic door" (SCAD) technology. (ECF No. 124, Pl.'s Resp. 56.1 at ¶¶ 46-50.)  BMW AG contracts the manufacture of SCAD to a company called Kiekert AG. (*Id.*)  BMW MC installs the SCAD in the BMW vehicles.  (*Id.* ¶ 57.)  BMW NA is responsible for the distribution of completed vehicles in the United States and "deals with the SCAD in the way of replacement parts [and] quality problems."  (*Id.*)

SCAD references the "soft-close automatic door" feature included in some BMW vehicles, including the Subject Vehicle's model.  The SCAD is designed to assist the user of the vehicle, in providing "comfortable door closing without making noise and to close the door safely at any time." (*Id.* ¶ 6.)  Per Federal Motor Vehicle Safety Standard ("FMVSS") 206, a door must have a "fully latched position and a secondary (partially closed) latch position." (ECF No. 124, Pl. Resp. 56.1 ¶ 10.)  Although the secondary latch is typically present to minimize the ejection of occupants through an unintentional door opening, the secondary

latch is also the location where the SCAD engages. (*Id*. ¶¶ 10, 194.)

The "BMW Technology Guide" states that, upon partial closure of the door to the secondary latch position and "[w]hen the door is within approximately 6 [millimeters] (mm) of the lock, a sensor activates an electric motor that pulls the door firmly and quietly close[s] and secures it." (ECF No. 123-8, Exh. H, James Pugh Expert Report ("Pugh Report") at 2.) The parties differ in whether the foregoing statement is true. Defendants assert that the SCAD engages when a door reaches the "secondary" latch position. The sensor then "activate[s] an electric motor that pulls the door firmly and quietly closes and secures it." (ECF No. 124, Pl. Resp. 56.1 ¶¶ 12-14.) To fully close the door, the SCAD's "cinching mechanism causes the door to travel approximately 6 mm." (*Id*. ¶ 14; ECF No. 123-11, Exh. K, Donald Parker Report ("Parker Report") ¶ 27.) In response, Plaintiff identifies inconsistencies between Defendants' various experts and BMW representatives' opinions on the precise distance between the door and the SCAD at which the SCAD begins to engage. (*Id*. ¶ 13.) In particular, Plaintiff points to Klaus Bruecklmeier, a BMW AG employee in the doors and entry development division, who stated at his deposition that the stated gap can exceed 8 millimeters. (*Id*.; ECF 127-7, Exh.7, "Klaus Bruecklmeier Deposition Transcript ("Bruecklmeier Dep. Tr."), at 15, 88-89.)

As discussed further below, the parties also dispute whether the SCAD disengages and releases the door if "an obstruction"—like a thumb— "prevents the door from fully closing within the force capability of the SCAD mechanism." (ECF No. 124, Pl. Resp. 56.1 ¶ 20.)

### 1. Testing & Requirements of the SCAD System

In 2001, BMW AG retained a German firm, Technical Control Board ("TUV"), which specializes in testing and approving automotive equipment in order to evaluate the safety of SCAD. (ECF Nos. 124, Pl.'s Resp. 56.1 ¶¶ 84-91; 122, Def. 56.1 Reply ¶ 84-91.)[3] TUV measured "the gap from the time . . . self-closing begins" to when the SCAD fully closes the door in order to determine whether the closing mechanism posed a risk of injury from "pinching".[4] (ECF No. 122, Def. Reply ¶ 86.) TUV found that the point of activation for the SCAD system was a distance of 6 millimeters from the fully closed position plus a 1-millimeter tolerance, meaning that if a user brings the door to a distance of roughly 6 to 7 millimeters away from full closure, the door automatically closes by itself. (*Id.*) TUV provided BMW a one-page internal memo that was dated February 8, 2001, signed by an

---

[3] The Court refers to Defendants' Reply 56.1 Statement for facts that are undisputed between the parties, because the reply addresses the Plaintiff's Counter Statement facts that Defendants do not dispute.

[4] Although Defendant appears to describe the potential injury from the SCAD closure as "pinching," the parties do not dispute Plaintiff suffered a partial amputation of his thumb.

employee that concluded that "the [SCAD] system was rated as sufficiently safe with regards to the danger of pinching" and "the gap in the door provides sufficient safety against the risk of entrapment when SCAD is activated." (*Id*. ¶¶ 83, 88-89.)  The TUV's internal memo stated that the SCAD was "inspected for possible risk of jamming."  (*Id*. ¶ 90; *see also* ECF 127-7, Exh. 7, Bruecklmeier Dep. Tr. at 110-112.)

### 2.   Government Inquiries into SCAD

In 2016, a German regulatory agency called the Kraftfahrt-Bundesamt ("KBA") that oversees automotive vehicles began investigating the SCAD system.  (*Id*. ¶¶ 92-93.)  KBA was concerned that BMW "had no pinching protection other than [one] could open the door again" and that injuries occurred despite "the lesser gaps" in SCAD systems.  (*Id.* ¶¶ 94-99.)  In response to the KBA's investigation, BMW AG employee Bruecklmeier confirmed that "pinching" injuries were possible despite the 6-7 millimeters activation gap.  (ECF 127-7, Exh. 7, Bruecklmeier Dep. Tr. at 162.)[5]  Bruecklmeier explained that "if the finger is already in the gap, and the door is already pressed with many thousands of newtons . . . I can go ahead and push the door into the place where

---

[5] Because Defendants state that Plaintiff "mischaracterize[s] the KBA letter and the [Bruecklmeier] testimony about it, the Court directly refers to the deposition transcript of Bruecklmeier.  (ECF Nos. 126, Def. 56.1 Reply ¶¶ 102-04; *see generally* 127-7, Exh. 7, Bruecklmeier Dep. Tr.)

the pre-latch gets engaged and SCAD starts . . ." completing the closure, but "not without a prior pinching." (*Id.* at 178.)

In the KBA correspondence, there have been at least 44 reports of injuries "related to SCAD" (ECF No. 127-7, Exh. 7, Bruecklmeier Dep. Tr. at 146), although the Defendant asserts that "it remains in dispute that SCAD caused such incidents." (ECF No. 126, Def. 56.1 Reply ¶¶ 59-61.) Peter Baur, the Manager of Product Analysis for BMW NA, reported knowing about a dozen SCAD-related injuries from the Subject Vehicle's SCAD model. (ECF Nos. 126, Def. Reply 56.1 ¶ 61; *see* 125-5, Exh. 5, "Peter Baur Deposition Transcript ("Baur Dep. Tr.") at 297.)[6] The thumb is the predominant finger injured in this set of SCAD incidents acknowledged between the parties. (ECF No. 126, Def. 56.1 Reply ¶ 62.) BMW NA is aware of 21 injuries potentially related to SCAD. (*Id.* ¶ 64.) BMW has not implemented any additional safety measures in response to SCAD-related injuries. (*Id.* ¶ 63.)

The KBA also raised concerns about whether the warning presented in the owner's manual was sufficient to ensure that users would safely use the SCAD. (ECF 127-7, Exh. 7, Bruecklmeier Dep. Tr. at 174.)[7] Specifically, KBA "alleged" that BMW owners who did

---

[6] "We searched our files according to the discovery and with limitation of E70, as this is Soft-Closure, which we understand is identical to the Boateng. And I testified before, I think it was like a dozen injuries here[.]" (ECF No. 125-5, Exh. 5, Baur Dep. Tr. at 297.)

[7] Q. So am I correct that in the last paragraph of this, KBA is telling -- alleging that the owner's manual is not accessible to people who don't know about it and, therefore, those people could be injured because they haven't

not know about the owner's manual, and therefore had not read it, could be injured by SCAD.  (*Id.*)

###    3.   **Vehicle Warning Manual**

BMW AG created and assembled the owner's manual that came with the Subject Vehicle.  (ECF Nos. 126, Def. Reply 56.1 ¶ 139; *see also* 123-7, Exh. G, Owner's Manual at 3.)  The SCAD warning appears as follows:

**Doors**

**Automatic soft closing**
To close the doors, push lightly. It is closed au-
tomatically.

Danger of pinching
Make sure that the closing path of the
doors is clear; otherwise, injuries may result. ◄

The warning language about the SCAD is in the owner's manual and displayed next to a warning symbol—an exclamation point within a yellow triangle within a square.  (*Id.*)  The warning informs the owner about the vehicle's automatic soft closing feature, advises owners to close the doors lightly, notifies them about the "danger of pinching," and to "[m]ake sure that the closing path of the door is clear; otherwise, injuries may result." (*Id.*)  BMW dealers are also given a "safety tip card" that mentions

---

read the owner's manual; is that what it's basically -- is that what they're alleging?
A. MR. SEMPREVIVO: Objection.
A. That is what KBA alleges.
Q. Okay, that's all -- that's all I was asking.
A. Now we got it clarified.

"keeping hands clear of doors," but dealers are not instructed to, and there is no evidence that dealers did, communicate any of those additional "safety tip" warnings to customers.   (ECF Nos. Def. Reply 56.1 ¶ 138; *see also* 125-5, Exh. 5, Baur Dep. Tr. at 66-67.)

   B.   **The Subject Vehicle and Accident**

        Plaintiff purchased the Subject Vehicle on or about December 20, 2013.  (ECF No. 124, Pl.'s Resp. 56.1 ¶ 28.)   After buying the Subject Vehicle, Plaintiff became aware of the SCAD feature when he noticed that the car doors "automatically pulled shut."   (*Id.* ¶ 31.)   The Subject Vehicle came with an owner's manual that Plaintiff did not read at any point prior to his injury.  (*Id.* ¶ 38-40.)

        On July 6, 2016, at approximately 3:00 PM, Plaintiff drove his friend to her house, using the Subject Vehicle.  (*Id.* ¶ 44.)  Upon arrival, Plaintiff parked on the narrow street adjacent to his friend's house and exited the vehicle from the driver's side, facing the roadway.  (*Id.* ¶¶ 48-49.)   Plaintiff described his positioning as: "With his back facing the driver side door, Plaintiff's right hand was positioned behind his back with most of his fingers resting on the handle as he positioned the door away from oncoming traffic."  Plaintiff observed an approaching vehicle and moved the door backward to avoid the oncoming traffic.  (*Id.* ¶ 55.)

With his back still to the door, Plaintiff stepped backward, "trying to close the door to make way for the truck" and "at some point . . . the SCAD took over." (*Id.* ¶¶ 57-58; ECF No. 123-6, Exh. F, Godwin Boateng Deposition Transcript ("Boateng Dep. Tr.") at 153.)  Mr. Boateng does not recall that any other part of his body contacted the Subject Vehicle's door during his accident. (ECF No. 123-6, Exh. F, Boateng Dep. Tr. at 154.)  He also never registered "a moment where [he] felt that the SCAD function was starting to operate" and did not "struggle[] to get out" from the door. (*Id.* at 155-56.)  The closing door "immediately amputated" Plaintiff's thumb. (*Id.* 157.)

Plaintiff underwent two surgeries, initially in an effort to reattach his thumb and then for a right thumb amputation. (ECF No. 124, Pl.'s Resp. 56.1 ¶ 32.)  As a result of the incident, Plaintiff's right thumb is shortened by approximately one centimeter, is slightly whitened, and is hypersensitive. (*Id.* ¶¶ 38-42.)  Plaintiff, a software engineer at the time, did not work for a year following his accident. (*Id.* ¶¶ 18, 20.)  He has changed the way he types and avoids making presentations that require gesticulation. (*Id.* ¶¶ 21-26.)  He has trouble holding things and struggles to dress himself. (ECF No. 123-6, Exh. F, Boateng Dep. Tr. at 154.)  He has not consulted with any therapists or psychologists since his accident, though he has thought about it. (*Id.* at 264.)  He is "very, very self-conscious to the

condition of [his] hand" and tries "as hard as possible to avoid people looking at it, commenting on it or seeing [his hand]." (*Id.* at 265).

### A. Expert Opinions

#### 1. Dr. James Pugh, Plaintiff's Expert, Engineer

On February 3, 2020, Dr. James Pugh, a biomechanical and biomedical engineer who was retained as Plaintiff's expert, met with Plaintiff and inspected the Subject Vehicle, issuing an expert report on February 16, 2020. (ECF Nos. 124, Pl.'s Resp. 56.1 ¶ 62; 123-8, Exh. H, Pugh Report.) Dr. Pugh opined that the Subject Vehicle's "lack of any safety measures," considering the existence of safer "similar SCAD features" in other vehicles, "falls nothing short of a design defect." (ECF No. 123-8, Exh. H, Pugh Report at 3.) He stated that if BMW had conducted more testing, "inherent risks and dangers identified would undoubtedly have been discovered, and that similar safety measures such as that on Mercedes-Benz vehicles would have been installed in BMW vehicles, or sensors designed by BMW itself." (*Id.* at 3.)

Dr. Pugh observed a distance of 6 millimeters between the Subject Vehicle door and the door jamb at the time the SCAD was activated. (*Id.* at 6.) Dr. Pugh placed a rubber dog toy known as a "KONG" into the Subject Vehicle's door to test the SCAD mechanism, stating that the "rubber cylinder of varying dimensions simulating a human finger was used to provide resistance to the

12

soft-close mechanism". (*Id.* at 6-7.) Dr. Pugh explained that the dimensions of the KONG were "not really dissimilar to [those of] a thumb." (ECF No. 123-9, Exh. I, James Pugh Deposition Transcript ("Pugh Dep. Tr."), 110.) When the Subject Vehicle door was "gently closed" on the KONG up to the 6-millimeters activation point, the SCAD activated and "crushed" the KONG. (ECF No. 123-8, Exh. H, Pugh Report at 7.) Dr. Pugh performed the same test with a small sausage, "with similar dimensions and consistency like a human thumb," and the SCAD cut the sausage in half. (*Id*; ECF No. 123-9, Exh. I, Pugh Dep. Tr. 157.) He did, however, acknowledge that unlike a thumb, there was no bone in the sausage. (*Id.*) Next, Pugh placed the KONG and the sausage in the window of the Subject Vehicle, which uses a different automatic closing system. (*Id.*) The automatic closing mechanism on the window sensed the physical resistance of the objects and retracted, leaving the items intact. (*Id.*) Dr. Pugh opined that the soft-close doors "fail[ed] to protect items in the path of the door jamb by continuing to close the doors forcefully in spite of an item such as a finger, a KONG, a sausage, or a similarly sized item present in the door jamb." (*Id.* at 3.)

Next, Dr. Pugh examined his own 2006 Mercedes-Benz S-Class S430 Sedan, which incorporates an electronic door closing system known as "Power Closing Assist" or "PCA." (*Id.* at 7.) The PCA uses a mechanical design similar to SCAD, but the PCA does not

activate at the first latch, and instead requires a further push to activate the electronic closing mechanism. (ECF Nos. 126, Def. Reply 56.1 ¶ 149; 123-9, Exh. I, Pugh Dep. Tr. at 215, 234-35.) The exact distance required to initiate PCA is disputed by the parties, but Dr. Pugh claims that it is 2.5 millimeters. (*Id.*) Dr. Pugh placed the KONG in the door jamb of the Mercedes, but the PCA did not activate to cinch the door shut. (ECF No. 126, Def. Reply 56.1 ¶ 151.) Dr. Pugh concluded that the 2006 Mercedes-Benz soft-close door system was "available for many years prior to the manufacture of the 2013" SCAD system on the Subject Vehicle. (ECF No. 123-8, Exh. H, Pugh Report at 7.) He also stated that the SCAD System could have been "economically and feasibly designed in a safer way, including a sensor system," citing his own vehicle as an example of an automatic door that can "sens[e] an item in the door" and not "trigger or engage" a closure. (*Id.* at 8.)

### 2. Dr. Matthew Greenston, Defendants' Expert, Biomechanics and Accident Reconstruction

Dr. Matthew Greenston is the Defendants' expert in biomechanics, emergency medicine, and accident reconstruction. (ECF Nos. 126, Def. Reply. 56.1 ¶ 154; 125-18, Exh. 8, Matthew Greenston Expert Report ("Greenston Report") at 1.) Dr. Greenston measured an exemplar 2013 BMW X5 and concluded the SCAD mechanism engages at approximately 8 millimeters, after three measurements produced caliper readings of 8.83 millimeters, 8.22 millimeters,

and 8.91 millimeters, respectively. (*Id.* ¶ 156-157.) Dr. Greenston explained that his measurements of 8+ millimeters of the SCAD gap and those proffered by BMW and other experts (6 millimeters) differed because they were taken "diagonally" while the other measurements were taken "perpendicularly." (*Id.* ¶ 159.)

Dr. Greenston used a surrogate to test the manual closing force of the Subject Vehicle's doors when shut from different positions. (*Id.* ¶¶ 169-72.) He was able to demonstrate various scenarios including: i) surrogate leans back; (ii) surrogate bumps the door with his bottom; (iii) surrogate takes a half-step back; and (iv) surrogate leans back with his bottom leading, in an attempt to determine the various ways Mr. Boateng could have stepped back into the Subject Vehicle during the day of the accident. (*Id.*) Dr. Greenston concluded from his scenarios tested that "the surrogate easily generated enough force to amputate a digit without the SCAD mechanism being engaged." (ECF No. 125-18, Greenston Report at 7.) Consistent with Plaintiff's expert, Dr. Greenston also conceded that one "doesn't need force to engage the SCAD system" because all a person has to do is "put the door at the appropriate position, so the SCAD [] senses where the door is and acts based on that." (ECF Nos. 126, Def. 56.1 Reply ¶ 172; 125-16, Exh. 16, Matthew Greenston Deposition Transcript ("Greenston Dep. Tr.") at 218.)

### 3. Donald Parker, Defendants' Expert, Mechanical Engineer and Automotive Design

Donald Parker is a mechanical engineer and automotive design expert for BMW NA who produced a report on the mechanics of the BMW SCAD system and an analysis of Dr. Pugh's testimony. (*See Id.* ¶ 180; *see also* ECF No. 123-11, Exh. K, Parker Report.)  Parker also reported that it takes only a small amount of force to engage the latch on a BMW door and activate the SCAD system.  (ECF No. 126, Def. Reply 56.1 ¶¶ 209-10.)  He stated that he believes the force required to move the door from an open position to the secondary latch is roughly ten pounds.  (ECF No. 125-14, Exh. 14, Parker Dep. Tr. at 77-78.)  Parker also said that slamming the car door with more than 50 pounds of force would "override the SCAD system entirely" and manually close the door.  (*Id.* at 95.)  Parker further explained that a thumb is ordinarily "too big" for a car door to close to the point where SCAD engages, but admitted that the thumb could be compressed to the point where SCAD activates. (*Id.* at 157-158.)  Parker did not measure an 8.9-millimeter gap in the BMW door when the secondary latch position was engaged, as Dr. Greenston found—-though Parker asserted that this discrepancy was not due to variability in the hardware. (*Id.* at 164.)  In Parker's opinion, it is possible that Mr. Boateng "applied enough force to the door to squeeze his finger down" to engage the secondary latch, which would have engaged the SCAD.  (*Id.* at 252-53.)

Parker examined an exemplar Mercedes to study its PCA system and determined that it "operate[s] essentially similarly to that of the BMW," but had a slightly narrower activation gap of 4-6 millimeters, compared to BMW's exposed gap of 5 millimeters to 7 millimeters, "depending on the angle of measurement." (ECF No. 123-11, Exh. K, Parker Report at 18.)   Parker also reported that "an obstruction must be smaller than approximately 6 millimeters, or must be compressed to that dimension, in order for the closing-assist feature to activate.   In each case, once activated, the system will energize to the maximum force capability of the system in an effort to assure a fully-closed door under any environmental conditions." (*Id*. at 17.)   Parker testified that he did not measure "how much force [] it take[s] to engage the secondary position where SCAD will just, boom, take over." (ECF No. 125-14, Exh. 14, Parker Dep. Tr. at 227.)   Parker did not run any tests to see what the impact of the door closure would be on various objects.

Parker concluded that BMW's SCAD system did not present a safety hazard above that of a manually closed door and that the PCA system did not provide a safer design alternative. (ECF No. 123-11, Exh. K, Parker Report at 18.)   The Parker report also included the 2006 Mercedes-Benz S-Class Sedan's manual, which included the warning text in relevant part: "To prevent possible personal injury, always keep hands and fingers away from the door

17

or trunk opening when closing a door or the trunk lid." (*Id.* at 15.)



**Warning!**

To prevent possible personal injury, always keep hands and fingers away from the door or trunk opening when closing a door or the trunk lid. Be especially careful when small children are around.

In case of danger, pull the inside or outside door handle, or press the trunk lid lock.

To prevent personal injury, never actuate the closing assist mechanism by tampering with the door or trunk lid latch.

### 4. Nathan Dorris, Defendants' Expert on Warnings and Communications

Nathan Dorris is an engineer and specialist on warnings and communication who provided an expert report for BMW. (ECF Nos. 126, Def. Reply 56.1 ¶ 245; 125-13, Nathan Dorris Expert Report ("Dorris Report").) Dorris opined that BMW's SCAD warning, described above, is "capable of being noticed, understood, and followed," and did not see the need for any improvement. (ECF No. 126, Def. Reply 56.1 ¶ 253.) Dorris confirmed that BMW does not include an "on product" SCAD warning. (*Id.* ¶ 260.) He also stated that the word "pinching" in the warning description was not meant to match the colloquial, playful sense of the term, and that as such the word may convey a different message than the warning intended. (*Id.* ¶ 262-64.)

Dorris also opined that "more is not always better with respect to warnings." (ECF 125-13, Exh. 13, Dorris Report at 3.) Dorris explained that the National Highway Traffic Safety Administration (NHTSA) has recognized the need to avoid "information overload" because an oversaturation of warnings reduces the effectiveness of precautions. (*Id.*) Dorris stated that the obvious danger of closing a door on one's hand meant that BMW doors "operate consistently with user expectations regarding function and potential pinch points." (*Id.* at 4.) He also wrote that "door closing injuries are likely to be associated with a lapse of attention or execution error, not from a lack of information or knowledge about closing the vehicle's door or the potential risk of injury." (*Id.* at 10.)

Dorris stated he was not aware of any on-product labels that addressed the soft-close feature of automatic doors. (ECF No. 125-12, Exh. 12, Nathan Dorris Deposition Transcript ("Dorris Dep. Tr.") at 68-69.) He specified that even with an automatic soft-close function, people could intuitively understand the danger. (*Id.* at 72.) He stated that he did not think replacing the words "danger of pinching" with "danger of serious injury" would lead to a different understanding of risk. (*Id.* at 83-84.) As such, Dorris concluded that different or additional warnings would likely not improve user safety. (*See generally* ECF No. 125-13, Exh 13, Dorris Expert Report.)

## LEGAL STANDARD

Summary judgment shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249—50 (internal citations omitted).

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact and an entitlement to judgment as a matter of law. *Rojas*, 660 F.3d at 104. In deciding a summary judgment motion, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A moving party may establish the absence of a factual dispute by

"showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has fulfilled its preliminary burden, the onus shifts to the nonmoving party to present evidence of the existence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson*, 477 U.S. at 252. A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must "constru[e] the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)).

To defeat a motion for summary judgment, the nonmoving party must identify probative, admissible evidence in the record from which a reasonable fact-finder could find in his or her favor. *Anderson*, 477 U.S. at 256–57. The non-movant must do more than simply show that there is some "metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*, 475 U.S. at 586. The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v.*

*U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).  Summary judgment "therefore requires the nonmoving party to go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

Local Civil Rule 56.1 requires that the movant also file a "short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried," and provide supporting evidence.  Each proffered fact will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph[.]"  Loc. Civ. R. 56.1(a)-(c).  Each statement must be supported by a citation to admissible evidence.  *Id*. at 56.1(d).  The response by the nonmoving party must be supported by a "citation to evidence which would be admissible" as required by Federal Rule of Civil Procedure 56(c).  *Id*.  A reviewing court "may not rely solely on the statement of undisputed facts[,] . . . [i]t must be satisfied that the citation to evidence in the record supports the assertion." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 244 (2d Cir. 2004) (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)).  A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the

evidence presented." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015).  It is not appropriate for the Court to make credibility assessments or resolve conflicting versions of the events presented; these are essential questions for a jury.  *See id*.

## **Discussion**

Defendants contend that summary judgment is appropriate on each of Mr. Boateng's federal and state law claims alleging that the Subject Vehicle's SCAD caused amputation of Plaintiff's finger.  In particular, Plaintiff has alleged design defect, failure to warn, and manufacturing defect claims, under theories of strict products liability and negligence.  *See Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106 (1983).

Under New York law, a plaintiff's claim based upon an alleged design defect or manufacturing defect sounding in either negligence or strict liability are functionally equivalent and will be analyzed concurrently. *See Jarvis v. Ford Motor Co.*, 283 F.3d 33, 62-63 (2d Cir. 2002) (citing *Denny v. Ford Motor Co.*, 662 N.E.2d 730, 735 (1995)) ("In general . . . the strict liability concept of 'defective design' is functionally synonymous with the earlier negligence concept of unreasonable designing" (internal citation omitted)); *S.F. v. Archer Daniels Midland Co.*, 594 F. App'x 11, 12 (2d Cir. 2014) (summary order) ("New York courts generally consider strict products liability and negligence claims

23

to be functionally synonymous."); *Castaldi v. Land Rover N. Am., Inc.*, 06-CV-1008, 2007 WL 4165283, at *11 (E.D.N.Y. Nov. 21, 2007) ("The standard of fault in manufacturing defect cases is simply strict liability, regardless of whether the claim is characterized as negligence or strict liability."). It is also well-settled that "'[w]here liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent.'" *Estrada v. Berkel Inc.*, 789 N.Y.S.2d 172 (App. Div. 2005) (internal citation omitted); *Savage v. Beiersdorf Inc.*, No. 13-CV-0696, 2013 WL 5532756, at *5 (S.D.N.Y. Sept. 30, 2013) ("[F]ailure to warn claims are identical under strict liability and negligence theories of recovery."). Thus, the negligence and strict liability claims alleging the design, manufacturing, and failure to warn defects will be analyzed together.

Plaintiff has also brought claims that assert: breaches of express and implied warranties; negligent misrepresentation and fraudulent concealment; violations of New York's General Business Law § 349; violations of 15 U.S.C. § 1232; and negligent infliction of emotional distress. The Court first addresses Defendants' request to preclude Plaintiff's expert testimony, before addressing the merits of the various claims.

I.   **Defendants' Motion to Preclude Plaintiff's Expert, Dr. Pugh**

   A. **Admissibility      of      Dr.      Pugh's      Testimony**

24

As a threshold matter, the Court must address Defendants' argument that Dr. Pugh's opinion should be precluded. *See Cohalan v. Genie Indus., Inc.*, No. 10-cv-2415 (JMF), 2013 WL 829150, at *2 (S.D.N.Y. Mar. 1, 2013) ("Because on a summary judgment motion a 'district court properly considers only evidence that would be admissible at trial,' a court may—and sometimes must—decide questions regarding the admissibility of evidence, including expert opinion evidence, on a motion for summary judgment.") (citations omitted).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. If expert testimony is found inadmissible under Rule 702, then the remaining "summary judgment determination is made by the district court on a record that does not contain that evidence." *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 173–74 (E.D.N.Y. 2008) (citations omitted). "Such an analysis must be conducted even if precluding the expert testimony would be outcome determinative." *Id.*

Rule 702, in particular, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Put differently, the Court must determine: (1) whether the witness is a qualified expert; (2) whether the opinion is based on application of reliable data and methodology to the facts of the case; and (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine an issue of fact. *See Beruashvili v. Hobart Corp.*, No. 05-cv-1646 (ENV), 2010 WL 11622750, at *4 (E.D.N.Y. July 15, 2010).

Though "[t]he proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied," *Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 419 F. Supp. 3d 490, 511 (E.D.N.Y. 2019) (internal quotation marks and citation omitted), "the district court is the ultimate 'gatekeeper.'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citations omitted). The Court, however, recognizes that the Rule 702 inquiry is "liberal and flexible," *Zsa Zsa Jewels*, 419 F. Supp. 3d at 511, and that "[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." *Lappe v. American Honda Motor Co.*, Inc., 857 F. Supp. 222, 227 (N.D.N.Y. 1994), *aff'd*, 101 F.3d 682 (2d Cir. 1996) (expert qualified to testify on automobile design even though he did not design automobiles for a living). As long as the expert stays within the "reasonable confines of his subject area," the

expert can fairly be considered to possess the "specialized knowledge" required by Rule 702. *Id.* (citation omitted); *see also Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 482 (S.D.N.Y. 2004) (admitting an expert's opinion on the inadequacy of warnings, noting that the expert based his opinion on "his experience in consumer safety and on several articles on warnings and labeling.").

    **1.   Qualifications**

As an initial matter, Dr. Pugh is a qualified expert in the areas of biomechanical and biomedical engineering, and Defendants do not contend otherwise.  Dr. Pugh is a licensed Professional Biomechanical and Biomedical Engineer in New York. (ECF No. 123-8, Exh. H, Pugh Report.)  He holds a bachelor's degree in metallurgy and material sciences and a PhD in biomedical engineering from the Massachusetts Institute of Technology. (*Id.* at 17, Curriculum Vitae.)  He served as the Director for the Division of Bioengineering at the Hospital for Joint Diseases Orthopedic Institute from 1979 to 1984. (*Id.*)  He was a professor at the following institutions: State University of New York at Stony Brook's School of Engineering and School of Medicine, the Cooper Union School of Engineering in New York, New York University's Department of Occupational Health and Safety, City College of the City University of New York, and Mount Sinai School of Medicine of the City University of New York. (*Id.*)  He has

been the Director at Inter-City Testing & Consulting Corporation since 1985 and served as the President since 2005. (*Id.*) Dr. Pugh is also active in professional organizations, including the Society of Automotive Engineers, American Society of Mechanical Engineers, the American Society for Testing and Materials, and the National Association of Professional Accident Reconstruction. (ECF No. 123-9, Exh. I, Pugh Dep. Tr. at 39.)

Particularly relevant here, Dr. Pugh testified that he has significant experience in automotive injuries, occupant protection, and injury analysis. (ECF Nos. 123-8, Exh. H, Pugh CV; 123-9, Exh. I, Pugh Dep. Tr. at 36-37.) Dr. Pugh has also provided consulting in the design and manufacturing of vehicle components. (*Id.* at 76-77.) Dr. Pugh has testified as an expert in depositions or at trials over 20 times since 2016. (ECF No. 123-8, Exh. H, Pugh Court Testimony List.) Considering his significant experience in automotive injuries, occupant protection, and injury analysis, and because Defendants do not dispute that Dr. Pugh is a qualified expert, this Court concludes that Dr. Pugh has the specialized knowledge, skill, experience and education required by the Federal Rules of Evidence and is qualified to offer opinions in his subject area.

2. **Reliability and Relevance (*Daubert*)**

Defendants contend, however, that Dr. Pugh's expert opinion and testimony are unreliable as a matter of law. In

*Daubert v. Merrell Dow Pharms.*, Inc., the Supreme Court articulated several factors to guide district courts in assessing the reliability of expert testimony: (1) whether the expert's theory or technique has been or can be tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential rate of error; and (4) its general acceptance by the relevant scientific community.  509 U.S. 579, 593–94 (1993).

The reliability inquiry envisioned by *Daubert* is "a flexible one," *id.* at 594, and the factors to be considered "depend[ ] upon the particular circumstances of the particular case at issue." *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 150 (1999).  The four factors are not exhaustive and must be applied flexibly, as they "may or may not be pertinent in assessing reliability, depending on the nature of the case, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150 (internal quotation marks and citation omitted).

The Second Circuit has emphasized that courts should focus on "the indicia of reliability identified in Rule 702" and that this "flexible *Daubert* inquiry gives the . . . court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265-67 (2d Cir. 2002).  "Expert engineering testimony may rest on scientific

29

foundations, the examination of which invokes the *Daubert* factors directly, but may also rest on the personal knowledge or experience of the engineer." *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001); *see Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). As the Second Circuit cautioned in *McCullock v. H.B. Fuller Co.*, trial judges acting as gatekeepers under *Daubert* must not assume "the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul" and thereby usurp "the ageless role of the jury" in evaluating witness credibility and weight of the evidence. 61 F.3d 1038, 1045 (2d Cir. 1995).

As to Dr. Pugh's opinions on the deficiencies in the Defendants' SCAD design and warnings, and his proposed alternative design and warnings[8], Defendants contend that they are "not based on a reliable factual foundation and are junk science which will mislead the trier of fact." (ECF No. 121, BMW. Mot. for Summ. J. at 4.) Specifically, Defendants argue that Dr. Pugh's testing procedure was "devoid of measurements or details," lacking a reliable factual or methodological foundation, and that he did not

---

[8] Dr. Pugh's expert report provides a list of areas about which he expects to "opine and testify," but he does not state that he is prepared to testify regarding any manufacturing defect. (ECF No. 123-8, Exh. H, Pugh Report at 4.)

perform a risk/utility balancing analysis as required under New York law." (*Id.* at 6-11.)

The Court finds that Dr. Pugh took measurements, provided detailed findings, and conducted a sufficient risk-utility test when he weighed the "intended design purpose" of the SCAD (closing the door completely and "reducing and/or minimizing the undesirable sound of the slamming of the doors of the vehicle") with the risks ("injuries resulted from the lack of any safety features and sufficient counter measures such as a sensor.") (ECF No. 123-8, Exh. H, Pugh Report at 2-3.) Tellingly, Defendants' experts also took measurements to support their opinions. Defendants, however, fail to cite any examples of alternative measuring or testing procedures that would have been more reliable. That is, Defendants offer no scientific methods or theories that support their contention that Dr. Pugh's opinion based on "junk science." *See Amorgianos*, 303 F.3d at 267.

Rather, the Court concludes that Dr. Pugh's methodology is reliable and his opinions are based on sufficient and reliable facts and data. In addition to reviewing case-related materials and interviewing the Plaintiff, specifically, Dr. Pugh tested the Subject Vehicle and precisely measured the distance at which the soft-close mechanism activated, a gap he reported to be about 6 millimeters. (ECF No. 123-8, Exh. H, Pugh Report at 5.) He placed the KONG and sausage, both approximately the same general

circumference as a human digit, in the 6 millimeters open gap, before and after the SCAD pulled closed to simulate and test the SCAD-activated door closing on Mr. Boateng's thumb in that gap. (*Id.*)  Dr. Pugh also used the KONG and sausage to test the closing mechanism of the BMW's window, and found that the window's automatic operation sensed resistance or obstructions from the objects and immediately began to retract.  (*Id.*)  The sausage only had a mild dent on its surface from the window's initial contact before the window retracted.  (*Id.*)  Lastly, Dr. Pugh conducted the same process with the KONG and sausage on the automatically closing doors and windows of the Mercedes-Benz's PCA system.  (*Id.* at 7).  He reported that neither the door nor the window of the Mercedes activated and closed all the way on the objects, instead "revers[ing] direction upon gently touching" the test objects. (*Id.*)

Defendants are incorrect that Dr. Pugh's opinion must be precluded because it lacks the precision to be expected of scientific testimony.  The closing of a car door is grounded in real-world experiences, and it was no less proper for Dr. Pugh to rely on his measurements, observations, and "personal knowledge or experience [as an] engineer." *See Cacciola*, 127 F. Supp. 2d 175. Dr. Pugh was testing the Subject Vehicle and another vehicle with enhanced closing door systems for the basic physical facts: what happens when, and at what measurement does the SCAD activate,

32

whether or not objects are in its path.  Defendants do not contend that the size of a sausage or consistency of the specific dog toy used by Dr. Pugh are in fact dissimilar to a human finger.  And although Defendants offer a host of instances where Dr. Pugh's testimony could have been articulated with greater precision and methods, his imprecision is not fatal to his ability to offer expert testimony as a matter of law.  Instead, Defendants may challenge on cross-examination the exactitude of Dr. Pugh's testing and his credibility.  Furthermore, Defendants are incorrect that Dr. Pugh's tests on the Subject Vehicle and on his own vehicle, are entirely irrelevant to the factual questions regarding the alleged design defects.

Any judgment about the weight and credibility of Dr. Pugh's expert testimony should be decided by the jury itself, and the Court will not preclude Dr. Pugh from testifying and assisting the jury with understanding and deciding the contested issues, based on his experience, knowledge, and observations regarding the automobile and engineering fields.  This Court finds that Dr. Pugh's testimony would assist the jury in deciding whether Plaintiff's allegations against Defendants have been proven. Consequently, BMW's motion to preclude Dr. Pugh from testifying as an expert at trial is denied.

## II.  Design Defect (Count III — Strict Products Liability and Count IV — Negligence)

The Court next considers Defendants' challenge to Mr. Boateng's design defect claims brought under strict liability and negligence theories. In New York, "to establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Voss,* 450 N.E.2d 204, 208 (N.Y. 1983). The design of a product is "not reasonably safe" if "a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id*. "The plaintiff, of course, is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm, and it was feasible to design the product in a safer manner." *Id*; *see also Rupolo v. Oshkosh Truck Corp*., 749 F. Supp. 2d 31, 42 (E.D.N.Y. 2010). "This standard demands an inquiry into such factors as (1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the

manufacturer's ability to spread the cost of any safety-related design changes." *Denny*, 662 N.E.2d 730, 735 (N.Y. 1995) (citation omitted).

In arguing for summary judgment, Defendants assert that Plaintiff cannot provide evidence to create an issue of fact regarding a feasible alternative design or whether the design defect was the proximate cause of Mr. Boateng's accident. The Court finds that there are genuine issues of material fact on both elements, precluding the grant of summary judgment for Defendants on the Plaintiff's claims of design defect, based on theories of strict liability and negligence.

## A. Proof of Feasible Alternative Design

The Court finds that Mr. Boateng has met the "burden of presenting evidence that the product . . . feasibly could have been designed more safely." *Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir. 1991); *see Greenberg v. Larox, Inc.*, 673 F. App'x 66, 69 (2d Cir. 2016) (summary order). "[I]n order to . . . raise a genuine issue of fact . . . [a plaintiff] must present some admissible evidence that there exists a technologically feasible and commercially practicable alternative design that would have reduced or prevented the harm sustained by the plaintiff." *Soliman v. Daimler AG*, No. CV 10-408 (SJF)(AKT), 2011 WL 6945707, at *5 (E.D.N.Y. Aug. 8, 2011), report and recommendation adopted, No. 10-CV-408 (SJF)(AKT), 2011 WL 4594313 (E.D.N.Y. Sept. 30, 2011)

(quotation omitted)).  There are two means of proving the existence of a feasible alternative: plaintiff must provide an expert who (1) "can show, through testing and construction of a prototype, that such an alternative design is within the realm of practical engineering feasibility, thereby demonstrating the utility, cost, safety, sanitation and other characteristics of the proposed alternative; and/or (2) identify makers of similar equipment who have already put into use the alternative design that has been proposed."  *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003).

In this case, based on Dr. Pugh's findings, the parties' evidence presents a genuine dispute of material fact as to viable alternative designs to the BMW soft-close feature.  Dr. Pugh's expert report and deposition proposes two design alternatives to BMW's SCAD: (1) Mercedes-Benz's PCA (identifying a maker of similar equipment), and (2) BMW's own automatic windows that have a safety sensor that stops and retracts a closing window if it encounters an obstruction.[9]  (*See generally* ECF No. 123-8, Exh. H, Pugh

---

[9] Though Dr. Pugh also listed a vehicle door that does not have a soft-close automatic door system as an alternative, it appears that Plaintiff has abandoned this alternative, so the Court will not include it in its analysis. The Court notes Defendants' supplemental briefing to this Court that Judge Brown, in a similar case to this one, found during BMW's Rule 50(a) motion for directed verdict that Plaintiff's design defect claim cannot be predicated upon an alternative design for the BMW vehicle door without the soft-close feature.  (ECF No. 135, Def. Supp. Letter.); *see S.F. v. Archer Daniels Midland Co.*, 594 F. App'x 11, 12-13 (2d Cir. 2014); *Trisvan v. Heyman*, 305 F. Supp. 3d 381, 405 (E.D.N.Y. 2018) (citing *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 300 (6th Cir. 2015) (quoting

Report.)   Dr. Pugh conducted an experiment where he placed the same KONG in the door jamb of the Mercedes-Benz doors and the door "closed gently to the point of actuation of the soft-close system, and nothing happened," demonstrating that the PCA did "not actuate" with something in its way.   (*Id.* at 7.)   Dr. Pugh also points to the automatic window retreats of the Subject Vehicle and the Mercedes-Benz as evidence that similar equipment can be designed to prevent closures of doors if objects are in the path of closure. (*Id.*)   The Court agrees that the existence of mechanisms that stop and/or retract in the PCA doors and vehicle windows (both reported to be present in the windows of the Subject Vehicle and the Mercedes-Benz) presents sufficient evidence for a jury to find a "technologically feasible and commercially practical alternative design" for car doors that may close on their own in any fashion. *Soliman* at *5.

Although Defendants dispute in conclusory fashion that the Mercedes-Benz PCA is a "legally viable alternative design" to the BMW SCAD, they provide no supporting evidence for their position.   The Defendants' expert, Parker, procured and inspected the same model of Mercedes-Benz that Dr. Pugh tested.   (ECF No. 123-11, Exh. K, Parker Report at 17.)   Parker took measurements of the distance at which the SCAD (BMW) and PCA (Mercedes Benz) would

---

*Mutual Pharmaceutical Co., Inc. v. Bartlett*, 570 U.S. 472, 488 (2013))); *see also Adamo v. Brown & Williamson Tobacco Corp.*, 11 N.Y.3d 545, 551 (2008).

engage. (*Id.*) Parker reported with respect to the Mercedes-Benz PCA, that "[o]nce engaged, it was found that the Mercedes PCA system would energize to the maximum force capability of the system in an effort to fully close the door . . . an obstruction in the door gap would not change or affect this effort." (*Id.*) Parker's report, however, does not discuss actual testing. Parker's report does not state that Parker used any object to determine if the Mercedes-Benz PCA would arrest the closing of the door if an obstruction were encountered. Parker states that the SCAD and PCA are "essentially similar with respect to operation and functionality" and that the PCA, like the SCAD, does *not* have a functionality that would sense an item in the door and pause activation as a result. (*Id.* at 17-18.) Defendants' expert concludes that the PCA "does not provide a safer design alternative," but provides no evidentiary support (such as conducting a test similar to the tests conducted by Dr. Pugh's) for his conclusion. (*Id.* at 19.) Further, Parker's report does not address the ability of vehicle windows to retreat when encountering an obstruction.

The Court finds that the jury should resolve any inconsistencies and disputes between experts for the parties. Fundamentally, Dr. Pugh's opinion is that the SCAD should and could have included *some* safety sensor or other feature, and Defendants offer no reason why a safety mechanism would have made their SCAD

less "functional" or useful. (ECF No. 121, BMW Mot. for Summ. J. at 16.) Indeed, BMW's own practices are relevant; it appears that safety sensors on other parts of the car—such as their windows—are in fact more functional and useful. The Court thus finds that there are material facts in genuine dispute about whether there were viable alternative designs presented, and that a reasonable jury should assess and decide the disputes regarding the viability of Dr. Pugh's proffered designs.

### B. Proximate Causation

Separate and apart from establishing safer alternative designs for the SCAD, the Court finds that there are genuine issues of material fact as to whether the alleged design defects caused Mr. Boateng's injury. Mr. Boateng testified at his deposition that he did not close the Subject Vehicle door on himself, and that when he positioned the door away from oncoming traffic, "at some point . . . the SCAD took over" and "automatically" closed the door, severing his right thumb. (ECF No. 123-6, Exh. F, Boateng Dep. Tr. at 96, 153.) Mr. Boateng also told Defendants, "It's an accident, so my finger got in there and it just automatically closed over it." (*Id*. at 96.)

Without citation to facts, BMW nonetheless argues that Mr. Boateng caused the amputation of his own thumb. Defendants contend that Plaintiff moved backward with such a degree of force that it "cause[d] the amputation *just from the force of his body*."

(ECF No. 121, BMW Mot. for Summ. J. at 21.)   Defendants assert
that   according   to   Dr.   Greenston's   multiple   surrogate
demonstrations, with or without SCAD, the door closed all the way
because Mr. Boateng pushed it with sufficient force.   (*Id*; ECF No.
125-18, Greenston Report at 7.)

        Dr.  Greenston's  expert  report  and  deposition,  taken
together, however, acknowledges the existence of a genuine dispute
of fact as to what caused Mr. Boateng's injury, but he concludes
that  Plaintiff  caused  his  own  injury.    Indeed,  Dr.  Greenston's
expert  opinion  and  deposition  considered  both  parties'  alleged
scenarios—that (1) according to Mr. Boateng, when the vehicle door
was  moved  within  a  specific  distance  to  the  secondary  latch,  the
"SCAD  []  senses  where  the  door  is  and  acts  based  on  that"  or  (2)
according  to  Defendants,  "[w]ithout  the  SCAD  closure  mechanism
engaged,  [a  man  Mr.  Boateng's  size]  could  easily  generate  enough
force  to  amputate  a  fingertip  in  the  door  gap."   (ECF Nos. 125-
16, Exh. 16, Greenston Dep. Tr. at 218; 125-18, Greenston Report
at 7.)

        Furthermore, Defendants' second expert, Mr. Parker, also
acknowledges in his report and deposition that a genuine dispute
of fact exists as to what caused Mr. Boateng's injury.   Parker
reports "that the door need only be pushed lightly to close the
door  with  the  SCAD  feature"  and  that  "[a]t  nominal  room
temperatures  and  with  clean  and  dry  door  seals/weatherstrips,

approximately 47 pounds of force, applied at the door handle
location, is required to fully close the door from the secondary
latch position."  (ECF No. 123-11, Exh. K, Parker Report at 4,
10.)  Parker also said that slamming the car door with more than
50 pounds of impulse would "override the SCAD system entirely" and
manually close the door.  (ECF No. 125-14, Exh. 14, Parker Dep.
Tr. at 77-78.)  Defendants appear to contend that Mr. Boateng
pushed the door of the Subject Vehicle hard enough to "override"
the SCAD entirely, causing the amputation of his thumb without any
activation of the SCAD.

In light of the numerous causation possibilities
proffered by both of Plaintiff's and Defendants' experts, and other
reported SCAD-related accidents, a reasonable jury could easily
conclude that Mr. Boateng's injury was not self-inflicted by
Plaintiff's use of force when closing the door.  The factual
question of whether and how Mr. Boateng may have moved the door of
the Subject Vehicle from the outer latch to the secondary latch,
thereby activating the SCAD, remains.  The Court finds that these
factual questions are best reserved for a jury.  Accordingly, the
Court finds that there are genuine issues of material fact
precluding the grant of summary judgment for Defendants on the
design defect claim.

**III. Failure to Warn (Count I — Strict Product Liability and Count**
**IV — Negligence)**

The Court next addresses Defendants' motion for summary judgment on Plaintiff's failure to warn claim, which alleges that BMW failed to provide adequate warnings of the dangers posed by the BMW SCAD.  "A defendant may be liable under a negligence or strict products liability theory by failing to adequately warn of a potentially harmful aspect of the product.  There is no difference between the prima facie elements of a failure to warn claim sounding in negligence and one sounding in strict products liability." *Mustafa v. Halkin Tool, Ltd.*, No. 00-CV-4851 (DGT), 2007 WL 959704 (E.D.N.Y. Mar. 29, 2007); *see Enright v. Eli Lilly & Co.*, 570 N.E.2d 198, 203 (N.Y. 1991) (noting that a failure to warn claim "couched in terms of strict liability, is indistinguishable from a negligence claim.") (citation omitted).

On either theory, to bring a failure to warn claim, Plaintiff must show "(1) that a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of harm*." Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 84 (S.D.N.Y. 2001); *see also Burke v. Spartanics, Ltd.*, 252 F.3d 131, 137-40 (2d Cir. 2001) (same).  A manufacturer can be liable even after the product is sold based on "dangers in the use of a product which come to his attention after manufacture or sale, through advancements in the state of the art with which he is expected to stay abreast, or through being made

aware of later accidents involving dangers in the product of which
warning should be given to users." *Cacciola*, 127 F. Supp. 2d 175,
186.  "A manufacturer's superior position to garner information
and its corresponding duty to warn is no less with respect to the
ability to learn of modifications made to or misuse of a product."
*Liriano v. Hobart Corp.* ("*Liriano I*"), 700 N.E.2d 303, 309 (N.Y.
1998).

     The New York Court of Appeals has described the standard
for evaluating failure to warn claims as "intensely fact-specific,
including but not limited to such issues as feasibility and
difficulty of issuing warnings in the circumstances; obviousness
of the risk from actual use of the product; knowledge of the
particular product user; and proximate cause." *Liriano I*, 700
N.E.2d 303, 309 (internal citation omitted).  Given this fact-
intensive inquiry, the Second Circuit has emphasized, "[t]he
adequacy of the instruction or warning is generally a question of
fact to be determined at trial and is not ordinarily susceptible
to the drastic remedy of summary judgment." *Urena v. Biro Mfg.
Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (citations omitted); *see
Liriano v. Hobart Corp.* ("*Liriano II*"), 132 F.3d 124, 131 (2d Cir.
1998) (stating that courts have "squarely h[e]ld that it is up to
the jury to decide whether the manufacturer, in fact, has a duty
to warn.") (citations omitted); *Johnson v. Johnson Chem. Co., Inc.*,
588 N.Y.S.2d 607, 610 (App. Div. 2d Dep't 1992) ("Whether a

particular way of misusing a product is reasonably foreseeable, and whether the warnings which accompany a product are adequate to deter such potential misuse, are ordinarily questions for the jury.") (citations omitted); *Cooley v. Carter-Wallace Inc.*, 478 N.Y.S.2d 375, 376 (App. Div. 4th Dep't 1984) ("The adequacy of the warning in a products liability case based on a failure to warn is, in all but the most unusual circumstances, a question of fact to be determined at trial.").

Defendants argue that they are entitled to summary judgment because Mr. Boateng did not and would not have read BMW's warnings, which Defendants assert are sufficient in warning about the dangers of the SCAD.  (ECF No. 121, BMW Mot. for Summ. J. at 21-23.)  Defendants also contend that the lack of warning was not the cause of Mr. Boateng's accident.  (*Id.*)

### A. Knowledge of the User Exception

The Court first respectfully rejects Defendants' invocation of the knowledge of the user exception.  A court may grant summary judgment to a defendant on a failure to warn claim as a matter of law where the plaintiff cannot prove that the absence of warning proximately caused his injury.  S*ee Burke v. Spartanics, Ltd.*, 252 F.3d 131, 138 (2d Cir. 2001).  A defendant can show the lack of proximate cause by demonstrating the futility of warnings, through evidence that plaintiff was fully aware of the hazard through general knowledge, observation, or common

sense.  *See Liriano I*, 700 N.E.2d at 308 (no causation where "the injured party was fully aware of the hazard through general knowledge, observation or common sense"); *see also Gonzalez v. Morflo Indus., Inc.*, 931 F. Supp. 159, 168 (E.D.N.Y. 1996) ("[W]here a warning would not have increased the particular injured user's awareness of the danger, failing to warn cannot be said to have been the proximate cause of the accident.").

To fall under the knowledge of the user exception for a failure to warn claim, Plaintiff "must have known about the specific hazard that caused the injury and must have appreciated the severity of the danger.  Although in appropriate cases a court may as a matter of law decide that a manufacturer's warning would have been superfluous given an injured party's actual knowledge of the specific hazard that caused the injury, where reasonable minds might disagree as to the extent of [the] plaintiff's knowledge of the hazard, the question is one for the jury." *Leibstein v. LaFarge N. Am. Inc.*, 689 F. Supp. 2d 373, 388–89 (E.D.N.Y. Feb. 12, 2010) (internal quotation marks and citations omitted).

Mr. Boateng specifically testified that "with *no warning*, the door automatically closed" demonstrating that he was not aware of any immediate danger related to the vehicle door. Plaintiff testified knowing not to put a finger or body part in between a door and a door frame when a door is closing.  (ECF 123-6, Exh. F, Boateng Dep. Tr. at 93-94).  But he also testified that,

prior to the accident, he did not "believe that the door could self-close from a distance of approximately one foot." (*Id*. at 87.)   A jury could find that relevant danger about which Mr. Boateng should have been warned was the specific, heightened danger, if any, posed by the Defendants' soft-close automatic door.

Defendants argue that Plaintiff was fully aware of the danger posed by placing his hand in the door of a vehicle. (ECF No. 121, BMW Mot. for Summ. J. at 30.) ("Plaintiff understood since childhood, not to put a finger or body part in between a door and its door frame while it is closing.")   But the Court finds that reasonable minds could differ as to the extent of Plaintiff's knowledge of the danger posed by the SCAD, which, unbeknownst to Plaintiff, included the risk of activation when the door is within a certain distance from closure.   Furthermore, though the Defendants argue that Plaintiff should have been aware of the danger of having his hand in the door "while [the door was] closing" (*id*.) Defendants ignore Plaintiff's testimony that the door suddenly, automatically, and forcefully closed on his thumb without any force exerted by Plaintiff.   Accordingly, the Court concludes that there are genuine issues of material fact concerning Defendants' warning was adequate, and the extent of Plaintiff's knowledge of the danger presented by the SCAD.   Consequently, the Court declines to grant summary judgment on Plaintiff's failure to

warn claim based on Plaintiff's purported knowledge of the risk posed by SCAD.

### B. Open and Obvious Risk

The Court also respectfully rejects Defendants' argument that they had no duty to warn because the hazard was patently dangerous or posed an open and obvious risk. *See Liriano I*, 700 N.E.2d at 308 ("Where a danger is readily apparent as a matter of common sense, there should be no liability for failing to warn someone of a risk or hazard which he [or she] appreciated to the same extent as a warning would have provided.  Put differently, when a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning.") (internal quotation marks and citation omitted) (alteration in original).  In contrast, "the open and obvious defense generally should not apply when there are aspects of the hazard which are concealed or not reasonably apparent to the user." *Id*.

The open and obvious inquiry goes to the manufacturer's duty and depends on, not what the plaintiff understands about the risk, but whether reasonably foreseeable users of the product would perceive it to be open and obvious. *Burke*, 252 F.3d at 137—38. Further, "[t]he class of reasonably foreseeable users will, of course, encompass a spectrum of persons with widely varying abilities and experience bearing on their perception of the hazards

at hand." *Id.* at 138.   Plaintiff's own knowledge, though a relevant reference point, does not determine the outcome of the open and obvious inquiry, which is an objective one; thus, whether a reasonable user of a vehicle door with an automatic soft-close feature would foresee or consider the potential risk of its use to be open and obvious is a fact-intensive inquiry that is more appropriate for the jury.

Defendants' argument that the SCAD posed an open and obvious risk appears to be in insurmountable tension with their arguments that the SCAD is safe.   Defendants focus on how Mr. Boateng "knew not to put his finger between a door and its frame when the door is closing" but do not address the specific danger of an automatic soft-close function, which closes in a manner, and with force and speed that may not be obvious to the reasonable user.   (ECF No. 121, BMW Mot. for. Summ. J. at 23.)   Defendants state, "given the freakish circumstances of Plaintiff's accident (i.e., the result of avoiding an oncoming truck with his back to the door)," no warning label, within the car or outside on the car door, would have prevented the accident.   (*Id.* at 23.)   But this conclusory description (equating the "freakish circumstances" of avoiding traffic to the *result* of the avoiding traffic) ignores that a jury could find that the unexpected and forceful automatic door closing may not have been open and obvious to Mr. Boateng or any reasonable user.   The nonobvious nature of the potential danger

presented by the SCAD feature is also demonstrated by the fact that Plaintiff, who has two degrees in mechanical engineering, did not expect the door to shut so automatically and forcefully during his accident in 2016. Plaintiff's testimony is at least sufficient for a jury to decide the disputed material fact of whether the hazard presented by the SCAD was open and obvious.

Finally, the Court declines to grant summary judgment on Plaintiff's failure to warn claim in favor of Defendants based on their contentions that the lack of adequate warnings was not the proximate cause of Plaintiff's injury because Mr. Boateng did not read the manual or see the warning, even if one were placed on the door. (ECF No. 121, BMW Mot. for Summ. J. at 22-23.) There is no evidence supporting Defendants' conclusory argument that an adequate warning on the door would not have caused (or prevented) Plaintiff's injury. Courts have found that "a plaintiff . . . may be able to prevail under New York law with respect to his failure to warn claim, even though it is undisputed that he failed to read the warnings, if he can demonstrate that adequate warnings would have come to the attention of a third party . . .and they would have informed him of those warnings." *Humphrey*, 556 F. Supp. 2d at 181; *see, e.g.*, *Sorto-Romero v. Delta Intern. Mach. Corp.*, No. 05-cv-5172(SJF), 2007 WL 2816191, at *12 (E.D.N.Y. Sept. 24, 2007) ("[I]n light of Plaintiff's inability to read the warnings, Plaintiff may be able to prove causation whereby a third party may

have conveyed the warning to him.") (citing New York cases); *Mustafa*, 2007 WL 959704, at *19 ("[Plaintiff] could prove the requisite ca[usa]l link in light of his inability to read the warning . . . under a theory of causation whereby [a] third party may have conveyed the warning to him.").

Defendants do not seriously dispute that BMW could have placed a warning regarding the SCAD right on the door. That warning would be in plain sight. Not only would Plaintiff have been more likely to notice a warning on the door, other consumers of the 2013 BMW X5 or passengers of Mr. Boateng's Subject Vehicle could have also read the warning and realized that an extra degree of caution was required when shutting the vehicle door. Those other viewers of the warning label could have imparted the extra degree of caution to Mr. Boateng at some point before his accident.

Further, though Defendants' expert, Dr. Dorris, testifies "more is not always better," a reasonable jury could find that measures, beyond the Defendants' one warning buried in the pages of the manual about the SCAD's dangers of "pinching," were feasible and could have prevented the injury. *See Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 570 (S.D.N.Y. 2005) (finding that manuals containing warnings on half their pages could lead a jury to conclude the warnings were inconspicuous) (citation omitted); *see also Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 451 (S.D.N.Y. 1999) ("Whether those warnings should have

specified, for example, the specific danger of paralysis from neck injury, rather than only the danger of 'serious injuries,' is a question upon which reasonable people could disagree.")  Even if a warning label meets the appropriate standard, its adequacy may not be dispositive as a matter of law.  *See Anderson*, 76 F. Supp. 2d 422, 450; *Sawyer v. Dreis & Krump Manufacturing Co.*, 493 N.E.2d 920 (N.Y. 1986) (holding that meeting industry standards is not conclusive of a negligence claim.)

Defendants argue that Plaintiff would have missed any warning on the Subject Vehicle because he was outside of the car and would not have seen a warning inside the car door *during* his accident.  (ECF No. 121, BMW Mot. for Summ. J. at 23.)  But that is not the relevant question.  A reasonable jury could find that Mr. Boateng, or others who he would have communicated with, would have read a warning on the door or elsewhere on the vehicle at some time *before* the accident, and this could have altered his behavior, in response to the otherwise unforeseeable danger posed by the SCAD.  A reasonable jury could also find that were the warning language to reflect the possibility of amputation along with or instead of "pinching", Mr. Boateng or others around him could have altered their interactions with the Subject Vehicle door's soft-close automatic function.

Because it is possible that if the jury finds that warnings regarding the point at which the SCAD activates could

51

have come to the attention of Plaintiff or others around him, and, in turn, the warnings would have likely been conveyed to Plaintiff, a jury could reasonably find the requisite causal link for Plaintiff to prevail on his failure to warn claim.   Thus, this Court concludes that the question of whether Defendants' warning was adequate or not should be left to the jury.   For the reasons stated above, Defendants' motion for summary judgment on Plaintiff's failure to warn claim is denied.

## IV.  Manufacturing Defect (Count II – Strict Products Liability and Count IV – Negligence)

The Court next address Defendants' motion for summary judgment on Plaintiff's manufacturing defect claim.   To state a claim for manufacturing defect under either theories of negligence or strict liability, Mr. Boateng must (1) demonstrate that BMW's "specific product unit was defective as a result of some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction, and [(2)] that the defect was the cause of plaintiff's injury." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 85 (S.D.N.Y. 2001) (quoting *Caprara v. Chrysler Corp.*, 417 N.E.2d 545 (N.Y. 1981)).

A plaintiff must show the product purchased departed from the manufacturer's intended specifications for other units in the same line of product. *Id.* at 85. ("[A] manufacturing flaw exists when the unit in question deviates in quality and other

performance standards from all of the other identical units."); *Oden v. Boston Scientific Corporation*, 330 F. Supp. 3d 877 (E.D.N.Y. 2018) (a plaintiff must show specifically what part of the manufacturing process or what component of the final product was defective.)  In the absence of direct evidence of a defect, a plaintiff may demonstrate the existence of a defect using circumstantial evidence from the injury to infer that the product did not perform as it was designed to. *Lynch v. Trek Bicycle Corp.*, No. 01-cv-3651(DAB)(JCF), 2011 WL 1327032, at *4 (S.D.N.Y. Mar. 30, 2011) (denying summary judgment for the defendant because circumstantial evidence that a bicycle component snapped during normal use could support the inference that the component was manufactured defectively.)

Mr. Boateng offers several theories for his manufacturing defect claim.  Dr. Pugh reported that "after repeated" tests of the Subject Vehicle's door, the SCAD "failed to operate," but did not identify any defect in the manufacturing itself.  (ECF No. 123-8, Exh. H, Pugh Report at 6.)  Along with not identifying the manufacturing defect, Dr. Pugh's report does not identify how a manufacturing defect caused Plaintiff's injury or provide an explanation of any defect in the manufacturing process.  In any case, the Court notes that Dr. Pugh's expert report provides a list of areas he expects to "opine and testify" on, but he does not mention that he is prepared to testify on any

manufacturing defect.   (*Id.* at 4.)   Nor does Dr. Pugh's report expressly address or opine on manufacturing defects.   Considering that Dr. Pugh's testimony cannot be offered to support Plaintiff's manufacturing defect claim, the Court finds that Plaintiff in effect has no evidence from which a jury could find a manufacturing defect.

Nonetheless, Plaintiff also argues there may be a manufacturing defect because (1) Defendants cannot agree with one another at what precise millimeter during closure the SCAD is designed to activate, and (2) Defendants refused to provide materials on their inspection of the Subject Vehicle.   (ECF No. 127, Pl. Mot. in Opp'n. at 21-22.)   Neither argument creates a genuine dispute of material fact as to Plaintiff's manufacturing defect claim.   First, the precise activation distance of SCAD—though perhaps significant for a design defect claim—is neither in genuine dispute nor material to the issue of a manufacturing defect.   The "various" measurements (*id.*) were derived using different measuring techniques.   Defendants' expert, Dr. Greenston, who concluded that the SCAD mechanism engages at approximately 8 millimeters, explained that his measurement differed from the 6-millimeter gap measured by other experts because they were taken "diagonally" while the other measurements were taken "perpendicularly."   (ECF No. 126, Def. Reply 56.1 ¶ 159.)   Given the breadth of evidence proffered from both parties

stating that that SCAD's standard activation gap is 6 millimeters plus a 1-millimeter tolerance, (ECF Nos. ECF 127-7, Exh.7, Brueclmeier Dep. Tr. at 87-88; 123-11, Exh. K, Parker Report ¶¶ 24-29; 125-16, Exh. 16, Greenston Dep. Tr. at 173:6-174:3; 123-8, Exh. H, Pugh Report at 3), there is no genuine, material disagreement about the millimeter distances.

Plaintiff, moreover, offers no reason why a 1-millimeter difference regarding when the SCAD actually engages might be material and relevant to a manufacturing defect claim. Plaintiff does not proffer a theory about the intended manufacture of the SCAD mechanism and how the differences in the measurement of the Subject Vehicle's gap relates to his manufacturing defect claim. *Bertini v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 246, 257 (E.D.N.Y. 2014) ("A manufacturing defect claim should be dismissed if plaintiff has not alleged that the particular [product] administered to her had a defect compared to other samples of that [product].").  Even if the size of the SCAD activation gap were disputed, Plaintiff still does not explain how this is material to his manufacturing defect claim or most importantly, how any particular manufacturing defect allegedly caused his injury.  It is not enough that a product be defective, the defect must also cause of the injury in question.  Here, Plaintiff does not provide a causal connection between the unidentified manufacturing defect and the resultant injury.  Plaintiff offers no evidence of a

manufacturing defect from which a jury could draw an inference connecting the manufacturing defect and the injury in question. Plaintiff has failed to meet his burden of proffering evidence that any manufacturing defect was a "substantial factor" in causing his injuries. *See Derienzo*, 376 F. Supp. 2d at 560.

The circumstances of the injury alone do not support the inference that Plaintiff's SCAD was defectively manufactured because the parties agree that a fully functional SCAD can amputate a finger. (*See* ECF No. 124, Pl. Resp. 56.1 ¶¶ 139, 223.) This case is unlike *Lynch*, cited by Plaintiff, where the failure of a bicycle component during normal use was circumstantial evidence that the part was defectively manufactured. 2011 WL 1327032, *4. In *Lynch*, the injury itself was evidence of a defect because non-defective bicycle components do not "snap" during normal use. Nothing about the circumstance of Plaintiff's injury–a door closing unexpectedly and forcefully upon the activation of his vehicle's SCAD–supports the inference that the manufacture of the Subject Vehicle's SCAD departed from the manufacturer's intended specifications and design.

Second, Plaintiff asserts that "Boateng complied with BMW's request to inspect his vehicle, but BMW chose not to include its report or findings in their moving papers," and suggests that Defendants are hiding pertinent information from this Court. (ECF No. 127, Pl. Mem. in Opp'n. at 21.) This Court declines to

entertain mere speculation as to why Defendants did not include a copy of Defendants' inspection of the Subject Vehicle in its moving papers as it is unclear what inference Plaintiff suggests the Court should draw from this omission. *Knight*, 804 F.2d 9, 12. The undisputed fact remains that Plaintiff's expert, Dr. Pugh, assessed the Subject Vehicle's SCAD activation gap at 6 millimeters—the same measurement that Defendants admit was intended by the design. (ECF No. 123-8, Exh. H, Pugh Report at 2, 3.) As such, Plaintiff's speculation does not support the inference that Subject Vehicle's SCAD was defectively manufactured to make it more dangerous than other units.

Although the Court construes the facts presented in the light most favorable to Plaintiff, for the purposes of opposing summary judgment, "the nonmoving party must produce more than a scintilla of admissible evidence that supports the pleadings." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 210 (E.D.N.Y. 2005); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Here, Plaintiff points to the accident itself and inconsistencies in the measurements between Defendants' experts without articulating a specific theory for how the Subject Vehicle's SCAD departed from the intended design or why a *manufacturing* defect, rather than a design defect, caused the instant injury. Absent additional evidence, such

speculation is insufficient to establish a genuine triable issue of fact as to whether the SCAD was defectively manufactured. *Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 322–23. Based on the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's manufacturing defect claim is granted.

**V.    Breach of Warranty (Count VII – Breach of Implied Warranty, Count VIII – Express Warranty, Count IX – MMWA, and Count X – Breach of Implied Warranty of Merchantability)**

The Court further addresses Plaintiff's several breach of warranty claims: 1) breach of implied warranty of merchantability (Count VII and Count X); 2) breach of express warranty (Count VIII); and 3) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 (the "MMWA")(Count IX).  Plaintiff brings two different causes of action for breach of implied warranty (Count VII) and breach of implied warranty of merchantability (Count X).  (ECF No. 68, Amended Compl., 36, 41-42.)  The Court will analyze and determine both Count VII and Count X as one claim for breach of implied warranty of merchantability pursuant to the New York Uniform Commercial Code (N.Y. U.C.C.).  The N.Y. U.C.C. Law § 2-314 and § 2-315 specifies two types of implied breach of warranties, one for "merchantability" and another for "fitness for a particular purpose," but does not provide a separate, general implied warranty claim.  Courts in the Second Circuit and this District do not consider breach of implied warranty and breach of implied warranty for merchantability claims

as two separate claims, and this Court will adhere to the guidance of those courts. *See Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 247 (2d Cir. 1986)(defining implied warranty as "an implied warranty arising under State law [] in connection with the sale by a supplier of a consumer product" pursuant to 15 U.S.C. § 2301(7)); *Jackson v. Eddy's LI RV Ctr., Inc.*, 845 F. Supp. 2d 523, 530 (E.D.N.Y. 2012)("Implied warranties include the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. In New York, any implied warranty of merchantability is governed by Section 2-314 of the New York Uniform Commercial Code [].") ; *Kolle v. Mainship Corp.*, No. 04-cv-711, 2006 WL 1085067, at *3 (E.D.N.Y. Apr. 20, 2006)("New York's UCC provides for two forms of implied warranties-an implied warranty of merchantability under UCC § 2-314 and an implied warranty of fitness for a particular purpose under UCC § 2-315.") The Court notes that the cases that Plaintiff cites in their opposition to the motion for summary judgment on a generalized implied breach of warranty claim all refer back to the N.Y. U.C.C. "ordinary purpose" standard. *Cavanagh v. Ford Motor Co.*, 13-cv-4584, 2014 WL 2048571, at *5 (E.D.N.Y. May 19, 2014)(stating that "implied warranty is breached where the product in question is not fit for the ordinary purpose for which it is to be used.") (quoting *Plemmons v. Steelcase Inc.*, 04-cv-4023, 2007 WL 950137, at *3 (S.D.N.Y. Mar. 29, 2007) (in turn quoting Denny, 662 N.E.2d at

736) (in turn quoting the N.Y. U.C.C. § 2-314.)); *Tears v. Bos.
Sci. Corp.*, 344 F. Supp. 3d 500, 513 (S.D.N.Y. 2018)(analyzing a
separate breach of implied warranty of merchantability and breach
of implied warranty of fitness claim, but no general breach of
implied warranty); *Saratoga Spa & Bath, Inc. v. Beeche Sys. Corp.*,
656 N.Y.S.2d 787, 789 (1997)(same).

        BMW argues that it is entitled to summary judgment on
Plaintiff's breach of express and implied warranty claims, because
the Subject Vehicle and its soft close doors do not violate any
express affirmations and they are clearly "fit for the ordinary
purposes for which such goods are used." *Denny*, 87 N.Y.2d 248, 258
(1995) (quoting N.Y. U.C.C. § 2-314(2)(c)).  Defendants also seek
summary judgment on Plaintiff's MMWA claim because such a claim
cannot be brought "unless the [defendant] obligated under the
warranty or service contract is afforded a reasonable opportunity
to cure."  15 U.S.C. § 2310(e).

        **A. Implied Warranty Claims**

        The Court denies summary judgment on Plaintiff's implied
warranty claims.  As discussed above, in New York, implied warranty
of merchantability is governed by Section 2-314 of the New York
Uniform Commercial Code.  That section provides, in pertinent part,
that "a warranty that the goods shall be merchantable is implied
in a contract for their sale if the seller is a merchant with

60

respect to goods of that kind." N.Y.U.C.C. § 2-314(1). Defendants are merchants of BMW vehicles with the SCAD door closing mechanism.

Further, "[i]n a breach of implied warranty action, the inquiry is not whether there were safer designs available." *Groome v. Matsushita Elec. Corp. of Am.*, No. 92-cv-3073, 2000 WL 341134, at *6 (E.D.N.Y. Mar. 30, 2000); *see Bah v. Nordson Corp.*, No. 00-cv-9060, 2005 WL 1813023, at *13 (S.D.N.Y. Aug. 1, 2005) ("[W]hether or not there were feasible safer alternative designs . . . is irrelevant to the merits of Plaintiff's breach of implied warranty claim."); *Gonzalez by Gonzalez v. Morflo Indus., Inc.*, 931 F. Supp. 159, 165 (E.D.N.Y.1996) ("Plaintiff's recovery in a breach of warranty action depends on a showing that the product was not minimally safe for its expected purpose, regardless of the feasibility of making the product safer.").

To prevail on a claim for breach of implied warranty of merchantability, a plaintiff must show that the product at issue is not "fit for the ordinary purposes for which such goods are used" and it caused injury as a result. *Brazier v. Hasbro, Inc.*, No. 99-cv-11258, 2004 WL 515536, *4 (S.D.N.Y. 2004) (citing *Denny*, 662 N.E.2d at 732). In determining whether the product was unmerchantable, the focus is on "the expectations for the performance of the product when used in the customary, usual, and reasonably foreseeable manners." *Denny*, 662 N.E.2d at 736. "A warranty of fitness for ordinary purposes does not mean that the

product will fulfill a buyer's every expectation," but rather ensures that the product is minimally safe for its expected purpose. *Id.* at 736 n.4.

Defendants argue only that the SCAD is fit for its ordinary purposes, but the Court finds that there are genuine disputes of material facts as to the "ordinary purpose" of the soft-close automatic door. As Plaintiff argues, a reasonable jury could find that the "SCAD is not fit for the ordinary purpose for which it is to be used because the purpose of a car door is to ensure a driver's security and safety while operating a vehicle," and not to "put a passenger in danger of having a finger dismembered on the off-chance that a door closes within the parameters of SCAD's motion activation." (ECF No. 127, Pl. Mot. in Opp'n. at 25.) A reasonable jury could at least infer from the record that the SCAD runs afoul of reasonable expectations of safety. Indeed, from Plaintiff's evidence, it appears that there are dozens of accidents related to the SCAD. BMW AG acknowledged there have been 44 reported BMW SCAD-related injuries. (ECF No. 127-7, Exh. 7, Brueckmeier Dep. Tr. at 146.) BMW NA was aware of at least 21 BMW SCAD-related injuries. (ECF No. 125- 5, Exh. 5, Baur Dep. Tr. at 296-298.) BMW MC contends that to its knowledge, the only person injured as a result of SCAD it knew about was Mr. Boateng. (ECF No. 125-4, Exh. 4, Neil Guthrie Deposition Transcript ("Guthrie Dep. Tr.") at 39.)

Defendants argue that "the Vehicle clearly provides for a minimal level of quality and is suited for its ordinary purpose," and cites Plaintiff's continued use of the car itself as proof. (ECF No. 121, BMW Mot. for Summ. J. at 25.)  But a reasonable jury could readily find that the potential of the SCAD to amputate a finger, and the dozens of reported accidents involving the SCAD, are inconsistent with what ordinary consumers would expect of their car door.  *See Denny*, 87 662 N.E.2d 730, 738 (1995)(concluding that "a rational fact finder could have simultaneously concluded that the [vehicle's] utility as an off-road vehicle outweighed the risk of injury resulting from rollover accidents and that the vehicle was not safe for the 'ordinary purpose' of daily driving for which it was marketed and sold.")  The parties dispute the SCAD's "minimal level of quality" and whether the "ordinary purpose" of the SCAD should include the chance of causing someone personal injury.  Based the foregoing evidence, a reasonable jury could conclude that the SCAD was not fit for the purpose for which it was intended, and thus the Defendants' motion for summary judgment with respect to Plaintiff's breach of implied warranty claim is denied.

## B. Express Warranty

The Court concludes that Plaintiff presents no evidence and thus cannot prove that Defendants breached an express warranty. In New York, "a cause of action on an express warranty asks only

that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product." *Bates v. Dow Agrosciences, L.L.C.*, 544, U.S. 431, 444 (2005). A "seller can create an express warranty by affirmation, promise, description or sample." *Kraft v. Staten Island Boat Sales, Inc.*, 715 F. Supp. 2d 464, 472 (S.D.N.Y. 2010); *Mill Printing & Lithography Corp. v. Solid Waste Management Systems, Inc.*, 65 A.D. 590, 590-91 (App. Div. 2d Dept. 1978) ("An express warranty is interpreted like a contract, and a Plaintiff can provide evidence of the warranty through various means.") Critically, to prevail on an express warranty claim, a Plaintiff must demonstrate that the "affirmation of fact or promise by the seller" was to "induce the buyer to purchase and that the warranty was relied upon[.]" *Schimmenti v. Ply Gem Indus.*, 156 A.D.2d 658, 659 (App. Div. 2d Dept., 1989) (quotation omitted)); *see also Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y.1999).

Mr. Boateng does not provide any evidence of the existence of an express warranty agreement or that any warranty by Defendants induced him to purchase the Subject Vehicle. Plaintiff states in his opposition to Defendants' motion for summary judgment that the warning label about the SCAD's potential dangers was hidden in the 500-page owner's manual. (ECF No. 127, Pl. Mot. in Opp'n. at 25). First, the Court finds that the warning was not an express warranty. A warning in fact does not act as a promise of

safety—it is just the opposite, because it warns that a product could be unsafe in certain circumstances. Plaintiff also both claims that he did not know of the dangers in the SCAD design, but he still "relied on BMW's special knowledge that the product it was advertising, marketing and placing in the stream of commerce was safe and would not result in an amputated thumb or body limb." (*Id.* at 28.) First, even if Plaintiff had knowledge of the warnings regarding the SCAD in the owner's manual, his knowledge is not an "affirmation of fact or promise by the seller." *Schimmenti*, 156 A.D.2d at 659. Second, Mr. Boateng did not know about the warning, so even if it were more express in its promise of safety, he could not have relied on it.

As such, a jury could not find for Plaintiff on his claim for breach of express warranty based on the lack of disclosure of the full dangers and injuries related to the SCAD by Defendants, because a breach of express warranty claim in New York requires a showing that Defendants provided an affirmation of fact or promise. *Donald v. Shinn Fu Co. of America*, 2002 WL 32068351, *5 (E.D.N.Y. Sept. 4, 2002) (granting summary judgment for the defendant on a breach of express warranty claim where "a review of the record reveals no express warranties at all.") In his only mention of express warranties, Plaintiff simply restates the elements, asserts that Mr. Boateng "relied on BMW's special knowledge," and that "Mr. Boateng made clear he had no knowledge of SCAD when he

purchased his vehicle." (ECF No. 127, Pl. Mot. in Opp'n. at 28.) Plaintiff appears to have abandoned his express warranty claim because he has not proffered evidence in support of the express warranty claim in opposing Defendants' motion for summary judgment. *See LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995)(appellants can be deemed to have abandoned issues they fail to raise before the district court); *see also Bozeman v. United States*, 780 F.2d 198, 199 n. 4 (2d Cir.1985) ("[Plaintiff] did not raise or brief that issue in this appeal and we therefore treat that claim as abandoned."). Given the lack of evidence from which a jury could find an express warranty and that Defendants breached it, Defendants' motion for summary judgment on Plaintiff's express warranty claim is granted.

### C. Magnuson-Moss Warranty Act ("MMWA")

For reasons provided in this Court's analysis of the breach of implied warranty of merchantability analysis, the Court denies Defendants' motion for summary judgment on Plaintiff's claim under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 et seq. The MMWA provides, in relevant part, that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1). "To state a claim under the MMWA,

plaintiffs must adequately plead a cause of action for breach of written or implied warranty under state law." *See Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 226 (S.D.N.Y. 2015)*; see also Cali v. Chrysler Grp. LLC*, No. 10-CV-07606, 2011 WL 383952, at *4 (S.D.N.Y. Jan. 28, 2011) ("[C]laims under the Magnuson-Moss Act stand or fall with the express and implied warranty claims under state law." (quoting *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022-23 (9th Cir. 2008))), *aff'd*, 426 F. App'x 38 (2d Cir. 2011). Because this Court denies Defendants' motion for summary judgment on Plaintiff's breach of implied warranty claim, it also denies summary judgment on Plaintiff's MMWA claim, insofar as it seeks additional relief on the implied warranty claim; and grants summary judgment on Plaintiff's MMWA express warranty claim.

## VI.  Negligent  Misrepresentation  (Count  V)  &  Fraudulent Concealment (Count VI)

For the reasons below, the Court grants summary judgment on Plaintiffs' claims of negligent misrepresentation and fraudulent concealment concerning the safety of the SCAD. In New York, a claim for negligent misrepresentation requires the plaintiff to allege: (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.

*Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (citing *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).

Under the "duty to impart correct information" element, "New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of contract between the parties or a relationship so close as to approach that of privity.'" *Anschutz Corp.*, 690 F.3d at 114 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993)). "[L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer*, 675 N.E.2d 450 (N.Y. 1996). In the commercial context, for a negligent misrepresentation claim, a closer degree of trust between the parties than that of the ordinary buyer and seller is required to establish the "existence of . . . a special relationship . . . [capable of] giv[ing] rise to an exceptional duty regarding commercial speech and justifiable reliance on such speech." *Id.* at 264.

Similarly, "[a] cause of action for fraudulent concealment requires proof of the elements of fraud based on a misrepresentation . . . as well as 'an allegation that the

defendant had a duty to disclose material information and that it failed to do so.'" *Id*. (quoting *P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 376 (1st Dep't 2003)).   A duty to disclose in fraudulent concealment claims arises in one of three circumstances: where the parties are in a fiduciary relationship; under the "special facts doctrine," where "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge"; or where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure. *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984); *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).   As discussed below, because Plaintiff has not proffered evidence demonstrating a special relationship or fiduciary relationship with Defendants beyond the commercial transaction involving the purchase of the Subject Vehicle, the Court declines to address any of the other elements of Mr. Boateng's negligent misrepresentation or fraudulent concealment claims.

In general, a simple commercial relationship, such as that between a buyer and seller, does not constitute the kind of "special relationship" or "fiduciary relationship" necessary to support a negligent misrepresentation or fraudulent concealment claim. *See Dimon, Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 373

(S.D.N.Y. 1999); *see also K.M.L. Lab'ys Ltd. v. Hopper*, 830 F. Supp. 159, 168 (E.D.N.Y. 1993)(finding an "arms-length commercial transaction" did not constitute a fiduciary relationship.)  A commercial relationship may become a special relationship, however, where "the parties . . . enjoy a relationship of trust and reliance 'closer . . . than that of the ordinary buyer and seller.'" *Polycast Tech. Corp. v. Uniroyal, Inc.*, No. 87 Civ. 3297, 1988 WL 96586, at *10 (S.D.N.Y. Aug. 31, 1988) (citations omitted). Courts have found a special relationship and duty, for example, where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information. *See Kimmell*, 89 N.Y.2d at 264-65; *New York Islanders Hockey Club, LLP v. Comerica Bank-Tex*as, 71 F. Supp. 2d 108, 119 (E.D.N.Y. 1999).

Plaintiffs have not presented sufficient evidence to establish any of the foregoing circumstances of inducement with the intent to cause Plaintiff's reliance, and the special or fiduciary relationship necessary to sustain actions for negligent misrepresentation and fraudulent concealment.  Defendants assert that the parties were involved in nothing more than a commercial transaction, that BMW MC and BMW NA do not have retail licenses to sell or distribute vehicles directly to consumers, and the dealership sold the Subject Vehicle to Plaintiff who was not a

"known party" to any of the Defendants.  (ECF Nos. 121, BMW Mot. for Summ. J. at 26; 125-4, Exh. 4, Guthrie Dep. Tr. at 386, 390.) Given that the dealership where Mr. Boateng purchased the Subject Vehicle is not a named defendant, the Defendants (respectively in the roles of distributor (BMW NA), manufacturer (BMW MC), designer/headquarters (BMW AG), and holding company (BMW HC)) and Mr. Boateng thus sit farther apart than ordinary seller and buyer. (ECF No. 124, Pl. Resp. 56.1 ¶¶ 2-5.)

Mr. Boateng counters that though he did not interact with the BMW entities in purchasing his Subject Vehicle, BMW has an "agency relationship with its subsidiaries and distribution centers" (ECF No. 124, Pl. Resp. 56.1 ¶¶ 46-52), and as such, Defendants created an agency relationship with those who sold Mr. Boateng his car.  (ECF No. 127, Pl. Mot. in Opp'n. at 29.)  But whatever the relationship between BMW and its varied entities and dealerships, the mere relationship between a corporation and a consumer or customer is insufficient.  *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508 SAS, 2013 WL 837536, at *4 (S.D.N.Y. Mar. 6, 2013) ("Absent testimony from [plaintiff] that there was direct contact, much less contact sufficient to establish a 'privity-like' relationship, indirect evidence of a single communication is simply too thin a reed on which to find a triable issue of fact as to whether [plaintiff] had the requisite special relationship with Morgan Stanley."); *see Silvercreek*

*Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 501 (S.D.N.Y. 2018) (requiring plaintiff to evince they were "a member of some very small group of persons for whose [defendants'] guidance [] was made" to establish a special relationship).

Plaintiff's proffered evidence is not sufficient to establish a special relationship between Plaintiffs and Defendants. Consequently, the Court grants summary judgment on Plaintiff's negligent misrepresentation and fraudulent concealment claims.

## VII. Deceptive Trade Practice (Count XI – New York's General Business Law § 349)

The Court denies summary judgment to Defendants on Plaintiff's claims under Section 349 of New York's General Business Law ("GBL").  GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).  Plaintiff must establish three elements in a GBL § 349 claim: that "a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam); *see Capitol Records, Inc. v. Wings Digital Corp.*, 218 F. Supp. 2d 280, 285–86 (S.D.N.Y. 2002); *Oden*, 330 F. Supp. 3d at 901 (citing *Daniel v. Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 186 (E.D.N.Y. 2018)).

"[A] claim for deceptive business practices under GBL § 349 . . . requires evidence of a causal connection between some injury to plaintiffs and some misrepresentation made by defendants." *Oden*, 330 F. Supp. 3d at 902 (quoting *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 15 (1st Dep't 1998), *aff'd*, 94 N.Y.2d 43 (1999)). The phrase "deceptive acts or practices" under the statute does not refer to the mere invention of a scheme or marketing strategy, but an actual misrepresentation or omission to a consumer. *Goshen v. Mut. Life Ins. Co. of New York*, 774 N.E.2d 1190, 1195 (N.Y. 2002); *see Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598 (N.Y. 1999). As detailed below, because an omission of material information qualifies as a "deceptive act[] or practice[]" with respect to GBL § 349, the Court applies an analysis similar to the failure to warn claim, as opposed to the analysis for the more stringent breach of express warranty standard, which requires an "affirmation of fact or promise by the seller," *Schimmenti*, 156 A.D.2d at 659.

GBL § 349 protects consumers, in other words, "those who purchase goods and services for personal, family or household use." *Sheth v. New York Life Ins. Co.*, 273 A.D.2d 72, 73 (1st Dep't 2000). To establish that a practice was "consumer-oriented" the plaintiff needs to establish "that the acts or practices have a broader impact on consumers at large." *Oswego Labors' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744

(N.Y. 1995).  "[I]n the case of omissions in particular . . . the statute surely does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation."  *Id.* at 745.  Instead, for claims that a business has omitted material facts, the plaintiff must demonstrate that "the business alone possesses material information that is relevant to the consumer and fails to provide this information."  *Id.*; *Kyszenia v. Ricoh USA, Inc.*, No. 20-cv-2215, 2022 WL 326981, at *4 (E.D.N.Y. Feb. 3, 2022)("[A] plaintiff claiming an omission constitutes actionable deception must show either that the business alone possessed the relevant information, or that a consumer could not reasonably obtain the information.")

Defendants assert that they are entitled to summary judgment because there are no transactions between Plaintiff and any of the Defendants and because there is no evidence that Defendants have deceived or misled Plaintiff.  (ECF No. 121, Def. Mot. for Summ. J., 28-29.)  For the reasons below, the Court disagrees as a matter of law that Defendants cannot be held accountable as a party under GBL § 349.  The Court also finds that a reasonable juror could find that Defendants' omissions about the dangers of SCAD could have misled Mr. Boateng and consumers to be injured.

### A. Consumer-Oriented Conduct

Even without a direct transaction between the parties, Plaintiff has established the requisite GBL § 349 element that Defendants' conduct and potentially "deceptive act" were "consumer-oriented." *Oden*, 330 F. Supp. 3d at 901. In fact, Courts find that "[s]ingle shot transactions" or "[p]rivate contract disputes, unique to the parties" are not governed by GBL § 349. *Oswego*, 647 N.E.2d at 744; *see also MaGee v. Paul Revere Life Ins. Co.*, 954 F. Supp. 582, 586 (1997) ("[T]he injury must be to the public generally as distinguished from the plaintiff alone."). The aim of GBL § 349 is to prohibit "[d]eceptive acts or practices in the conduct of *any business*, trade or commerce or in the furnishing of any service" in New York. GBL § 349(a). "The statute provides both for enforcement by the attorney general, *id*. § 349(b), and a private right of action to any person injured by the deceptive acts or practices committed by a business, *id*. § 349(h)." *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 51 (2d Cir. 1992).

Defendants are in the business of designing, manufacturing, distributing, and advertising BMW vehicles placed in the stream of commerce to be sold to consumers. BMW Defendants "alone", rather than any single dealership or retailer, have the "material information that is relevant to" Mr. Boateng and other consumers interested in the manufacturing and representation of BMW vehicles' safety to the public. *Oswego*, 647 N.E.2d 741, 745

(N.Y. 1995). *Weiss*, the case that Defendants cite in their motion for summary judgment found that the manufacturers had no contact with plaintiffs, noting that they were subcontractors who transacted for the product with the manufacturers first, "thereby reducing any potential that a customer in an inferior bargaining position would be deceived." *Weiss v. Polymer Plastics Corp.*, 802 N.Y.S.2d 174 (2005). In the instant case, however, dealerships and retailers helping BMW Defendants sell their cars cannot be said to protect the consumer from deception, as they pass on the same information about the vehicles, or lack of information, that only BMW Defendants are aware. Furthermore, courts in the Second Circuit have consistently considered lawsuits against manufacturers and distributors, and not just retailers who directly transact with consumers to be in alignment with GBL § 349's purpose of protecting consumers from material misrepresentations from corporations. *See Eidelman v. Sun Prod. Corp.*, No. 21-cv-1046, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022)(adjudicating a GBL § 349 claim against a laundry detergent manufacturer); *In re Amla Litig.,* 320 F. Supp. 3d 578, 592 (S.D.N.Y. 2018)(certifying a class action claiming violation of GBL § 349 by a hair relaxer kit manufacturer); *Haag v. Hyundai Motor Am.*, 969 F. Supp. 2d 313, 315 (W.D.N.Y. 2013)(adjudicating a GBL § 349 claim against Hyundai Motor America); *Koenig v. Boulder*

76

*Brands, Inc.*, 995 F. Supp. 2d 274, 287 (S.D.N.Y. 2014)(adjudicating an GBL § 349 claim against a consumer food products company).

### B. Materially Misleading

Plaintiff has also proffered evidence of conduct by Defendants "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020). BMW Defendants knew that there had been injuries apparently related to the SCAD and conducted their own inspections into these occurrences. Peter Baur, the Manager of Product Analysis for BMW NA, reported knowing about a dozen SCAD-related injuries from the Subject Vehicle's SCAD model. (ECF Nos. 126, Def. Reply 56.1 ¶ 61; 125-5, Exh. 5, Baur Dep. Tr. at 9-10.) BMW NA was aware of 21 injuries potentially related to SCAD. (ECF No. 126, Def. Reply 56.1 ¶ 64.) BMW had also undergone at least one external investigation with the KBA. In the KBA correspondence, there were at least 44 reports of injuries in connection with BMW doors "claimed" to be equipped with SCAD, although the Defendants assert that "it remains in dispute that SCAD caused such incidents." (ECF Nos. 126, Def. 56.1 Reply ¶¶ 59-61; 127-7, Exh. 7, Brueclmeier Dep. Tr. at 146.) The KBA also raised concerns about whether the warning presented in the owner's manual was sufficient to ensure safe use of the SCAD. (ECF 127-7, Exh. 7, Brueclmeier Dep. Tr. at 174.) Specifically, KBA "alleged" that BMW owners who did not know about

77

the owner's manual, and therefore had not read it, could be injured by SCAD. (*Id*.)  BMW, having been investigated by KBA in in 2006, has not implemented any additional safety or warning measures in response to SCAD-related injuries or updated its warning in the manual. (*Id*. ¶ 63.)  A reasonable jury could find that the reported dangers of the SCAD, including the results of the KBA investigation, could have a "broader impact on consumers at large."

### C. Injury Suffered as a Result

Contrary to Defendants' arguments about reliance, the undisputed fact that Mr. Boateng never saw any warnings about the SCAD does not preclude him from prevailing on this claim.  Unlike the negligent misrepresentation and fraudulent concealment claims, with respect to GBL § 349, Mr. Boateng need not establish that he actively relied on the BMW's representations in deciding to purchase his Subject Vehicle, or that his decision would have changed but for BMW's omissions. *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 535 (E.D.N.Y. 2017) ("Reliance [ ] is not an element of plaintiff's claims under the New York General Business Law."); *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675– 76 (N.Y. 2012) ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law §§ 349 and 350 claims, it was error.  Justifiable reliance by the Plaintiff [on the misrepresentation or omission] is not an element of the statutory claim.").

In any case, even if reliance were relevant, Plaintiff has proffered sufficient evidence to defeat Defendants' motion for summary judgment. Mr. Boateng has demonstrated that his personal injury was caused by the lack of awareness that the SCAD could result in amputation. Plaintiff testified that, prior to the accident, he did not "believe that the door could self-close from a distance of approximately one foot." (ECF No. 123-6, Exh. F, Boateng Dep. Tr. at 87). He testified that his accident happened "with no warning" and a jury could find that had Mr. Boateng known that the SCAD could amputate or severely injure his finger beyond a "pinching", he would have acted differently. Accordingly, this Court denies summary judgment on Plaintiff's New York General Business Law § 349 claim.

## VIII. Disclosure of Automobile Information (Count XII – Violation of 15 U.S.C. § 1232)

This Court concludes that Plaintiff does not have a viable claim for violations of 15 U.S.C. § 1232(g), based on Defendants' failure to include on the new vehicle label "safety concerns conveyed to them by the [National Highway Traffic Safety Administration]." (ECF No. 123-1, Exh. A, Am. Compl. ¶¶ 240, 243-244). Defendants correctly assert that there is no private right of action for a violation of 15 U.S.C. § 1232(g). Plaintiff provides no statutory basis, and the Court can find none, for finding a private right of action under § 1232(g)of the statute,

which outlines the duties, authorities, and enforcement powers of the Automobile Information Disclosure Act of 1958 (the "Act"). 15 U.S.C. §§ 1231-1233. The Act regulates basic information vehicles should provide consumers on the new vehicle label, but does not provide a cause of action for individual drivers. 15 U.S.C. § 1232(g). Without a showing of congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *see, e.g., Touche Ross & Co. v. Redington*, 442 U.S. 560, 571, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) ("Implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best.").

Plaintiff's cited cases do not expressly state that there is a private cause of action provided by 15 U.S.C. § 1232(g). In *Peguero v. Toyota Motor Sales, USA, Inc.*, the Act is mentioned as a secondary cite to support the proposition that the Defendants had a duty to disclose, but does not expressly find a private cause of action. 2021 WL 2910562 (C.D. Cal. Apr. 26, 2021). The other case Plaintiff cites, *In re Subaru Battery Drain Products Liab. Litig.*, speaks to whether the Act exhaustively demands the information an automobile manufacturer must include on its new vehicle labels. 2021 WL 1207791, at *25 (D. N. J. Mar. 31, 2021). Without a private cause of action expressly provided by the Act,

whether the Act exhaustively describes the information manufactures should include on vehicles is irrelevant.

The Court finds that statutes "that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Alexander* at 289; *see also Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007) ("[T]he absence of 'rights-creating language' indicates a lack of congressional intent to create private rights of action."). The Act clearly imposes a messaging "duty" on "[e]very manufacturer of new automobiles distributed in commerce," but does not confer privately enforceable rights to consumers such as Mr. Boateng. Defendants' summary judgment motion is granted on Plaintiff's claim pursuant to 15 U.S.C. § 1232.

## IX. Emotional Distress (Count XIII – Negligent Infliction of Emotional Distress)

The Court next addresses Plaintiff's claim for negligent infliction of emotional distress (NIED) for the amputation of his finger. Under New York law, negligent infliction of emotional distress requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress. *Simpson v. Uniondale Union Free Sch. Dist.*, 702 F. Supp. 2d 122, 134 (E.D.N.Y. 2010); *Meadows v. Planet Aid, Inc.*, 676 F. Supp. 2d 83, 97–98

(E.D.N.Y. 2009) (citations and internal quotation marks omitted);(finding liability for negligent infliction of emotional distress only where the "defendant engaged in conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.")

New York law also recognizes a cause of action where there exists "an especial likelihood of genuine and serious mental distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious." Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000)(citing *Johnson v. State*, 334 N.E.2d 590 (N.Y. 1975)). The requisite "genuine and serious" mental distress can be proven with evidence of the "causation and substantiality of the harm suffered." *Johnson* , 334 N.E.2d 590 (N.Y. 1975)

Under New York law, there are two generally accepted methods of proving a claim of negligent infliction of emotional distress: the "bystander" and the "direct duty" theories. *See Baker*, 239 F.3d at 415. For a claim of negligent infliction of emotional distress under a "direct duty theory," "it is well settled that the 'circumstances under which recovery may be had for purely emotional harm are extremely limited and, thus, a cause of action seeking such recovery must generally be premised upon a breach of a duty owed directly to the plaintiff which either

endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety.'" *Simpson*, 702 F. Supp. 2d at 135; *Green v. Leibowitz*, 118 A.D.2d 756, 500 N.Y.S.2d 146, 148 (N.Y. App. Div.1986)).

A negligent infliction of emotional distress claim cannot be asserted if it is "essentially duplicative of tort or contract causes of action." *Djangmah v. Falcione*, 2013 WL 208914, *9 (S.D.N.Y. Jan. 18, 2013) (quoting *Wolkstein v. Morgenstern*, 275 A.D.2d 635, 713 N.Y.S.2d 171 (1st Dep't 2000)); *Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) ("The New York Court of Appeals has strongly cautioned against allowing emotional distress claims to be brought where other tort remedies are available.") (citing *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978)).  "The rationale for this rule is grounded in the underlying purpose of the common law tort of negligent infliction of emotional distress which 'has its roots in the acknowledgment by the courts of the need to provide relief in those circumstances where traditional theories of recovery do not.'" *Virgil v. Darlak*, 2013 WL 4015368, at *10 (W.D.N.Y. Aug. 6, 2013) (quoting *Lee v. McCue*, 410 F. Supp. 2d 221, 226-27 (S.D.N.Y. 2006), *aff'd*, 218 F. App'x 26 (2d Cir. 2007)).

Mr. Boateng has suffered from the loss of his thumb from the incident at the center of this case.  On the record before the Court, as a matter of law, summary judgment must be granted to

Defendants on Plaintiff's claim of negligent infliction of emotional distress. As an initial matter, there is no requisite "direct duty" for this claim. Although Defendants certainly owe a general duty to consumers to prevent dangerous design and manufacturing defects, this duty is not a special one owed specifically to Mr. Boateng. *Druschke v. Banana Republic, Inc*., 359 F. Supp. 2d 308, 315 (S.D.N.Y.2005) (the "direct duty" standard for an NIED claim "is far more specific than the more generalized duty to avoid negligently injuring another"); *compare Mortise v. United States*, 102 F.3d 693, 696–97 (2d Cir. 1996) (affirming summary judgment dismissing NIED claim because National Guardsmen had only a "generalized duty" to prevent unreasonable risks to citizens passing through a training exercise) with *Broadnax v. Gonzalez*, 2 N.Y.3d 148, 155 (N.Y.2004) (special duty of care owed by obstetrician to expectant mother supported NIED claim where malpractice resulted in miscarriage).

Furthermore, Mr. Boateng's NIED claim seeks damages for the same circumstances and injuries, physical and emotional, that his tort claims seek. His injury, allegedly caused by BMW Defendants, may be remedied through traditional theories of recovery. The alleged conduct of Defendants, potentially having designed, manufactured, or failed to warn of defects in a product, also does not rise to the "outrageous" conduct or indecent behavior that a claim of NIED requires. Defects in innovation, design, and

manufacturing are not considered "utterly intolerable in a civilized community," even if society does expect product companies to hold themselves to the best standards for their consumers.  *Meadows*, 676 F. Supp. 2d at 97–98.

Granting of summary judgment on Plaintiff's NIED claim does not minimize the severe emotional distress that Mr. Boateng has endured or preclude him from seeking damages on that basis if he prevails on his other claims.  Plaintiffs who have suffered physical injuries such as Mr. Boateng's amputation of a major, visible body part present "an especial likelihood of genuine and serious mental distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious." *Baker*, 239 F.3d at 421 (citation omitted.)  Nonetheless, as a matter of law, the Court must grant summary judgment on this claim.

## CONCLUSION

Based on the foregoing analysis, Defendants' motions to preclude Dr. Pugh's testimony are DENIED as to his opinion on the design of the Subject Vehicle's SCAD, and as to his opinion on the adequacy of the warnings about the SCAD.  Defendants' motions for summary judgment are GRANTED as to Plaintiff's manufacturing defect, breach of express warranty, negligent misrepresentation, fraudulent concealment, the Automobile Information Disclosure Act, and negligent infliction of emotional distress claims. Defendants' motions for summary judgment are DENIED as to

Plaintiff's design defect and failure to warn claims, as well as the breach of implied warranty, Magnuson-Moss Warranty Act, and New York General Business Law claims.

       The parties are directed to confer and provide a joint status report within seven business days of this Order to advise the Court how they plan to proceed with this case.  The parties are also directed to schedule a settlement conference with Magistrate Judge Locke and report to the Court regarding the outcome within two business days thereafter.

SO ORDERED.

DATED: September 20, 2022

       Brooklyn, New York

                            _____/s/_____

                            HON. KIYO A. MATSUMOTO

                            United States District Judge