UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------X

GODWIN BOATENG,

               Plaintiff,             **MEMORANDUM & ORDER**

   - against -               17-CV-209 (KAM)(SIL)

BMW AG, BMW OF NORTH AMERICA, LLC,
and BMW MANUFACTURING COMPANY, LLC,

              Defendants.

------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

    Between June 17 and 26, 2024, the Court presided over a jury trial in an action brought by Godwin Boateng ("Plaintiff") against Defendants BMW AG, BMW of North America, LLC, and BMW Manufacturing Company, LLC (together, "BMW" or "Defendants"). (*See generally* ECF Nos. 192-3 through 192-9, Trial Transcript ("Tr.").)[1] The trial involved claims of strict products liability and negligence, failure to warn, and breach of implied warranty, along with claims of misleading business practices brought pursuant to New York General Business Law ("GBL") § 349. Plaintiff's claims were related to his injury on July 6, 2016, when his thumb was partially amputated by the door of his 2013 BMW X5 (the "Subject Vehicle").

---

[1] Although the trial transcript is split into several files, the page numbers on the top right corner are continuous and the Court refers to the trial transcript as one document.

The jury returned a verdict in favor of Plaintiff only as to the GBL § 349 claim, and awarded Plaintiff $255,360 in past loss of earnings, $800,000 in past pain and suffering, and $850,000 in future pain and suffering. (*See* ECF No. 179, Verdict Form.)  On June 26, 2024, the Court entered judgment in favor of Plaintiff and against Defendants in the amount of $1,905,360, with post-judgment interest at the rate provided by 28 U.S.C. § 1961.  (*See* ECF No. 180, Judgment.)

Presently before the Court is BMW's renewed motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 50(b) ("Rule 50(b)"), and, in the alternative, motion for a New Trial pursuant to Fed. R. Civ. P. 59 ("Rule 59") or for remittitur and/or a new trial on the damages granted to Plaintiff. (ECF No. 192, Defendants' Notice of Motion; ECF No. 192-1, Defendants' Combined Memorandum of Law ("Def. Mem.").) Plaintiff opposes Defendants' motions. (ECF No. 204, Plaintiff's Memorandum of Law in Opposition to Defendants' Motions ("Pl. Mem.").)  For the reasons set forth below, Defendants' Rule 50(b) and 59 motions, and Defendants' request for remittitur, are **DENIED**.

Following the entry of judgment, Plaintiff filed a motion for a bill of costs pursuant to Fed. R. Civ. P. 54. (ECF No. 183, Bill of Costs.)  Plaintiff also moved to alter the judgment to account for prejudgment interest from the date of his injury,

July 6, 2016, through June 26, 2024. (ECF No. 182, Motion to Alter Judgment.) For the reasons set forth below, Plaintiff's motion to alter the judgment is **DENIED** and Plaintiff's motion for a bill of costs is **GRANTED IN PART** and **DENIED IN PART**.

<u>BACKGROUND</u>

The Court assumes the parties' familiarity with the background of this case. *See, e.g., Boateng v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17-CV-209 (KAM)(SIL), 2022 WL 4357555 (E.D.N.Y. Sept. 20, 2022). Only those facts necessary for disposition of the instant motions will be set forth herein as part of the Discussion section.

**I. Pre-Trial Proceedings**

The parties filed several motions in limine prior to trial, on which the Court ruled on April 8, 2024. *See Boateng v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17-CV-209 (KAM)(SIL), 2024 WL 1513601 (E.D.N.Y. Apr. 8, 2024). Relevant to the instant motions, the Court granted in part, and denied in part Defendants' motion to exclude evidence of other similar incidents ("OSI") proffered by Plaintiff. *Id.* at *3-6. Despite finding that much of the OSI evidence proffered by Plaintiff would have constituted inadmissible hearsay if offered to prove causation, the Court nonetheless found that the evidence could be admitted in summary form to show that BMW was on notice of the other incidents. *Id.* at *5.

3

The Court subsequently held a pre-trial conference on May 2, 2024, to discuss the remaining evidentiary disputes following the resolution of the motions in limine. (*See* Minute Entry dated May 3, 2024.) In order to resolve a dispute regarding how to present differing information provided by BMW in its interrogatory responses, along with the OSI evidence the Court deemed admissible only in summary form, the parties agreed to work together on mutually-agreeable stipulations regarding both topics. (*Id.*) The parties were able to resolve the majority of the evidentiary issues, but were unable to come to an agreement on the interrogatory information and OSI evidence in summary form, and requested the Court's guidance. (ECF No. 165.)

In resolving the remaining evidentiary disputes, the Court found that admission of Defendants' full interrogatory responses by Plaintiff would "confuse the issue and create undue delay" given the numerous references to multiple discovery disputes over the course of pre-trial discovery, and ordered Defendants to prepare a stipulation containing, among other things, "an updated list identifying any and all foreign or domestic SCAD closure injury claims up to the date of Plaintiff's injury (Interrogatory #8, as supplemented by 9/9/20 letter)." (Docket Order dated May 20, 2024.) The Court further directed Defendants to prepare a stipulation involving customer claims being introduced only to show notice to Defendants that closely

tracked the Defendants' proposal, which had been rejected by Plaintiff. (*Id.*)

The parties subsequently conferred regarding the remaining disputes surrounding the stipulations, reached agreement on the contents of the two stipulations, and notified the Court of the resolution of the dispute on May 31, 2024. (ECF No. 170.) The Court subsequently held the final pre-trial conference on June 14, 2024, and discussed trial logistics, including potential examination of Defendants' witnesses during the presentation of Plaintiff's case in chief due to defense witness scheduling constraints. (Minute Entry dated June 14, 2024.) The parties further indicated they wished to revise the joint stipulations to make minor changes to the titles of each and agreed to bring final copies to the first day of the trial on June 17, 2024. (*Id.*)

## II. Trial, Verdict, and Judgment

Jury selection began and was completed on June 17, 2024, and the trial commenced on the same date. (*See* ECF No. 173, Minute Entry for June 17, 2024.)

### A. Evidence at Trial

Plaintiff's case in chief consisted of five witnesses: Tonya Perry, a friend of Mr. Boateng's who was present when he injured his thumb; Mr. Boateng; Dr. Ari Hoschander, the surgeon who treated Mr. Boateng's injury in the emergency room and

thereafter; Dr. Jacob Rauchwerger, the pain specialist who treated Mr. Boateng; and Dr. James Pugh, Plaintiff's expert witness in the area of biomechanics, bioengineering, safety, and warnings. (*See generally* Tr.)  In addition, Plaintiff examined witnesses called both by Plaintiff and the Defendants, Neal Guthrie and Klaus Brueclmeier, employees of various arms of the BMW Defendants who testified as to the design and manufacture of the soft-close mechanism, as well as inquiries from, and BMW's responses to, German governmental authorities regarding BMW's soft-close mechanism. (*Id.*)  In addition to Mr. Guthrie and Mr. Brueclmeier, Defendants also called three expert witnesses: Dr. Donald Parker, an expert in automotive engineering; Dr. Mathew Greenston, an expert in biomechanics; and Dr. Nathan Dorris, an expert in warnings.  (*Id.*)  The Court will briefly recount relevant portions of Mr. Boateng's and Mr. Brueclmeier's testimony that are related to the pending motions.

### 1.  Mr. Boateng's Testimony

Mr. Boateng began his testimony by discussing his educational background and his work experience as a software engineer.  (Tr. at 97-129.)  Mr. Boateng testified that he purchased the Subject Vehicle in December 2013, and that the accident which injured his thumb occurred on July 6, 2016.  (*Id.* at 129.)  According to his testimony, Mr. Boateng did not see any advertising or literature concerning, nor was he aware of,

soft-close doors, before his purchase; nor was he aware of any warnings regarding soft-close doors in the Subject Vehicle's manual. (*Id.* at 131-32.)   Mr. Boateng specifically testified that he had not read the page of the Subject Vehicle's manual warning of a danger of "pinching" related to the door. (*Id.* at 134-35.)  Mr. Boateng further testified that BMW did not provide him with any documents specifically discussing the soft-close door functionality. (*Id.* at 132.)   Mr. Boateng testified that BMW never informed him that there were any "dangerous features to the" Subject Vehicle's door. (*Id.* at 135.)  Mr. Boateng also testified that he "never believed" the soft-close mechanism "could do such a damage" or "could be really [] dangerous." (*Id.* at 342-43.)

Regarding the accident itself, Mr. Boateng testified that he had parked his vehicle and had his hand resting on the door frame, with his thumb tucked in the driver-side door itself, as a truck passed by him on a narrow road approximately three feet away. (*Id.* at 147-50.)  Mr. Boateng moved "a little bit" backwards "to give way to [the] truck" but testified that as he moved backwards his "body wasn't touching the door." (*Id.* at 150-51.)  Mr. Boateng testified that he never felt the soft-close automatic door activating, but his right thumb was partially amputated "just before the nail bed" when the door suddenly closed on his thumb. (*Id.* at 156, 162.)  Mr. Boateng

7

testified that he was a "righty" and therefore the injury was to his dominant hand. (*Id.* at 151.) Mr. Boateng described the amputation as happening "immediately" and felt a "sharp pain" when it occurred. (*Id.* at 162.) Mr. Boateng testified that he was certain the soft-close feature was responsible for his injury, as he did not slam the car door on his hand. (*Id.* at 164.)

Mr. Boateng testified that he would have continued working as an independent software engineer if he had not been injured in July 2016, but that he was required to take time off from work due to his injury. (*Id.* at 115, 244, 252.) Mr. Boateng worked as a contractor for the Department of Defense through his S-Corporation, GAB Consulting. (*Id.* at 103-05, 255.) Mr. Boateng testified that he was out of work for 13 months, and went back to work full-time in August of 2017, after being injured in July of 2016. (*Id.* at 115.) Based on Mr. Boateng's hourly pay rate under his contract in effect at the time of his injury and the duration of time that he was out of work, Mr. Boateng estimated he had lost $255,360 in earnings due to his injury. (*Id.* at 253.)

### 2. Mr. Bruecklmeier's Testimony

Klaus Bruecklmeier, BMW AG's head of door design, testified regarding the design, purpose, and functioning of the soft-close door mechanism, which was installed in the Subject Vehicle.

(*Id.* at 985-1009.)   Mr. Bruecklmeier explained that the soft-close door feature was introduced in 2001, and that approximately 1.4 million vehicles with the soft-close door functionality had been sold by BMW AG between 2001 and July 2016, when Plaintiff's accident occurred. (*Id.* at 1010.)   Mr. Bruecklmeier testified that BMW considered the possibility of entrapped fingers by soft-close doors, and attempted to address that concern by, among other things, working with TUV, an Austrian/German technical service, in 2001 to assess the danger posed by the soft-close door. (*Id.* at 1012-20.)   According to Mr. Bruecklmeier, TUV's inspection concluded in February 2001 that the soft-close system provided sufficient protection against a finger or limb being "pinched." (*Id.* at 1019.)

Subsequently, Mr. Bruecklmeier testified as to a series of inquiries from the KBA, a German government agency akin to the U.S. National Highway Traffic Safety Administration ("NHTSA"). (*Id.* at 1014, 1021.)   The KBA sent a letter to BMW dated June 3, 2016, in which it stated that the KBA was aware of two German customers injured by the soft-close feature, and inquired as to the number of injuries caused by the soft-close feature worldwide. (*Id.* at 1021, 1062, 1104.)   Mr. Bruecklmeier testified that he prepared BMW's response dated July 6, 2016, which stated, *inter alia*, that the company was aware of 44 cases since the introduction of the soft-close mechanism in 2001

9

"reported worldwide in which injuries of varying degrees to fingers that were in the closing area had occurred when the [Soft Close Automatic ("SCA") mechanism] of the doors was activated." (*Id.* at 1023; *see also* ECF No. 192-15, Trial Exhibit P-101.) The response also noted that "anti-trap protection cannot be reliably implemented" because of the short distance at which the soft-close function is activated, and because of the high forces required to close the door. (Tr. at 1024; *see also* ECF No. 192-15, Trial Exhibit P-101.) Mr. Bruecklmeier testified that the KBA ultimately concluded that no further measures were required to be taken regarding the soft-close door mechanism, but that the KBA requested BMW to immediately notify the agency as to any further accidents involving the mechanism. (*Id.* at 1045.)

**B.   Defendants' Directed Verdict Motions**

On June 24, 2024, following the presentation of Plaintiff's case in chief, Defendants moved for a directed verdict pursuant to Rule 50(a) as to each of Plaintiff's claims. (Tr. at 1122.) Regarding Plaintiff's GBL § 349 claim, Defendants argued that Plaintiff had failed to prove any actual misrepresentation or omission that was made to him regarding the soft close automatic door ("SCAD") feature on his vehicle, or that Defendants alone possessed information that a reasonable consumer could not obtain regarding the safety of the door. (*Id.* at 1148-49.)

10

Defendants also argued that even if Plaintiff had been shown a misrepresentation or omission, Plaintiff failed to link the misrepresentation or omission to his injury given the "split second decision-making" on the date of the incident. (*Id.* at 1149.) The Court reserved ruling, and Defendants subsequently renewed the directed verdict motion at the close of evidence. (*Id.* at 1389-90.) The Court again reserved judgment on Plaintiff's substantive claims but granted Defendants' motion to strike Plaintiff's demand for punitive damages. (*Id.* at 1407.)

### C.    Verdict and Judgment

On June 26, 2024, the jury returned a verdict for Plaintiff, finding BMW liable for damages under Plaintiff's GBL § 349 claim. (Verdict Form at 4-5.) The jury did not, however, find BMW liable for Plaintiff's design defect, failure to warn, or breach of implied warranty/Magnuson-Moss Warranty Act claims. (*Id.* at 1-3.) The jury did not apportion any comparative fault to Plaintiff, and awarded Plaintiff $255,360 in past loss of earnings, $800,000 in past pain and suffering, and $850,000 in future pain and suffering. (*Id.* at 5.) The Court entered judgment in the amount of $1,905,360 on the same day as the jury's verdict was entered. (*See* Judgment.)

## III. Post-Verdict Proceedings

### A.    Plaintiff's Request for Pre-judgment Interest

The Court explicitly did not include pre-judgment interest

in the Judgment, explaining that the "judgment [was] entered on the same date as the determination of liability." (*See* Judgment.)  Subsequently, Plaintiff submitted a letter to the Court on July 3, 2024, requesting that the Judgment "be amended or modified" to include pre-judgment interest.  (ECF No. 182.) The Court subsequently requested that Plaintiff submit a supplemental letter "setting forth the authority upon which his request for prejudgment interest . . . is based" in light of the Second Circuit's statement that "[u]nder New York law, in personal injury cases, prejudgment interest is added from the 'date of the liability determination.'" (Docket Order dated July 3, 2024 (quoting *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999)).)  Plaintiff responded, without addressing *Schwimmer*, and the Court requested a further response from Plaintiff addressing *Schwimmer*.  (Docket Order dated July 15, 2024.)  Plaintiff further responded on July 17, 2024, and the Court provided Defendants the opportunity to state their position on the availability of pre-judgment interest in a separate submission.  (ECF Nos. 185, 189.)

**B.  Plaintiff's Bill of Costs**

Plaintiff submitted his Bill of Costs, requesting a total of $69,524.43, on July 3, 2024.  (ECF No. 183, Bill of Costs.) Defendants filed their opposition on July 17, 2024.  (ECF No. 186, Defendants' Reply in Opposition to Plaintiff's Bill of

12

Costs.)  Defendants further filed a "notice of supplemental authority" on August 19, 2024, arguing that additional items from the Bill of Costs should be excluded based on *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012).  (ECF No. 201.)

### C.  BMW's Rule 50(b) and Rule 59 Motions

All of BMW's post-trial motions were submitted in a consolidated filing, which was served on Plaintiff and filed on the docket on July 29, 2024.  (*See* Def. Mem.)  Plaintiff's Opposition was filed on August 29, 2024.  (*See* Pl. Mem.)  Defendants' Reply was filed, and the motions were thus fully briefed, on September 13, 2024.  (*See* ECF No. 207, Defendants' Reply in Further Support ("Def. Reply.").)

## LEGAL STANDARD

### I.  Judgment as a Matter of Law – Rule 50

"Federal Rule of Civil Procedure 50 sets forth the procedural requirements for challenging the sufficiency of the evidence in a civil jury trial and establishes two stages for such challenges—prior to submission of the case to the jury [under Rule 50(a)], and after the verdict and entry of judgment [under Rule 50(b)]."  *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 399–400 (2006).  "Under Rule 50(b), if a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the Court may either order a new trial or direct the entry of judgment as a matter of law."

*Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP*, No. 08-CV-931 (PKC)(JO), 2015 WL 3605143, at *2 (E.D.N.Y. June 5, 2015), *aff'd sub nom. Protostorm, LLC v. Antonelli*, 673 F. App'x 107 (2d Cir. 2016) (citing Fed. R. Civ. P. 50(b)).

A Rule 50 motion "'may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair-minded [persons] could not arrive at a verdict against [it].'" *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)) (alterations in original). The issue on a Rule 50 motion is whether "'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" *This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (quoting *Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154–55 (2d Cir. 1994)) (alterations in original); *see Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (explaining that a court may not decide a Rule 50 motion by evaluating the credibility of witnesses or the relative weight of the evidence). "Weakness of the evidence does not justify

14

judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that 'a reasonable juror would have been compelled to accept the view of the moving party.'" *This is Me*, 157 F.3d at 142 (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir.1993)).

When ruling on a Rule 50(b) motion, "[a] court 'must give deference to all credibility determinations and reasonable inferences of the jury.'" *Caruolo*, 226 F.3d at 51 (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)); *see also Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994) (the court must "'consider the evidence in the light most favorable to the [non moving party] and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence'") (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)) (alterations in original). As the Supreme Court has explained, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Thus, a movant seeking to set aside a jury verdict faces "a high bar," *Lavin–McEleney v. Marist College*, 239 F.3d 476, 479 (2d Cir. 2001), and such motions "should be granted cautiously and sparingly," *Welch v.*

*United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 173 (E.D.N.Y. 2012) (quoting 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524, at 252 (1995)).

## II.  Motion for a New Trial – Rule 59

Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure provides that a "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Rule 59(a)(1)(A) permits a court to grant a new trial [if] the verdict is against the weight of the evidence.  *See Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012).  "[A] decision is against the weight of the evidence . . . if and only if the verdict is [(1)] seriously erroneous or [(2)] a miscarriage of justice."  *Id*. at 417–18 (*citing Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002)).  "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 106 (2d Cir. 2002) (internal quotation marks omitted).

The standard applied in reviewing a party's motion for a new trial "depends on whether that party objected

16

contemporaneously to the purported errors." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005).    Where objections have been preserved through contemporaneous objection, a new trial is warranted if "the district court committed errors that were a 'clear abuse of discretion' that were 'clearly prejudicial to the outcome of the trial.'"  *Id.* (*quoting Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 17 (2d Cir. 1996); *see also Vogelfang v. Riverhead County Jail*, No. 04-CV-1727 (SJF), 2012 WL 1450560, at *6 (E.D.N.Y. Apr. 19, 2012) (same).

Where claimed errors were not preserved by objections contemporaneously at trial, "a new trial will be granted only for error that was 'so serious and flagrant that it goes to the very integrity of the trial'," because "failure to object deprives the trial court of the opportunity to correct the error during trial." *Marcic*, 397 F.3d at 124 (*quoting Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998)); *see also Lore v. City of Syracuse*, 670 F.3d 127, 160 (2d Cir. 2012) (internal citations omitted) (a party's failure to object at trial to substance of verdict form "waives its right to a new trial on that ground and [party] has no right to object to such matters on appeal . . . unless the error is fundamental").

Federal Rule of Civil Procedure 59(e) "allows a litigant to file a 'motion to alter or amend a judgment.'"  *Banister v.*

*Davis*, 590 U.S. 504, 507 (2020) (quoting Fed. R. Civ. P. 59 (e)).  "A party may move for [Rule 59] reconsideration and obtain relief only when the party identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Cho v. Blackberry Ltd.*, 991 F.3d 155, 170 (2d Cir. 2021) (brackets and citation omitted).

Courts must bear in mind that a Rule 59 motion may be granted only "when the jury's verdict is egregious." *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 134 (2d Cir. 1998) (internal quotation marks and citation omitted).  "Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility." *Id.*  "[W]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Raedle*, 670 F.3d at 418 (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)).

Importantly, a party may not use Rule 59 to cure a failure to comply with Rules 50 and 51. *NG Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96-97 (2d Cir. 2014).  A Rule 50 motion is intended to notify the opposing party of a challenge to the sufficiency of the evidence. *Id.*  Rule 51 requires the parties to make objections prior to the reading of

18

jury charges during a trial so that the trial court has an opportunity to cure any defects in the instruction before the jury is charged and begins deliberating. *Id*. at 97.

Rule 59(e) motions are not vehicles for parties to relitigate cases or advance new theories that they failed to raise in their underlying motion practice. *Banister*, 590 U.S. at 507-08; *see also Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998) ("It is well-settled that Rule 59 is not a vehicle for . . . taking a 'second bite at the apple[.]'"). Reducing or amending the judgment pursuant to Rule 59(e) is "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (quotation omitted).

## **DISCUSSION**

The Court will first consider the Defendants' renewed Rule 50 and 59 motions, including remittitur, before turning to the Plaintiff's request for pre-judgment interest and Bill of Costs.

## I. **Defendants' Rule 50 Motion for Judgment as a Matter of Law**

BMW's Rule 50(b) motion[2] asserts that Plaintiff failed to establish that BMW made any material omission or misstatement

---

[2] BMW moves both to renew its original Rule 50(a) motion, made at the close of Plaintiff's case, and to submit a post-trial motion under Rule 50(b). Because a Rule 50(b) motion is in reality a renewal of the Rule 50(a) motion that was made before the case was submitted to the jury, the Court will accordingly consider the motions together. *See ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).

that would have misled a reasonable consumer acting reasonably, and that, in any event, any alleged omission was not the cause of Plaintiff's injury. (Def. Mem. at 3.) BMW further asserts that a finding of GBL § 349 liability based on the instant trial record would "establish an impracticable regime for product manufacturers to satisfy" and would discourage manufacturers from continuing to do business in New York. (*Id.*) Before determining whether Defendants are entitled to judgment as a matter of law under Rule 50(b), the Court "must first consider whether they preserved the bases of their Rule 50(b) motions by making a sufficiently specific Rule 50(a) motion prior to submission of the case to the jury." *Protostorm, LLC*, 2015 WL 3605143, at *4 (citing *Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 211 (E.D.N.Y. 2009)).

## A.    Legal Standard for Preservation of Rule 50(b) Arguments

Rule 50(a) provides that a motion for judgment as a matter of law made before the case is submitted to the jury "shall specify . . . the facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). "A post-trial Rule 50(b) motion is properly made only if a Rule 50(a) motion has been made before submission of the case to the jury." *Bracey v. Bd. of Ed. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004). Because a motion pursuant to Rule 50(b) "is only a renewal of

20

the preverdict motion" made pursuant to Rule 50(a), *Lore v. City of Syracuse*, 670 F.3d 127, 153 (2d Cir. 2012) (citation omitted), the grounds on which a party may rely in a Rule 50(b) motion are "limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]." *Galdieri–Ambrosini*, 136 F.3d at 286; *see Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury."). "[T]he movant is not permitted to add new grounds after trial" in a Rule 50(b) motion. *Galdieri–Ambrosini*, 136 F.3d at 286. Arguments not raised in a preceding Rule 50(a) application are not properly preserved for review in a subsequent Rule 50(b) motion. *See Lore*, 670 F.3d at 152; *Holmes v. United States*, 85 F.3d 956, 963 (2d Cir. 1996). "[T]he burden is upon the non-moving party to raise the issue; otherwise, it is waived." *United States ex rel. Maris Equipment Co. v. Morganti, Inc.*, 163 F. Supp. 2d 174, 181 (E.D.N.Y. 2001).

### B.    Elements of a GBL § 349 Claim

"Section 349 of the GBL provides a cause of action for any person injured by '[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing or any service.'" *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020) (quoting GBL § 349(a), (h)).  "'Deceptive

acts' are acts that are 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Id.* (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013)). To succeed on a claim under § 349, the plaintiff must show that the defendant "engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675 (N.Y. 2012) (citation omitted).

### C. Defendants Properly Preserved Rule 50 Arguments Related to GBL § 349

At trial, Defendants made the following oral motion for a directed verdict, on Plaintiff's GBL § 349 claim, at the conclusion of the Plaintiff's case-in-chief:

> Here, plaintiff has failed to prove any actual misrepresentation that was made to him regarding SCAD or the subject vehicle. Plaintiff testified that prior to purchasing his vehicle, he did not see or rely on any advertisements or literature concerning SCAD or the subject vehicle.

> Plaintiff further testified that he did not read the manual for the subject vehicle prior to the date of the accident.

> Plaintiff has failed to show that defendants alone possessed relevant information that a reasonable customer could not obtain even if defendants had knowledge of or other alleged incidents involving the SCAD, a customer could reasonably obtain information that closing their fingers in a door could result in serious injury. Mr. Boateng himself recognizes danger and testified with regards to this.

> Therefore, plaintiff has failed to show any omission

22

by the defendants.

Even if plaintiff had been shown a misrepresentation or an omission, plaintiff has also failed to prove that the misrepresentation or omission was the cause of his injury.

In light of the split second decision-making made by Mr. Boateng on the date of the incident in order to avoid being struck by the truck, plaintiff has failed to provide any testimony as to what he would have or could have done differently in order to avoid the accident under these circumstances.

(Tr. at 1148-49.)  Plaintiff's counsel argued, *inter alia*, in opposition to Defendants' Rule 50 motion regarding the GBL § 349 claim, that "[a] reasonable jury could find that the reported dangers of the [soft-close mechanism], including the results of the KBA investigation, could have a broader impact on consumers at large."  (*Id.* at 1149-50.)

Here, the Court has no difficulty concluding that at trial, based on the foregoing defense motion argued at trial, Defendants properly preserved the arguments made now in their post-trial Rule 50(b) motion.  Contrary to Plaintiff's argument, (Pl. Opp. at 9), Defendants did, in fact, argue that BMW lacked information regarding an increased risk of injury from the soft-close doors that a reasonable consumer could not obtain.  BMW again argues, in their post-trial motion, that soft close-equipped doors do not pose a risk of amputations "above and beyond the risks associated with non-soft close doors" and therefore any omission regarding the reported injuries of which

BMW was aware would not have been materially misleading to a reasonable consumer. (Def. Mem. at 11-14.) Plaintiff disagrees and argues that "BMW was suppressing vital information which could have prevented [Mr.] Boateng's injury." (Pl. Opp. at 10.) Notwithstanding the parties' disagreement regarding whether the information or lack of disclosure was materially misleading, the Court concludes that Defendants' oral motion for a directed verdict, which argued Plaintiff failed to show "defendants alone possessed relevant information that a reasonable customer could not obtain," (Tr. at 1148-49), properly preserved the arguments made in Defendants' Rule 50(b) motion. "The purpose of requiring that the moving party specify the basis for its preverdict motion for judgment as a matter of law is . . . to give the claimant a fair opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." *Piesco*, 12 F.3d at 340. Here, the Court is satisfied that Defendants preserved their GBL § 349 challenge, and that Plaintiff was on notice of the asserted evidentiary defects that Defendants again argue warrant judgment as a matter of law. The Court thus proceeds to consider the merits of Defendants' Rule 50(b) motion.

**D.    Sufficiency of the Evidence to Support the Jury's Verdict**

Having found that Defendants properly preserved their

motion as to the sufficiency of the evidence regarding the GBL §
349 claim, the Court may now proceed to the merits.  The first
element of GBL § 349 is not at issue in this case, as BMW does
not dispute that Defendants engaged in consumer-oriented
conduct.  Instead, Defendants argue that Plaintiff failed to set
forth sufficient evidence supporting the second or third
element.

As set forth above, the Court is compelled to deny the
motions unless, when viewing all of the evidence in the light
most favorable to the plaintiff, there is "such a complete
absence of evidence supporting the verdict . . . or the evidence
in favor of the movant is so overwhelming that reasonable and
fair-minded persons could not arrive at a verdict against it."
*Kinneary*, 601 F.3d at 155 (citation and alterations omitted);
*accord Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir. 1988) (stating
that the standard for granting a motion for judgment as a matter
of law is "appropriately strict").  Defendants have failed to
meet this stringent standard, and their motion for judgment as a
matter of law is therefore denied.

### 1.    Sufficiency of the Evidence as to Defendants' Deceptive Acts

Regarding the second element of Plaintiff's GBL § 349
claim, BMW makes several arguments regarding the sufficiency of
the evidence that BMW's consumer-oriented conduct was

"materially misleading." First, BMW argues that it is a matter of common sense that fingers or body parts should not be placed in the path of a closing door, and no further warning was necessary regarding the soft-close door. (Def. Mem. at 5-7.) Second, BMW argues that to the extent warnings *were* necessary, BMW affirmatively provided "a plethora of appropriate warnings to consumers." (Def. Mem. at 7-10.) Third, BMW argues that no warning of amputation was necessary, because the trial record did not establish that "soft close automatic doors pose a risk of amputation above and beyond the risks associated with non-soft close doors." (Def. Mem. at 10-16.) Finally, BMW argues that given the small number of injuries attributable to the soft-close function, a failure to disclose the existence of the complaints or injuries from BMW's soft-close doors could not have risen to the level of a "material" omission. (Def. Mem. at 16-19.)

As discussed below, the Court finds that, based on the evidence in the record and the jury charges regarding the GBL § 349 claim, the jury could reasonably have found BMW's conduct in failing to disclose the risk of injury posed by the soft-close mechanism to be materially misleading, and therefore judgment as a matter of law for the Defendants is not warranted based on the second element of GBL § 349.

### a.   Defendants' Argument that No Warning was Necessary

BMW argues that it is a matter of "common sense" or a "fact of life" that closing a door on one's finger could result in injury, and therefore a reasonable consumer acting reasonably would not require any further warning regarding the soft-close door mechanism at issue in the instant case. (*Id.* at 5-6.) The Court finds this argument to conflict with the evidence set forth at trial.

At trial, Mr. Bruecklmeier, BMW AG's head of door design, testified that a car door, with or without soft-close features, encounters "various forces" when it is closing. (Tr. at 1000.) These forces included "the weight of the door itself," the "force to push the door into the latch," and "especially [include] the counter-pressure from the door seals." (*Id.*) The door seals, which are made out of rubber, are present in all car doors, and BMW designed its soft-close mechanism to be capable of exerting a range of force between 600 newtons[3] and 1,000 newtons to close the door in its vehicles, including a 2013 BMW X5. (*Id.* at 1000-01, 1007-09.) In earlier testimony, Defendants' expert witness on biomechanics, Dr. Greenston,

---

[3] According to the U.S. National Institute of Standards and Technology ("NIST"), one pound of force is equivalent to 4.448222 newtons, and therefore the range of force expected would be equivalent to 134.885 to 224.809 pounds of force. *See* NIST, *NIST Guide to the SI, Appendix B.9,* https://www.nist.gov/pml/special-publication-811/nist-guide-si-appendix-b-conversion-factors/nist-guide-si-appendix-b9 (last visited Sept. 20, 2024).

testified that about 95 pounds of force would be required to fracture a thumb. (*Id.* at 810.) Mr. Bruecklmeier testified that 100 pounds of force would be equal to approximately 445 newtons, and that, therefore, the force required to fracture a thumb was less than the force required to close the 2013 BMW X5 car door onto its seals. (*Id.* at 1007.)

Mr. Bruecklmeier explained that a "small travel path[]" to close the door helped mitigate against the danger of a finger becoming entrapped in a soft-close equipped door. (*Id.* at 1012-13.) Mr. Bruecklmeier also stated that the soft-close process could be stopped "at any time" by pulling on the door handle. (*Id.* at 1013.) Mr. Bruecklmeier also explained that a similar mechanism is utilized in a power window, which has no pinching protection in its final 4 millimeters of travel in order to close into its seals. (*Id.* at 1034.) Ultimately, Mr. Bruecklmeier testified that there is no system that can "clearly detect whether there is something in the door gap that shouldn't be in the door gap" and therefore there was no way to make the soft-close feature safer against the risk of entrapment. (*Id.* at 1048.)

Contrary to Defendants' assertions, the Court does not find the function of the soft-close door mechanism to be a matter of common sense or a "fact of life" that required no further warning or explanation. The key fact here is the amount of

force required to close the door. Mr. Parker, Defendants'
expert in automotive engineering, testified that the soft-close
mechanism could generate a maximum of "285 pounds[4] of force."
(*Id.* at 1243.) Mr. Parker further testified that if a "steel
bar" or other "complete obstruction" were present in the door,
the soft-close mechanism "would engage for about two seconds,
then it would back off." (*Id.* at 1256.) Mr. Bruecklmeier
similarly testified that in the event a "coat [was] caught" in
the door and prevented it from closing, the soft-close function
would engage for two seconds, but then "time out" and stop
pulling the door closed. (*Id.* at 1077.)

Information regarding the soft-close door, though known to
BMW, is not immediately obvious, nor is it a matter of common
sense, that a car door soft-close mechanism would require 600
newtons of force to fully close into its seals, or that that is
more than the amount of force required to fracture a thumb. A
consumer might reasonably believe that a door equipped with the
soft-close mechanism with a thumb or digit caught in the way of
closing would react in the same manner as with a complete
obstruction – by applying force for two seconds without a
successful complete closure, and then "timing out" and stopping.
The fact that the maximum amount of force applied by the soft-
close mechanism was more than double that required to fracture a

---

[4] Equivalent to approximately 1267.74 newtons of force. *See supra* n.3.

thumb is not, as Defendants argue, a matter of "common sense" and, in fact, was only established in the instant case following detailed testimony by Defendants' two accomplished automotive engineers – Mr. Bruecklmeier and Mr. Parker.

Therefore, the Court finds the instant case easily distinguishable from those cited by Defendants in which a Court was able to use the "facts of life" to defeat a GBL § 349 claim. *See, e.g., Troncoso v. TGI Friday's Inc.*, No. 19-CV-2735 (KPF), 2020 WL 3051020, at *7 (S.D.N.Y. June 8, 2020) ("No reasonable consumer would believe that the snack chips, shelf-stable and sold at room temperature in gas stations, would be identical in taste or substance to an appetizer, prepared with perishable dairy products and served hot in a restaurant."); *see also Wurtzburger v. Kentucky Fried Chicken*, No. 16-CV-08186 (NSR), 2017 WL 6416296, at *3 (S.D.N.Y. Dec. 13, 2017) (dismissing GBL § 349 claim when "the alleged deceptive act is that [plaintiff] expected KFC to deliver a bucket of chicken filled to the rim, in excess of the number of pieces she purchased, because the bucket could accommodate more than the eight pieces").

### b.    Defendants' Argument that BMW Provided Appropriate Warnings

BMW next argues that "the trial record establishes no material omission or concealment" because BMW provided appropriate warnings to consumers regarding the danger of injury

30

from closing doors.   (Def. Mem. at 7.)   BMW specifically references the 2013 BMW X5 Owner's Manual, which includes the following warning:

## Doors

### Automatic soft closing

To close the doors, push lightly. It is closed automatically.

⚠ Danger of pinching

Make sure that the closing path of the doors is clear; otherwise, injuries may result. ◄

(ECF No. 192-11, Trial Exhibit D-11 at 35.)   BMW explains that the warning symbol is defined earlier in the manual as follows:

## Symbols

⚠ Indicates precautions that must be followed precisely in order to avoid the possibility of personal injury and serious damage to the vehicle.

(*Id.* at 6.)   BMW argues that these warnings appropriately signaled the risk of personal injury associated with the soft-close doors to users.   (Def. Mem. at 7-10.)

As an initial matter, the Court notes that the jury disagreed with Defendants' interpretations of the sufficiency of the warnings.   On Plaintiff's failure to warn claim, the jury found that Plaintiff sufficiently proved "that BMW failed to provide adequate warnings of dangers associated with the soft-close equipped door."   (Verdict Form at 2.)   The jury, however,

31

ultimately found that this failure to warn was not "a substantial factor in causing" Plaintiff's injury, therefore precluding liability, but still determined that Plaintiff proved BMW failed to provide adequate warnings. (*Id.*)

The Second Circuit has explained that "[a] warning is adequate if it is accurate, clear, and consistent, and portrays the risk with sufficient intensity." *Wu Jiang v. Ridge Tool Co.*, 764 F. App'x 43, 45 (2d Cir. 2019) (citing *Martin v. Hacker*, 628 N.E.2d 1308, 1312 (N.Y. 1993). The Court finds that the jury was not "compelled to accept the view of the [Defendants]" that the warnings were adequate, and the jury's determination was supported by adequate evidence. *This is Me*, 157 F.3d at 142 (quoting *Piesco,* 12 F.3d at 343).

The main disagreement over the warnings at trial focused on the phrase "Danger of pinching" that features prominently in the warning related to the soft-close automatic door. Plaintiff's counsel, in cross-examining Mr. Bruecklmeier, stated that "pinching gives a connotation of something that's not serious." (Tr. at 1060.) Mr. Bruecklmeier explained that he did not think that "zwicken," the German equivalent of "pinching," was used in the German manual, but that it might have instead said "einklemmen," which means "[w]ith a lot of force between two items . . . to be there and possibly not be able to pull out by yourself." (*Id.* at 1060-61.) BMW's letter to the KBA indicates

that the German-language version of the manual used the term "Einklemmgefahr."[5]  (ECF No. 192-15, Trial Exhibit P-101 at 4.) Dr. Dorris, Defendants' expert on warnings, testified that "[i]n the field of safety engineering and warnings and safety messages we talk about pinch points . . . [and] pinching is [the] relative motion."  (*Id.* at 1325.)  Dr. Dorris testified that even a hazard as great as being crushed and killed by heavy machinery could be referred to as a "pinch point warning." (*Id.*)  Dr. Dorris testified that he expected "consumers would understand that" pinching in the context of the car door "could be a serious injury."  (*Id.* at 1326.)  In contrast, Dr. Pugh, Plaintiff's expert, testified that "pinching" was a "vague term" and did not provide an adequate warning of the magnitude of the injury that could occur.  (*Id.* at 598.)

In light of the aforementioned evidentiary record, the Court finds the jury reasonably concluded that the warnings provided regarding the soft-close automatic door were not sufficient.  First, as set forth above, the evidence at trial indicated that the soft-close automatic door operated with sufficient force to fracture (and amputate) a finger or thumb. Therefore, sufficient evidence supported the jury's conclusion

---

[5] According to the Collins German-English Dictionary, "gefahr" means "danger" or "threat" in English, and "einklemmen" means "to jam" or "to get caught" in English.        *See*    Collins    German    Dictionary, https://www.collinsdictionary.com/dictionary/german-english    (last    visited Sept. 20, 2024).

that a general warning of "pinching" and "injuries" was not adequate to describe the potential for amputation injuries that could result. Second, the warning in question was directed towards drivers of BMW vehicles, and not occupational safety experts who would understand the specialized meaning of "pinching" and "pinch points" in the context described by Dr. Dorris. As such, the jury could have concluded that the use of the term "pinching" was misleading and vague, and did not accurately describe the risk of serious injury beyond "pinching" with sufficient clarity. Therefore, and given "[t]he adequacy of the . . . warning is generally a question of fact to be determined at trial," the Court will not disturb the jury's factual determination regarding the adequacy of BMW's warnings. *See Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997).

### c. Defendants' Argument that Soft-Close Doors Do Not Pose an Increased Risk of Amputation

BMW's next argument is that it did not possess any information suggesting that soft-close doors posed an increased risk of amputations, and therefore "could not be accused of failing to warn of that which it did not know to be true." (Def. Mem. at 11.) As the New York Court of Appeals has explained, GBL § 349 "does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation." *Oswego*

*Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995) (hereinafter referred to as "*Oswego*"). Nonetheless, GBL § 349 liability may be found "where the business alone possesses material information that is relevant to the consumer and fails to provide this information." *Id.* A logical corollary to this doctrine is that "[a] defendant's failure to reveal facts of which even it was unaware will not lead to liability under G.B.L. § 349." *Morales v. Kimberly-Clark Corp.*, No. 18-CV-7401 (NSR), 2020 WL 2766050, at *5 (S.D.N.Y. May 27, 2020) (citing *In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016)).

As set forth in Trial Exhibit P-101, BMW disclosed in a letter to the KBA, a German regulator, that BMW was aware on July 6, 2016, of "44 cases" since 2001[6] of "injuries of varying degrees to fingers that were in the closing area [of the car door] when the [soft-close mechanism] of the doors was activated." (ECF No. 192-15, Trial Exhibit P-101 at 7.) BMW subsequently explained in a January 19, 2017, follow-up letter to the KBA that "[d]epending on how a finger is located in the door gap, it cannot be ruled out that the [soft-close mechanism] would be mistakenly activated depending on the individual's

---

[6] BMW's Interrogatory Responses, entered in stipulated form as Joint Stipulation 1, list the date that a subset of the claims were communicated to BMW. (ECF No. 192-23, Joint Stipulation 1 at 1-2.) Included in the list are several claims from 2013 and before that predate Mr. Boateng's purchase of the Subject Vehicle in December 2013. (*Id.*; Tr. at 129.)

anatomy and a correspondingly severe crushing." (ECF No. 192-19, Trial Exhibit P-104 at 7.) BMW explained that according to the information it had available, "such potential injuries are usually tissue damage or nail fractures." (*Id.* at 8.) BMW contrasts these relatively rare occurrences with the risk of injury from standard car doors. At trial, Mr. Parker, BMW's expert in automotive engineering, testified that NHTSA statistics showed that the "number one non-crash injury was people closing parts of their body in doors." (Tr. at 1177-79.)

BMW argues that because injuries from car doors are such a common occurrence, and there were relatively few injuries attributed to the soft-close mechanism, BMW was not aware of any heightened risk of amputation from the soft-close mechanism and could not be expected to disclose something it did not know. (Def. Mem. at 15-16.) The Court does not find the Defendants' arguments to be persuasive.

Defendants correctly note that there the 44 cases of injuries from the activation of Defendants' soft-close door mechanism are few in number, relative to BMW's approximately "1.4 million vehicles" with the soft-close feature sold by BMW between 2001 and July 2016. (Tr. at 1010.) Defendants further argue that this point is reinforced by the NHTSA report that "the most common non-crash injury scenario [in 2012] was an injury from a closing vehicle door on a finger, hand, or other

36

body part." (ECF No. 192-21, Trial Exhibit D-72 at 3.) Notwithstanding the above, the Court finds that the soft-close automatic door posed an *additional risk* of injury above and beyond that posed by a standard car door, and that the jury could find the failure to disclose that additional risk to be materially misleading.

Mr. Parker, Defendants' automotive engineering expert, testified that "if you slam the [car] door with enough force . . . you can override the [soft-close] system entirely and close the door." (Tr. at 1253.) Therefore, a consumer would be faced with a similar risk of injury from slamming a car door with sufficient force, regardless of whether the soft-close mechanism was present or not.[7] As Mr. Parker explained, the additional risk from a soft-close mechanism occurs in a situation where an individual is "not trying to close the door, but [] just brings it to a distance of 6 millimeters [from the door pillar.]" (Tr. at 1247.) In such a situation, Mr. Parker testified that "the soft-close feature will activate," and close the door. (*Id.*)

Mr. Parker testified that an individual would need "to

_____

[7] BMW argues that the soft-close feature eliminates "the need to forcefully slam a door to achieve full closure" and points to a decreasing trend in door closure injuries from 2012 to 2019, (Def. Mem. at 15-16), and Mr. Parker opined that the less people "slam their doors, the less injuries are likely to happen," (Tr. at 1224-27). Nonetheless, BMW did not offer any evidence to suggest that the presence of soft-close doors *actually* resulted in fewer injuries from individuals slamming their doors less often, other than Mr. Parker's testimony that "if" less people slam their doors, less injuries are likely to happen. (*Id.* at 1227.)

squeeze his own finger to get it into" the position where the soft-close mechanism would activate but did not rule out the possibility that such a situation could occur. (*Id.* at 1248.) Dr. Greenston, Defendants' biomechanical engineer, testified that "the thumb is compressible" and could potentially be compressed to the point at which the soft-close mechanism activates. (*Id.* at 836.) Just such a situation was reported by BMW to the KBA on July 6, 2016, when they attributed a customer's injury, sustained on February 26, 2016, to the customer "press[ing] against the door with her own body until the pre-locking stage was reached and the [soft-close mechanism] was activated." (ECF No. 192-15, Trial Exhibit P-101 at 7; ECF No 204-4, Trial Exhibit P-99, at 5.)

Defendants' letter to the KBA indicates that they were aware that the soft-close mechanism posed a unique risk not common to all car doors – that a customer might inadvertently trigger the soft-close mechanism with a finger in the door by leaning against the door or otherwise partially moving the door toward closure and compressing their finger or thumb. Although "the mere existence of product complaints does not in and of itself prove that [a] product was unsafe," *Leonard v. Abbott Lab'ys, Inc.*, No. 10-CV-4676 (ADS)(WDW), 2012 WL 764199, at *24 (E.D.N.Y. Mar. 5, 2012), the jury might reasonably conclude that BMW's communications with the KBA indicate BMW had special

knowledge, unknown to consumers, as to a unique risk posed by soft-close equipped doors. Accordingly, the jury could reasonably have found BMW's failure to disclose the particular risk posed by the soft-close equipped door to be a material omission as required by GBL § 349.

### d. Defendants Argument that the Low Volume of Customer Claims Could Not Constitute a Material Omission

Defendants argue that the small number of customer complaints of injuries related to BMW's soft-close mechanism prevent BMW's failure to disclose the existence of the complaints from being considered a material omission. (Def. Mem. at 16-18.) The Court finds that the cases cited by Defendants are distinguishable from the instant case, and the jury could reasonably have found Defendants' failure to disclose the existence of injuries tied to the soft-close mechanism to be a material omission.

First, the Court will discuss *Bozick v. Conagra Foods, Inc.*, a case which will also be relevant to the consideration of BMW's Rule 59 motion for a new trial, *infra*. *Id.*, No. 19-CV-4045 (LJL), 2022 WL 4561779 (S.D.N.Y. Sept. 28, 2022). In that case, the plaintiff alleged that she suffered severe burn injuries after an explosion involving a can of PAM cooking spray left near a burner in her kitchen. *Id.* at *1. In that case, Judge Liman found unreliable and admissible the plaintiff's

39

expert's testimony that the can of PAM "may have buckled at a pressure as low as 136 PSI," as it was based on a mistaken assumption. *Id.* at *28. Accordingly, Judge Liman granted summary judgment to the defendants on the design defect claim. *Id.* at *28-30. Subsequently, in examining the plaintiff's failure to warn claim, Judge Liman stated:

> Plaintiff has failed to proffer admissible evidence that PAM Original cans did not reliably withstand pressures up to 180 PSI, let alone evidence that Defendants knew or should have known that they did not. In fact, the evidence in the record clearly establishes that the cans were subjected to quality assurance testing to ensure [they] did withstand pressure in excess of 180 PSI. Without evidence of Defendants' knowledge or reason to know of the possibility of an explosion from the circumstances Plaintiff describes, Plaintiff cannot claim that Defendants should have warned consumers of such dangers.

*Id.* at *36. Essentially, Judge Liman found that the plaintiff's proffered explanation of the way in which the can exploded was simply not possible, and therefore the defendants had no duty to warn of dangers that did not exist. *Id.*

Turning to the *Bozick* plaintiff's GBL § 349 claim, Judge Liman explained that the presence of "approximately twenty-six consumer complaints . . . related to PAM containers" was not sufficient to show that the defendants had "knowledge of the purported defect" with the can of PAM. *Id.* at *37. Judge Liman explained that "a review of the details of those complaints indicates that some appear to have been caused by risks that

40

[the defendants] disclosed to consumers—specifically, not to overheat the can." *Id.* As a result, Judge Liman found that a jury could not reasonably find for the plaintiff, "particularly in the absence of any other evidence that the product was defective and that Defendants were aware of it." *Id.*

Similarly, in *St. Patrick's Home for Aged & Infirm v. Laticrete Int'l, Inc.*, the Appellate Division held that a plaintiff failed to state a GBL § 349 claim because there was no "evidence in the record to refute [defendant's] assertion that it believed that the epoxy resin coating rendered [the product in question] suitable for exterior use." *Id.*, 696 N.Y.S.2d 117, 122 (1st Dep't 1999). The Appellate Division further found that the transaction in question "between two companies in the building construction and supply industry," involving "sophisticated business entities" in an "intermediary role," did not "constitute consumer-oriented conduct." *Id.* Furthermore, although the Appellate Division noted that "concealment of scores of complaints about the defective nature of a product would clearly approach fraud," it found that the defendant's failure to disclose the existence of "only four complaints or claims regarding [the product] . . . does not in and of itself rise to a fraudulent failure to disclose." *Id.*

In contrast, in the instant case, BMW's expert did not rule out that a thumb could be compressed to the point at which the

41

soft-close mechanism engaged. (Tr. at 836.) Similarly, BMW explained in its letter to the KBA that it believed a customer was injured when she "pressed against the door with her own body" and activated the soft-close mechanism with her thumb in the door. (ECF No. 192-15, Trial Exhibit P-101 at 7.) BMW stated that the customer was leaning against the door "to make room for passing vehicles" on "a narrow one-way street." (*Id.*) Mr. Boateng similarly explained that in his case, he was not intending to close the door, but his attention was "on the truck" that was approaching him on the street. (Tr. at 361-62.) Unlike the other BMW customer, however, Mr. Boateng testified that his body did not come into contact with the car door. (*Id.* at 151.) Based on the instant record, the Court concludes that the jury could reasonably have found the failure to disclose the previous customer injuries from the soft-close mechanism to be a material omission.

Even if Defendants are correct that, in absolute terms, BMW was aware of relatively few complaints of injuries from the soft-close door mechanism, and fewer still that involved serious injuries, (Def. Mem. at 17-18), nonetheless, the Court is aware of no binding precedent that holds a relatively small number of complaints can *never* constitute a material omission, especially in a situation where the manufacturer concedes the possibility that its product caused the injury. Courts consider both "the

volume and accuracy" of complaints in determining whether a failure to disclose the complaints would be material. *St. Patrick's Home for Aged & Infirm*, 696 N.Y.S.2d at 122. Here, the jury could reasonably have found that 44 complaints of injury, including the complaint specifically discussed by BMW in its letter to the KBA, constituted "accurate" complaints, and that BMW's failure to disclose the risk of injury as described in those complaints was a material omission.

### 2.    Sufficiency of the Evidence as to Causation

BMW argues that even if the jury found a material misrepresentation or omission related to the risks of the soft-close door, there is no evidence to show that the misrepresentation caused Plaintiff's injury, and therefore Plaintiff failed to establish the third element of his GBL § 349 claim. (Def. Mem. at 18-19.) BMW argues that Plaintiff "caused the door to close" in stepping away from the passing truck, and therefore more warnings about the danger of the door would not have changed his actions. (*Id.*)

The Court's examination of causation in the context of the GBL § 349 claim considers the jury's findings on the failure to warn claim in the instant case. On the failure to warn claim, although the jury found that the Subject Vehicle was "reasonably certain to be harmful if used in a way that BMW should have reasonably foreseen" and that "BMW failed to provide adequate

43

warning of dangers associated with the soft-close equipped door," the jury nonetheless found that Plaintiff failed to prove "that BMW's failure to provide adequate warnings was a substantial factor in causing plaintiff's injury." (Verdict Form at 2.) Based on these findings, it is possible that the jury concurred with Dr. Dorris, BMW's warnings expert, that "more warning about a danger of an injury" would not have changed Mr. Boateng's actions on the day of the injury. (*Id.* at 1347.) Such a conclusion is certainly reasonable, given Mr. Boateng's focus on the oncoming truck, and the fact that he testified that he did not read the manual beyond a "cursory read" or see its warning about the soft-close feature. (*Id.* at 132.)

Notwithstanding the above, the jury still found that Mr. Boateng proved that BMW's consumer-oriented conduct in the context of the GBL § 349 claim "was a substantial factor in causing [his] injuries." (Verdict Form at 4.) The Court instructed the jury, as proffered by and without objection from BMW, (*see* ECF No. 168-7, Defendants' Proposed Jury Instructions, at 29), that in determining whether BMW's consumer-oriented conduct was a substantial factor in causing Mr. Boateng's injury, they were to consider "whether a reasonable person would regard [the consumer-oriented conduct] as a cause of injury." (Tr. at 1519.) The language for causation for the failure to

44

warn claim was nearly identical, but was, of course, focused on "the omission of an additional warning" as compared to "BMW's statements or omissions regarding the safety of the soft close-equipped door" on the GBL § 349 claim. (*Id.* at 1516.)

The New York Court of Appeals has held that "while [GBL § 349] does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that caused actual, although not necessarily pecuniary, harm." *Oswego*, 647 N.E.2d at 745. A review of New York caselaw provides some guideposts for how causation might be considered in the context of GBL § 349. For example, in *Gale v. Int'l Bus. Machines Corp.*, 781 N.Y.S.2d 45, 46 (2d Dep't 2004), the plaintiff purchased an IBM hard drive which the plaintiff alleged subsequently failed, resulting in permanent loss of the plaintiff's data. The plaintiff in *Gale* subsequently brought an action claiming, among other things, a violation of GBL § 349, citing representations made by IBM "through press releases and other forms of advertisements" that the hard drive at issue was "highly reliable." *Id.* The Appellate Division held that the plaintiff failed to sufficiently plead causation because "he nowhere state[d] in his complaint that he saw any of these statements [about reliability] before he purchased or came into possession of his hard drive." *Id.* at 47. The Appellate

Division reasoned that "[i]f the plaintiff did not see any of these statements, they could not have been the cause of his injury, there being no connection between the deceptive act and the plaintiff's injury." *Id.*

In *Stutman v. Chem. Bank*, 731 N.E.2d 608 (N.Y. 2000), the New York Court of Appeals explained the distinction between reliance and causation in the context of a GBL § 349 claim. The plaintiffs in *Stutman* alleged that the defendant violated GBL § 349 by promising in a loan note that there would be no "prepayment charge" but subsequently assessing a $275 attorney's fee when plaintiffs sought to refinance the loan. *Id.* at 612. The Appellate Division had previously dismissed plaintiffs' claims, holding that plaintiffs failed to show that the $275 attorney's fee "had any effect on plaintiffs' decision to borrow from defendant in the first place." *Id.* The Court of Appeals held that the Appellate Division used the incorrect standard, "because reliance is *not* an element of a section 349 claim." *Id.* (emphasis in original). The Court of Appeals explained that "there is a difference between reliance and causation" and that the plaintiffs' allegations "that because of defendant's deceptive act, they were forced to pay a $275 fee that they had been led to believe was not required" was sufficient to satisfy the causation requirement of GBL § 349. *Id.* The Court of Appeals further explained that the plaintiffs need not

46

"additionally allege that they would not otherwise have entered into the transaction" absent the assurances to show causation. *Id.* at 613.

In light of the above New York precedent, the Court finds that there was sufficient evidence for the jury to conclude that BMW's deceptive acts caused Mr. Boateng's injuries. The instant case is distinguishable from *Gale*, in that Mr. Boateng did not base his GBL § 349 claim on specific claims of safety regarding the soft-close equipped doors. Mr. Boateng testified that he had not seen "any advertisements" or "literature" regarding the soft-close doors prior to his purchase of the Subject Vehicle. (Tr. at 131-32.) Mr. Boateng further testified that no one at the dealership discussed the soft-close equipped doors with him at the time of his purchase of the vehicle, and BMW did not inform him about any dangerous features of the vehicle at the time he purchased it. (*Id.* at 132, 135.) Mr. Boateng testified that he only became aware of the soft-close feature on his doors "about a week after [he] purchased the vehicle" when he "noticed that the door was pulling in by itself." (*Id.* at 136, 139.) Mr. Boateng also testified that he "never realized [the soft-close equipped door] could be that dangerous" prior to his accident. (*Id.* at 296.)

As stated in Discussion Section I.C.2, *supra*, based on the trial record, the jury reasonably could have found that BMW

47

committed a deceptive act when it failed to provide Mr. Boateng with additional information regarding the soft-close equipped door prior to Mr. Boateng purchasing the vehicle. For example, based on the trial record, the jury could have concluded that BMW's failure to disclose to Mr. Boateng that the soft-close equipped door operated with sufficient force to amputate a finger or thumb, and that the mechanism had no means of detecting such an obstruction, to be a material omission. Moreover, the trial record was sufficient for the jury to conclude that the failure to explain to Mr. Boateng that customers had previously complained of soft-close related injuries, including amputation, from the soft-close equipped door constituted a material omission. Having found that BMW committed a deceptive act in failing to disclose such information, the jury could reasonably have found that the omission caused Mr. Boateng's injury. Mr. Boateng stated that he had no idea that the soft-close door feature could be so dangerous at the time he purchased the vehicle, and the jury could reasonably infer that Mr. Boateng would not have purchased the "premium package" which included the soft-close doors, (Tr. at 281), if the risk of serious injury posed by the soft-close feature had been disclosed.

Having found that Mr. Boateng might not have purchased a vehicle with the add-on package absent BMW's material omission,

the jury could have reasonably concluded that BMW's deceptive acts were a "substantial factor" in causing Mr. Boateng's injuries. (Verdict Form at 4.)  Furthermore, the jury concluded that negligence by Mr. Boateng was not to blame for the injury, as they apportioned no comparative fault to Mr. Boateng for the injury. (*Id.* at 5.)  Therefore, the verdict form reveals that the jury was convinced by a preponderance of trial evidence that the soft-close feature, and not Mr. Boateng's negligence, was the cause of Mr. Boateng's injuries, and Mr. Boateng would not have purchased a vehicle with the soft-close feature if not for BMW's deceptive acts.

The Court finds this theory of causation to fit comfortably within the New York precedent regarding GBL § 349 causation described above.  The instant case is not a situation wherein Mr. Boateng alleges he was misled by assurances in an advertisement he does not claim to have seen, as in *Gale*.  781 N.Y.S.2d at 47.  Instead, Mr. Boateng was proceeding on a theory that he was misled by omission of material information – notably the fact that other individuals had been injured by BMW's soft-close door, and that it had the potential to amputate a finger or thumb.  There is no requirement that Mr. Boateng must have justifiably relied on any statements, or lack of statements, about the safety of the door in making his purchase.  *Stutman*, 731 N.E.2d at 612.  Rather, all Mr. Boateng needed to show, and

did show, is that because of BMW's deceptive act, he suffered an
injury from a door he did not know to be dangerous. *Id.* at 612-
13.   In light of the above, the Court finds that sufficient
evidence existed for the jury to conclude that Mr. Boateng
proved causation by a preponderance of the evidence as to his
GBL § 349 claim.

Accordingly, the Court finds that the evidence at trial was
sufficient for the jury to return a verdict in favor of
Plaintiff and against Defendant on the GBL § 349 claim and
denies Defendant's renewed motion for judgment as a matter of
law.

## II.   Defendants' Rule 59 Motion for a New Trial

BMW's Rule 59 motion asserts that a new trial is
appropriate because the jury's GBL § 349 verdict is against the
weight of the evidence, for the reasons already set forth in the
renewed directed verdict motion.  (*Id.* at 21.)  Defendants also
argue that the jury's finding of liability on GBL § 349 is
"irreconcilably inconsistent with the jury's dismissal of the
failure to warn claim" because both claims were "predicated upon
the theory that BMW omitted some kind of material warning that
could have prevented Plaintiff's accident."  (*Id.* at 22.)
Defendants further argue that they were prejudiced by
Plaintiff's counsel's arguments, to which Defendants objected,
"about differences in the number of claims indicated in three

50

different documents." (*Id.* at 23–24.) Finally, Defendants argue that damages awarded by the jury are excessive and unsupported by the trial record and should be set aside. (*Id.* at 28.)

### A.   Weight of the Evidence as to the GBL § 349 Claim

Defendants argue, for the same reasons set forward in their Rule 50 motion, that the jury's verdict on the GBL § 349 was "seriously erroneous" and therefore a new trial is warranted. (Def. Mem. at 21.) As compared to a motion for judgment as a matter of law, in determining whether to grant a new trial the Court need not view the evidence in the light most favorable to the Plaintiff and is "free to weigh the evidence" itself. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) (quoting *Song v. Ives Lab'ys, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992)). Even so, the Second Circuit has instructed courts to grant such a motion only "when the jury's verdict is egregious." *Id.* (internal quotation marks and citation omitted).

Even under the more lenient standard for granting a new trial, the Court finds no error in the jury's verdict, let alone a serious error, that justifies the granting of a new trial. For the reasons set forth in Discussion Section I, *supra*, the Court finds that the jury's verdict was supported by a preponderance of, and was not against the weight of the

evidence, and therefore BMW's motion for a new trial on this ground is denied.

**B.    Inconsistent Verdicts**

Defendants also argue that the jury's finding of liability on GBL § 349 is "irreconcilably inconsistent with the jury's dismissal of the failure to warn claim." (Def. Mem. at 22.) The Court has already considered the asserted tension between the jury's findings on causation regarding the failure to warn claim and the GBL § 349 claim, and found that the jury could reasonably have concluded Mr. Boateng proved causation as to one claim, but not the other. *See* Discussion Section I.C.3, *supra.* Regardless, the Court will first analyze whether Defendants properly preserved any objection regarding inconsistent verdicts before further considering whether the jury's verdict is, in fact, internally inconsistent.

**1.    Defendants Failed to Object to the Jury Instructions, Verdict Form, or Verdict**

First, "[i]t is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56–57 (2d Cir. 2002) (party waived objection to inconsistency between two general verdicts by failing to object to the jury instructions

or verdict form before the jury retired).  In this case, BMW argues that Plaintiff's failure to warn claims and GBL § 349 claims are based on the same factual theory, and that the jury's verdict in favor of Plaintiff on one, but not both, claims is inconsistent "and cannot be squared without a new trial."  (Def. Mem. at 23.)  BMW failed to present these arguments at trial, and the Court may therefore consider them waived.

The Court ordered proposed jury charges from the parties, and held, in effect, two charge conferences in the instant case. The first was held on the second day of the trial, June 18, 2024, while Plaintiff was still presenting his case in chief. (Tr. at 367.)  The Court provided drafts of the jury charges and verdict sheet for the parties, which were marked as Court Exhibits 1 and 1A, respectively, and filed on the docket on the same date.  (ECF No. 172.)  Counsel for the Defendants represented that they had only one request for a change, which was related to the design defect claim, and was denied.  (Tr. at 371-73.)  Defendants did not argue that the failure to warn and GBL § 349 claims should be grouped together on the verdict form, or that the jury should be instructed that their findings on one claim determine whether the other claim succeeds or fails. Notably, the Court did utilize that approach with the breach of implied warranty claim and Magnuson-Moss Warranty Act claim, instructing the jury that "your findings on plaintiff's implied

53

warranty claim will determine whether plaintiff's Magnuson-Moss Warranty Act succeeds or fails.  So you will consider those two claims together." (*Id.* at 1517.)  Following the charge conference on June 18, 2024, the Court filed revised versions of the jury charge and verdict form on the docket as Court Exhibits 2 and 2A, respectively.  (ECF No. 174.)

The Court granted Defendants' motion to strike Plaintiff's request for punitive damages at the conclusion of the Defendants' case on June 25, 2024, and the jury charge and verdict form were further revised to eliminate punitive damages. (Tr. at 1405-07.)  The Court filed the further revised versions of the jury charge and verdict form on the docket as Court Exhibits 3 and 3A, respectively, (ECF No. 175), on June 25, 2024, and solicited further feedback from the parties on the morning of June 26, 2024, prior to summations, (Tr. at 1413). Defendants' counsel suggested no changes, and Plaintiff's counsel suggested minor revisions, to which Defendants did not object, and the Court granted.  (*Id.* at 1413-15.)  Plaintiff's counsel offered a further suggestion regarding the breach of implied warranty claim that was subsequently withdrawn.  (*Id.* at 1415-19.)  The final versions of the jury charge and verdict form were filed on the docket as Court Exhibits 4 and 4A.  (ECF No. 176.)

Following summations on June 26, 2024, the jury returned

54

their verdict in favor of Plaintiff only as to the GBL § 349 claim. (Tr. at 1536.) Before excusing the jury, the Court asked the parties whether the Court needed "to address" anything, and counsel for both sides declined to voice any objection to the jury's verdict. (*Id.* at 1539.) To the extent Defendants believed the jury could not reach "opposite conclusions" on the failure to warn and GBL § 349 claim, (Def. Reply at 10), they failed to make that argument at any of the charging conferences, or upon publication of the jury's verdict and before the jury was discharged. Clearly, Defendants' counsel knew that such an option was available, given the grouping of the breach of implied warranty and Magnuson-Moss Warranty Act claims on the verdict form and in the jury instructions. Defendants' failure to make a similar argument regarding the failure to warn and GBL § 349 claims waived their claim of an inconsistent verdict and prevents the Court from granting a new trial on that ground.

### 2. The Jury's Verdict was not Factually Inconsistent

Nonetheless, the Court will briefly distinguish the cases cited by Defendants in order to further explain that the jury's findings are not inconsistent. As an initial matter, the Second Circuit has "long held the view that '[c]onsistent jury verdicts are not, in themselves, necessary attributes of a valid judgment.'" *Matusick v. Erie County Water Auth.*, 757 F.3d 31,

52 (2d Cir. 2014) (quoting *Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1290 n. 17 (2d Cir. 1969), *cert. denied*, 397 U.S. 913 (1970)).  Instead, the proper inquiry is "whether there was sufficient evidence in the record to support a finding of liability" on the allegedly inconsistent portion of the verdict. *Id.* at 52–53.  As discussed previously, the Court has already conducted such an analysis, and concluded that the jury's verdict on the GBL § 349 claim was based upon sufficient evidence.

Defendants' proffered cases are easily distinguishable given the jury's findings in the instant case.  As a refresher, the jury found against the Defendants on all the elements of the failure to warn claim *except* causation – the jury found that Plaintiff proved the soft-close equipped door "was reasonably certain to be harmful if used in a way that BMW should have reasonably foreseen" and that "BMW failed to provide adequate warning of dangers associated with the soft-close equipped door which BMW knew or should have known."  (Verdict Form at 2.) Despite these findings, the jury found for Defendants on the failure to warn claim because they found that Plaintiff failed to prove that "BMW's failure to provide adequate warnings was a substantial factor in causing plaintiff's injury."  (*Id.*)

In *Burkett v. Smith & Nephew Gmbh*, No. 12-CV-4895 (LDW)(ARL), 2014 WL 1315315 (E.D.N.Y. Mar. 31, 2014), the court

found a plaintiff's GBL § 349, fraudulent misrepresentation, and failure to warn claims to be preempted by the Medical Device Amendments of 1976 ("MDA") and therefore dismissed the claims. *Id.* at *6-8.    The *Burkett* court's analysis of the GBL § 349 claim was brief because it noted the claim was based on "theories of failure to warn and false representations" and had previously dismissed both claims as preempted by the MDA.    *Id.* at *8.    Given the *Burkett* opinion was focused on preemption in the context of the MDA, the Court finds the opinion to be of limited utility in determining whether the jury's verdict was inconsistent in the instant case.

The Court previously analyzed *Bozick v. Conagra Foods, Inc.,* 2022 WL 4561779, in great detail in Discussion Section I.C.2.d, *supra*.    As the Court noted, Judge Liman found in *Bozick* that the plaintiff's proffered explanation of the way in which a can of PAM exploded was simply not possible, and therefore the defendants had no duty to warn of dangers that did not exist. *Id.* at *36.    Because Judge Liman found that the plaintiff had "failed to create a triable issue of fact as to Defendants' knowledge of the purported defect," he ruled that Plaintiff's GBL § 349 claim failed as a matter of law.    *Id.* at *37.    The instant case is distinguishable, because the jury explicitly found that BMW "knew or should have known" about the dangers associated with the soft-close equipped door, and that the door

"was reasonably certain to be harmful if used in a way that BMW should have foreseen." (Verdict Form at 2.) Accordingly, the Court finds *Bozick* does not support Defendants' argument that the jury's verdict is inconsistent in the instant case.

Finally, in *Green v. Covidien LP*, No. 18-CV-2939 (PGG), 2021 WL 1198833 (S.D.N.Y. Mar. 30, 2021), Judge Gardephe found that the defendant "warned of the precise injuries that [plaintiff] allegedly suffered" and, therefore, the plaintiff had failed to show the defendant's statements were misleading for purposes of GBL § 349. *Id.* at *13. In contrast to the instant case, the failure to warn claim in *Green* failed because the defendant provided adequate warnings, and not because of a lack of causation. Given the warnings by the defendant in *Green*, the court reasonably found no deceptive act to have occurred for purposes of GBL § 349. Here, by contrast, the jury explicitly found that BMW failed to provide sufficient warnings, and *Green* is distinguishable.

Ultimately, the Court finds that the jury's verdict on the failure to warn and GBL § 349 claims are not inconsistent, as the jury could reasonably have considered a different theory of causation with regards to each of the different claims. *See* Discussion Section I.C.3, *supra.* As such, even if Defendants had not waived their argument as to the inconsistency of the verdict, the Court would find it to be without merit, and would

58

not grant a new trial on that basis.

**C.    Prejudicial Effect of "Misleading Presentation" by Plaintiff's Counsel**

BMW argues that a new trial is warranted because Plaintiff's counsel "improperly used" exhibits with different numbers of claims of injuries related to the soft-close equipped doors to imply to the jury that BMW had changed the numbers of reported claims.  (Def. Mem. at 23-25.)  BMW argues that this argument "likely swayed and confused the jury by causing them to think that some kind of deception had occurred."  (*Id.* at 26.)

Although Defendants cite to cases discussing errors in the admission of evidence as grounds for a new trial, Defendants do not appear to argue that any of the exhibits related to claims of injuries were not properly admissible, and Defendants did not object to the admissibility of these exhibits at trial.  (Def. Mem. at 23 (citing *Leo v. Long Island R. Co.*, 307 F.R.D. 314, 321 (S.D.N.Y. 2015)).)  Instead, Defendants' memorandum argues that Plaintiff's counsel's *use* of the exhibits and the arguments he made were improper, and constituted impermissible re-litigation of discovery disputes at trial.  (*Id.* at 26-27.)  As such, the Court construes Defendants' arguments as focusing on alleged misconduct by Plaintiff's counsel, and not an erroneous evidentiary ruling by the Court.

### 1.  Applicable Law

Rule 59(a) states that a court may grant a new trial in a jury case for any of the reasons "for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).  Although a new trial may be granted based upon misconduct of counsel, "not all misconduct . . . taints a verdict to such a degree as to warrant a new trial. Only when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict is a new trial warranted." *In re Fosamax Prods. Liab. Litig.*, 742 F. Supp. 2d 460, 477 (S.D.N.Y. 2010) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992)) (internal citations and quotation marks omitted).  Thus, a court addressing a motion for a new trial based on trial counsel's purported misconduct "must consider such a claim in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." *Levitant v. City of New York Hum. Res. Admin.*, 914 F. Supp. 2d 281, 311 (E.D.N.Y. 2012), *aff'd*, 558 F. App'x 26 (2d Cir. 2014) (quoting *In re Fosamax*, 742 F. Supp. 2d at 477) (internal quotation marks omitted).  It is well-accepted that "the judge who was present throughout the

trial [] is best able to determine the effect of the conduct of counsel on the jury." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir. 1990) (citation omitted).    Furthermore, trial courts "possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial." *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989).    When "ruling on a motion for a new trial based on attorney misconduct, the trial court must determine whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury." *Strobl v. N.Y. Mercantile Exch.*, 582 F. Supp. 770, 780 (S.D.N.Y. 1984) (citation omitted).

### 2.    Injury Claim Exhibits

The Court will first review the different sets of numbers of injury claims in various exhibits, to which Defendants did not object, and which were produced by Defendants based on data provided by Defendants.    First, in a letter dated July 6, 2016, to the KBA, BMW disclosed that it had received 44 claims alleging finger injuries in connection with soft-close equipped doors, and that three quarters of the claims "were reported to [BMW] from the USA."  (ECF No. 192-15, Trial Exhibit P-101 at 7.)    Second, in response to Plaintiff's interrogatory requests, BMW disclosed that it was aware of 25 claims of injuries involving the soft-close equipped doors of vehicles from the

61

E70, E71/E72, or E65 platform models that were communicated to BMW prior to July 6, 2016.  (ECF No. 192-23, Joint Stipulation 1 at 1-2.)   Third, in response to the Court's rulings on the motions in limine, BMW prepared a summary chart of "other claims" of injury related to BMW's soft-close doors, which totaled 19 claims and which were admissible only to show notice. (ECF No. 192-24, Joint Stipulation 2.)   BMW explains that the numbers differ because each of the exhibits "represent different things."  (Def. Mem. at 24.)   Specifically, the first number, 44, represents *all* claims worldwide as of July 6, 2016, and the second number, 25, represents only claims related to a *subset* of BMW vehicles which were equipped with soft-close doors, and not all models equipped with soft-close doors.   The third number, 19, represents in summary form a series of exhibits regarding claims that Plaintiff sought to introduce.   As such, the Court agrees with BMW that the numbers are not inconsistent with one another, and notes the exhibits post-date Plaintiff's injury, but include data prior to Plaintiff's injury.

### 3.  Plaintiff's Counsel's Use of the Injury Claim Exhibits

As mentioned above, Defendants argue that Plaintiff's counsel impermissibly used the injury claim exhibits during cross-examination of Defendants' witnesses to "manufacture an alleged deception."  (Def. Mem. at 23.)   The Court will briefly

recount the portions of testimony at issue that Defendants have cited.

First, during Plaintiff's counsel's cross-examination of Neal Guthrie, a current BMW NA employee who was previously deposed as a corporate representative of BMW Manufacturing Company, LLC, Plaintiff's counsel questioned Mr. Guthrie as to why he testified that he knew of two individuals alleging injuries from soft-close doors at the time of his January 2019 deposition. (Tr. at 933-939.) Counsel for the Defendants objected as Plaintiff's counsel began to inquire as to the circumstances surrounding the injuries, and the Court instructed Plaintiff's counsel not to inquire as to the circumstances of the injuries. (*Id.* at 938-39.) Subsequently, Plaintiff's counsel began questioning Mr. Guthrie as to the difference in numbers of injuries reported to the KBA, and what was reported as part of BMW's interrogatory responses. (*Id.* at 941-46.) When Plaintiff's counsel asked Mr. Guthrie why all 33 injury complaints reported to have occurred in the United States in the Defendants' response to the KBA had not been "reported" in the interrogatory response, Defendants' counsel objected, and the Court overruled Defendants' objection. (*Id.* at 945-46.)

The Court subsequently asked Mr. Guthrie if BMW used the same soft-close mechanism "across all models through the years" and Mr. Guthrie answered affirmatively that it was "[m]ore or

63

less identical." (*Id.* at 947.) Plaintiff's counsel ultimately pointed to yet another number of injury claims offered by a representative of BMW, and asked "[w]ho's telling the truth?" (*Id.* at 948.) Defendants' counsel objected, and the Court sustained the objection and instructed the jury that it was "the jury's job to find the facts." (*Id.* at 948-49.)

On redirect, Defendants' counsel asked Mr. Guthrie if the "33 that's referenced" in the KBA letter "potentially include[d] other vehicles that were not chosen to be in the joint exhibit" and Mr. Guthrie replied that that was "a very probable assessment." (*Id.* at 957.) Subsequently, on recross, the Court allowed, over Defendants' objection, Plaintiff's counsel to ask Mr. Guthrie "who makes decisions as to what documents are produced" in response to a document request during litigation. (*Id.* at 970.) Mr. Guthrie explained that he would be approached with "key words, things that are needed," but he was not involved directly and did not know what BMW produced in the instant litigation. (*Id.*)

Separately, during Plaintiff's counsel's cross-examination of BMW AG's head of door design, Klaus Bruecklmeier, counsel questioned Mr. Bruecklmeier regarding the number of claims disclosed in response to Plaintiff's interrogatories. (*Id.* at 1070-71.) After Mr. Bruecklmeier stated that he did not know the source of the number of claims, Plaintiff's counsel asked

"if BMW acknowledges in 2016 that there are 44 claims, and then changes it to 19 right before trial . . . which is the correct number?" (*Id.* at 1071.)  Defendants' counsel objected, and the Court instructed that Plaintiff's counsel "can only ask the witness what he knows.  He said there are 44."  (*Id.*)  Defendants did not request that the Court strike the question, or instruct the jury to disregard it.  (*Id.*)  Defendants argue in their Rule 59 motion that although their objection was sustained, "the damage was done in the eyes of the jury." (Def. Mem. at 25 n.5.)

### 4.  Analysis

At the outset, the Court notes that, to the extent Plaintiff's counsel was attempting to imply at trial that the Defendants had lied or provided false responses to any of the Plaintiff's interrogatories in the instant case, such an argument would have been without any factual basis, and improper.  Plaintiff, however, could permissibly argue in summation that Defendants' injury claim numbers were inconsistent and ask the jury to consider the inconsistencies in determining credibility and weight.  Accordingly, when Plaintiff's counsel came close to making such an argument during the cross-examination of Mr. Bruecklmeier, the Court sustained Defendants' objection.  (Tr. at 1071.)  Nonetheless, to the extent Defendants argue that the single instance that

65

Plaintiff's counsel posed such a question would provide a basis for a new trial, the Court is not persuaded.

Defendants have not offered convincing arguments to suggest that "absent the inappropriate conduct of plaintiff's counsel, the ultimate outcome of the trial would have been any different." *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 159 (E.D.N.Y. 2013); *see also Hopson v. Riverbay Corp.*, 190 F.R.D. 114, 122 (S.D.N.Y. 1999) ("Conduct that is 'de minimis in the context of the entire trial' or that is appropriately dealt with by curative instructions, is not sufficient to warrant a new trial." (quoting *Pappas*, 963 F.2d at 540)).  The Court is confident that the jury was able to disregard any inappropriate argument, especially in light of the Court's frequent reminders to the jury that "statements, arguments, and questions by the lawyers are not evidence." (Tr. at 4, 11, 272, 347, 1389, 1423, 1504-05.)

Regarding Plaintiff's counsel's questioning of Mr. Guthrie and Mr. Bruecklmeier about the differing numbers of claims of injuries in the two documents, the Court finds no error, let alone an error warranting the granting of a new trial.  First, BMW itself created the potential for confusion through its approach to answering the interrogatories in the instant case. During discovery, Plaintiff requested that BMW identify, among other things, "any foreign or domestic [soft-close equipped

66

door] [i]njury [c]laims, lawsuits, actions, proceedings, or complaints . . . in which any Defendant is or was a party to, or which is otherwise known to BMW." (ECF No. 32-1, Exhibit A to Plaintiff's Motion to Compel at 8.) BMW NA objected to the interrogatory and responded only as to "allegations of injuries due to the driver/passenger doors on the subject E70 platform." (ECF No. 32-2, Exhibit B to Plaintiff's Motion to Compel at 15[8].)

Ultimately, following litigation over Plaintiff's motion to compel discovery, BMW AG (which had not initially been joined as a party when the case was filed) provided a more comprehensive response to Interrogatory No. 8 which listed 25 claimants, but still only as to injuries on the "E70 platform vehicles such as Plaintiff's subject vehicle." (ECF No. 162-10, Plaintiff's Proposed Exhibit 121, BMW AG's Interrogatory Responses at 5.) Elsewhere in BMW AG's interrogatory responses, BMW explained that 18 separate vehicle platforms "implement the same soft close technology, if soft close is present in the vehicle, as the subject E70 platform." (*Id.* at 11.) Given BMW's response that the same soft close technology is used in 18 of BMW's vehicle platforms, Plaintiff subsequently requested that BMW supplement the list of injury claims "beyond the E70 platform" to which BMW objected, stating that "Plaintiff's subject vehicle is an E70 platform vehicle, so the response is appropriate in

---

[8] The Court utilizes the page number assigned by ECF, because the referenced document includes several documents, each separately paginated.

scope." (ECF No. 165-2, Defendants' Letter Dated September 9, 2020, at 10.) Defendants nonetheless supplemented the list to disclose "non-U.S. SCAD injury claimants on the E65, E71, and E72 platforms" and provided further information regarding U.S. injury claimants on those platforms in response to a separate document demand. (*Id.*)

Given BMW AG's admission that the soft close mechanism across 18 separate vehicle platforms is identical, and Mr. Guthrie's testimony that the soft-close mechanism is "[m]ore or less identical" across all models, (Tr. at 947), the Court does not find persuasive BMW's argument that injury claims on vehicle models beyond Mr. Boateng's E70 platform vehicle are not relevant to the instant case. The KBA asked BMW AG a nearly identical question in its June 3, 2016, letter when it requested BMW answer "[h]ow many injuries caused by the automatic door closing function" it was "aware of worldwide," (ECF No 204-4, Trial Exhibit P-99, at 5), and BMW responded that "44 cases have been reported worldwide" since the introduction of the feature, without distinguishing between vehicle platforms, (ECF No. 192-15, Trial Exhibit P-101 at 7). By providing Plaintiff with a different number of injuries in response to a very similar question, Defendants put themselves in the position of having to clarify why they provided different answers at trial.

It was proper for Plaintiff to question BMW's

representatives at trial as to why BMW's numbers of claimed injuries on the aforementioned exhibits differed. BMW's witnesses could have offered any number of explanations regarding the disparate numbers, which would have been relevant to the design and operation of the soft-close mechanism, and its potential for injury. Such an answer would have provided an explanation for the differing numbers that was relevant to the design of the soft-close equipped doors and would have avoided any confusion by the jury on the topic. In fact, Defendants' counsel solicited testimony to clear up any confusion on redirect from Mr. Guthrie:

> Q [Referring to Joint Exhibit 1] Do you see where it says No. 1 on top of that chart and then there's a paragraph below that lists out certain makes and models?
>
> A I do.
>
> Q Is that all BMW models?
>
> A It is not.
>
> Q It's just the X [and] the 7 series, am I correct?
>
> A You are correct.

(Tr. at 956.) Subsequently, Defendants' counsel, referring to BMW's response to the KBA and the number of U.S. injury claims reported, asked Mr. Guthrie the following question:

> Q You were also shown the letter from BMW AG that you didn't recognize. Do you remember that?
>
> A Yes.

Q Okay. And would you normally, in the course of your work, have knowledge of BMW AG communications with German entities?

A I would not.

Q And do you know if that 33 that's referenced did potentially include other vehicles that were not chosen to be in the joint exhibit?

A I think that's a very probable assessment.

(*Id.* at 957.)   Defendants' counsel utilized this testimony in summation to explain that the subset of injury claims reported in Joint Exhibit 1 "are the X models, the ones with the same locking systems" and noted that there are "different locking systems" and "[n]obody is trying to hide anything."   (*Id.* at 1488.)

In conclusion, the Court does not find Plaintiff's counsel's line of questioning regarding the differing numbers of injuries to be improper.   BMW AG provided differing responses to very similar questions posed by the KBA and by Plaintiff, and to the extent there was a reason for those differing responses, Plaintiff's counsel properly sought to question BMW's witnesses about those differences.   Defendants made a strategic decision to limit the scope of their response to Plaintiff's interrogatories in discovery, and that strategic decision provided Plaintiff with an opportunity to question Defendants' witnesses regarding the differing numbers at trial.   Certainly, BMW's interrogatory responses themselves could not have been a

"deceptive act" for purposes of Plaintiff's GBL § 349 claim. Nonetheless, the response was admissible to show that BMW was on notice of claims of injuries involving the soft-close equipped door, and Plaintiff properly questioned Defendants' witnesses as to the rationale behind the number of reported injuries in BMW's interrogatory responses differing from BMW's response to the KBA. As such, the Court does not find that Plaintiff's counsel's conduct "created undue prejudice or passion which played upon the sympathy of the jury" and therefore finds granting a new trial to be unwarranted. *Strobl*, 582 F. Supp. at 780 (citation omitted).

### D.   Remittitur or a New Trial on Damages

Defendants argue that the jury erred in determining Mr. Boateng's lost earnings, and that the Court should set aside the resulting award of $255,360 based on that erroneous determination. (Def. Mem. at 28-33.) Defendants further argue that the jury's award of $1.65 million for past and future pain and suffering to Plaintiff "clearly exceeds the range of pain and suffering awards under similar, or even more severe, circumstances, and a new trial on damages should be ordered or the damages remitted." (Def. Mem. at 33-37.) The Court will examine each of Defendants' arguments in turn.

### 1.   Applicable Law

In considering a Rule 59 motion on the issue of damages,

courts may "order[] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996); *see also Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) ("Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.") (internal quotation marks and citation omitted).  Under Federal law, remittitur is appropriate where a jury award "is so high as to shock the judicial conscience." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (internal quotation marks and citation omitted).  However, when courts "review[] the amount of damages awarded on a state law claim, [they] must apply [state] law." *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (citing *Gasperini*, 518 U.S. at 430-31).  In this diversity action, the Court must apply the law of the state of New York[9] to evaluate the Defendants' request for a new trial with respect to damages.  *Gasperini*, 518 U.S. at 438-39.

### 2.  Lost Earnings Award

"Under New York law, 'a claimant must present evidence

---

[9] The Court notes that Defendants cite to cases applying federal law in setting forth the legal standard for a new trial on damages.  (*See* Def. Mem. at 28, 33.)  Defendants subsequently cite to the New York state law standard for establishing lost wages, however, and the Court assumes that the reference to federal law was made in error.  (*Id.* at 29.)  In any event, application of New York's standard "tighten[s] the range of tolerable awards" for damages and therefore will not prejudice Defendants.  *Gasperini*, 518 U.S. at 425.

that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages. He need not prove the amount of loss with mathematical precision; but the jury is not allowed to base its award on speculation or guesswork.'" *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 581 (S.D.N.Y. 2010) (quoting *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992)).  "It [also] is well settled under New York law that the plaintiff's uncorroborated testimony as to the amount of lost past or future wages cannot, as a matter of law, satisfy the 'reasonable certainty' standard." *Id.* (internal quotation marks and citation omitted).  Rather, "a plaintiff must submit relevant documentation, such as tax returns or W-2 forms."  *Id.*

The jury's award of damages for past lost wages in the instant case--$255,360--was based on a simple calculation made by Plaintiff during his testimony.  At the time Plaintiff was injured, he was working, through his business, GAB Consulting ("GAB"), a pass-through entity he created in 1998, as a subcontractor for the Department of Defense.  (Tr. at 104-05.) Plaintiff's pass-through entity did not contract directly with the government, but rather with Stango & Associates ("Stango"), which was the main contractor for the project.  (*Id.* at 106-07.) Plaintiff's contract with Stango was entered into evidence and reflected that he was working 40 hours per week at $114 an hour

in 2016, the fourth year of the five-year contract. (*Id.* at 107-08.)   Plaintiff also provided his 2016 pay stubs from Stango, showing the amount he billed Stango each week. (*Id.* at 110-11.)   After Plaintiff was injured on July 6, 2016, he informed Stango that he would not be able to return to work. (*Id.* at 112.)

Subsequently, the main contract for the Department of Defense project shifted from Stango to SMS Data Systems ("SMS") in 2017, following the expiration of Stango's contract. (*Id.* at 113.)   Plaintiff testified that, at some point in or before May 3, 2017, SMS called him because "the client," which was the Department of Defense, "wanted [Plaintiff] on that project." (*Id.* at 113-14.)   Plaintiff testified that "at that point, [he] told [SMS] [he] wasn't ready to come yet." (*Id.*)   Eventually, Plaintiff signed a new contract with SMS on "May 3rd or so" of 2017, but Plaintiff explained that he would "have to take some time off" because he anticipated he would "have to go for a second surgery to resolve" his lingering pain issues. (*Id.* at 114.)   Plaintiff testified that he had the surgery in June of 2017, and did not return to work "full time uninterrupted" until "somewhere in August" of 2017. (*Id.* at 114-15.)   Plaintiff testified that he was out of work for approximately "56 weeks" as a result of his injury and, based on his hourly rate at the time of his injury, he calculated his lost wages as $255,360--40

74

hours a week at $114 per hour, for 56 weeks.  (*Id.* at 115-16, 253.)  Plaintiff subsequently entered his 2015, 2016, and 2017 tax records into evidence, reflecting $228,594 in gross receipts for Plaintiff's pass-through entity for 2015, $132,880 in 2016, and $82,500 for 2017.  (*Id.* at 255-57.)

BMW argues that it was speculative to award Plaintiff damages for 56 weeks for several reasons.  Specifically, BMW argues that it was not clear Plaintiff would have immediately been hired by SMS Data Systems, the successor main contractor to Stango, or that the contract passed seamlessly from Stango to SMS.  (Def. Mem. at 30-31.)

The Court does not find an award of damages for 56 weeks to be speculative.  *First*, Mr. Boateng testified that he "hardly get[s] any gaps between the contracts" from one project to the next, (Tr. at 104), and the Stango contract, which was entered into evidence, explained that Stango would be "negotiating a new contract with [the client, a project for the Department of Defense] prior to expiration of [the] current contract" but that if a new agreement was not finalized, the current rate would "stay in effect until a new agreement is reached," (ECF No. 192-25, Trial Exhibit P-29 at 1).  As such, the jury could have reasonably concluded, based on documentary evidence, that Stango would remain in place as the main contractor even after December 28, 2016, until such time as a new contractor was selected or

Stango entered into a new contract.

*Second*, Mr. Boateng testified that SMS reached out to him at the behest of their client, the Department of Defense, who wanted him back on the project. (*Id.* at 113.) In light of Mr. Boateng's testimony that SMS reached out to him and he easily negotiated a new contract with SMS even before he was able to return to work full-time, it was not speculative for the jury to have concluded that Mr. Boateng would have been swiftly hired by Stango's successor, SMS.

*Third*, to the extent Mr. Boateng returned to work briefly prior to his June 2017 surgery, the Court does not find a two-week period of work to render the jury's findings erroneous. Mr. Boateng testified that he returned to work in "late August." (*Id.* at 115.) There are 60 weeks between July 6, 2016, and August 30, 2017, and the Court finds 56 weeks to be a reasonable approximation of the number of weeks for which Mr. Boateng lost wages, based on the trial evidence. Accordingly, for the reasons set forth above, the Court does not find 56 weeks of lost work to be unreasonable for purposes of calculating Mr. Boateng's lost wages.

Next, BMW argues that "there was no guarantee" that Plaintiff's rate of compensation would have remained at a constant $114 per hour under Stango's successor. (Def. Mem. at 31-32.) BMW notes that Mr. Boateng was hired by SMS at $110 per

hour, and that there was no evidence to indicate the lower rate was due to Mr. Boateng's injury. (*Id.* at 31.) As an initial matter, the Court notes that the assumption of $114 an hour *understates* the wages Mr. Boateng would have received from Stango. Per Mr. Boateng's contract with Stango, he would have been entitled to $117 per hour for all work performed between September 19, 2016, and December 28, 2016, and at the same rate for any hours worked thereafter "until a new agreement [was] reached" between Stango and the client. (ECF No. 192-25, Trial Exhibit P-29 at 1.) Therefore, if anything, $114 per hour understates Mr. Boateng's lost wages in 2016.

Regarding Mr. Boateng's contract with SMS, the Court finds the jury reasonably could have inferred that Mr. Boateng would have been in a stronger negotiating position without any break in his work on the contracting project, and that he would have been able to maintain a wage of $114 per hour. Ultimately, Mr. Boateng was not required to prove the amount of his lost wages "with mathematical precision," *Mugavero*, 680 F. Supp. 2d at 581, and the jury did not err in making reasonable calculations based on the documentary evidence Plaintiff provided at trial.

Finally, BMW argues that it was incorrect to assume that Mr. Boateng would have "taken home 100% of the gross receipts" of GAB. (Def. Mem. at 32.) BMW argues that GAB "is not the plaintiff in this lawsuit, and GAB's business expenses must be

deducted from Mr. Boateng's personal income." (*Id.*) The Court does not find BMW's arguments to be persuasive because GAB was a pass-through entity, an S-Corporation, of which Mr. Boateng was the sole owner.[10]   Mr. Boateng's tax records reflect that he owned 100% of GAB's stock, and thus would be entitled to all of the entity's income.  (ECF No. 192-27, Trial Exhibit P-21 at 7.) Mr. Boateng did claim certain deductions in his tax returns for GAB, and he accordingly did not report the full amount of GAB's gross receipts as income on his own personal taxes, but the Court does not find any resulting tax advantage to be a basis for reducing Mr. Boateng's recovery of lost wages in the instant case.

During Defendants' cross-examination of Mr. Boateng, counsel questioned Mr. Boateng as to whether his "adjusted gross income" on his personal income tax returns was a "different number than the gross income of GAB." (Tr. at 331.) The Court is unaware of any persuasive authority suggesting that "adjusted gross income" as reflected on an individual's personal income tax returns, which reflects total income with numerous deductions taken out, should be the measure of lost wages in a personal injury case.  The Second Circuit has held to the contrary that "under New York law the calculation of future lost

---

[10] As the Supreme Court has explained, "Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation." *Gitlitz v. Comm'r*, 531 U.S. 206, 209 (2001).

wages as a component of a plaintiff's damage award must be based on projected gross earnings with no consideration of after-tax income either allowed into evidence or charged to the jury." *McKee v. Colt Elecs. Co.*, 849 F.2d 46, 49 (2d Cir. 1988). Absent authority supporting Defendants' arguments, the Court finds that the jury did not err in attributing the income earned by Mr. Boateng's 100% owned pass-through entity to Mr. Boateng.

Consequently, for the reasons set forth above, the Court finds no specific error warranting setting aside the jury's award of lost wages and denies Defendants' motion as to the lost wages award.

### 3. Pain and Suffering Award

Defendants argue that the jury's award of $1.65 million in past and future pain and suffering is excessive and a new trial on damages should be ordered, or the damages remitted. (Def. Mem. at 33.)

With respect to determining whether the jury's damages awards come within the confines of state law, "[u]nder New York law, a court 'shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'" *Stampf*, 761 F.3d at 204 (quoting N.Y. Civil Practice Law and Rules ("CPLR") § 5501(c)). "To determine whether a jury award is excessive within the meaning of [CPLR] § 5501(c), New York courts compare it with awards in

similar cases." *Id.* Though earlier court awards are instructive, they are not binding on the reviewing court. *Lewis v. City of New York*, 689 F. Supp. 2d 417, 430 (S.D.N.Y. 2010). The relevant standard "is not whether an award deviates at all from past awards--it is whether an award deviates *materially* from *reasonable compensation*." *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 439 (S.D.N.Y. 2008) (emphasis in original).

Earlier awards are instructive--rather than binding--because courts have recognized that "awards for pain and suffering . . . do not lend themselves as easily to computation" as quantifiable economic awards, such as compensation for past medical bills. *Id.* at 435 (internal quotation marks and citation omitted). To the contrary, "[m]easuring pain and suffering is heavily subjective and fact specific." *Lewis*, 689 F. Supp. 2d at 433; *see also Okraynets*, 555 F. Supp. 2d at 435-36. That "there exists an infinite variety of people who will experience different reactions to similar tragedies further compounds the difficulty of quantifying a reasonable verdict." *In re Joint E. & S. Dist. Asbestos Litig.*, 9 F. Supp. 2d 307, 312 (S.D.N.Y. 1998). Due to these complexities, reviewing the appropriateness of an award under § 5501(c) has been described as "one of the most difficult decisions" a trial court can face. *Id.* at 311 (internal quotation marks and citation omitted);

*Lewis*, 689 F. Supp. 2d at 432; *Okraynets*, 555 F. Supp. 2d at 436.

In support of their argument that damages are excessive in the instant case, Defendants offer several cases, from over a decade ago[11], in which plaintiffs similarly suffered finger injuries but received more modest damage awards. (*Id.* at 33-35.) The Court will review each case in turn, but first notes an important aspect of Mr. Boateng's injury established by testimony at trial – specifically, that Mr. Boateng suffered a "crush injury" to his thumb that resulted in amputation. (Tr. at 462.)

Dr. Hoschander described the distinction between a crush injury and an injury cause by a sharp object as follows:

> There are sort of two ways you can amputate a limb or a finger. One of them would be a sharp injury, if you were, let's say, a chef and using a very sharp knife and you were chopping. If you were to do that to your thumb, it would be much easier to reattach the piece because everything would be cut cleanly. And then when you bring the two pieces together under a microscope, you can sew the vessels back together and the nerves back together again.
>
> In this case, the tissue was crushed, meaning exactly as it sounds, so there's no clean -- there's just no clean way of putting this back together.

(*Id.* at 465.) Dr. Hoschander also wrote in his report, which was entered into evidence, that there was "a significant amount of crush tissue and necrotic tissue within the wound" and he was

---

[11] The Court acknowledges that Defendants did provide an inflation-adjusted amount for the award in the oldest case presented. (Def. Mem. at 34.)

therefore required to conduct a "revision amputation" of the wound. (*Id.* at 466-67.) In essence, the revision amputation required Dr. Hoschander to "amputate a little bit more of the bone," beyond the location of the crush injury, in order to "get the skin and everything to close on top of [the bone]." (*Id.* at 467.) Despite Dr. Hoschander's attempts to prevent any nerve pain in his initial operation, he was subsequently required to operate on Mr. Boateng again in June 2017 to relieve Mr. Boateng's ongoing nerve pain, which was caused by a healthy nerve confronting scar tissue that "allow[ed] the nerve endings to fire off." (*Id.* at 488-89.)

In contrast to Mr. Boateng's crush injury, the cases cited by Defendants generally involve situations closer to what the Court would consider a "sharp injury," as described by the testimony of Dr. Hoschander. In *Gonzalez v. Delta International Machinery*, No. 33704/98, JVR No. 385889, 2001 WL 1136768 (N.Y. Kings County Sup. Ct. 2001), a case tried over two decades ago, the tip of plaintiff's thumb was amputated by an industrial saw. The jury awarded the plaintiff $142,000 in pain and suffering, but the award was further reduced because the plaintiff was found 56 percent negligent. *Id.* It is not clear whether the plaintiff's thumb was able to be reattached, as the verdict report only noted that the thumb required "surgical repair," but the injury in *Gonzalez* is clearly distinguishable from the crush

injury suffered by Mr. Boateng. *Id.*

Similarly, in *Hudson v. Lansingburgh Cent. Sch. Dist.*, 812 N.Y.S.2d 678 (3rd Dep't 2006), the plaintiff "cut off a portion of his middle finger . . . while operating a jointer-planer" in middle school technology class. *Id.* at 680. The jury found the defendant 65% liable on a damage award of $90,000 for past pain and suffering and $150,000 for future pain and suffering, which the Appellate Division declined to reduce. *Id.* Although the injury required an amputation of the plaintiff's finger, the Appellate Division makes no mention of any nerve damage, pain, or sensitivity in the digit. *Id.*

*Villalba v. Rockford Sys., Inc.*, No. 02-CV-4455 (ARR)(RML), 2006 WL 526660 (E.D.N.Y. Mar. 3, 2006) involves an amputation by the "blade" of a "punch press" that "severed the top portions of the index and middle fingers of [the plaintiff's] left, dominant hand." *Id.* at *2. Magistrate Judge Levy conducted an inquest on damages and recommended the plaintiff be awarded $100,000 in past and future pain and suffering, and Judge Ross adopted Judge Levy's Report and Recommendation. *Id.* at *1. The plaintiff in *Villalba* required surgery to revise his amputations, and suffered from hypersensitivity of the injured fingers, similar to Mr. Boateng. *Id.* at *2. In *Villalba*, the Plaintiff based his damages request primarily on his own testimony, and Magistrate Judge Levy noted that a medical provider explained

that the plaintiff "will regain function in the injured hand and be able to lead a relatively normal life." *Id.* at *5. Accordingly, the Court finds that *Gonzalez, Hudson,* and *Villalba* each differ sufficiently factually from the instant case, either in mechanism and type of injury or in evidence provided to the court to distinguish them from the instant case.

Yet another case cited by Defendants, *O'Shea v. State*, 836 N.Y.S.2d 494, 2007 WL 494635 (N.Y. Ct. Cl. 2007), is distinguishable both because it involved a "sharp injury" from a table saw, and because the plaintiff did not sue the table saw manufacturer, but instead sued the hospital that treated him for malpractice. *Id.* at *1. In determining the plaintiff's damages, the court noted that "[t]his is not the case of an individual who is injured on the job and the measure of damages is a comparison of, for example, the right ankle before and after." *Id.* at *6. Rather, the court noted that "not all of [the plaintiff's] functional impairment is a proximate result of defendant's malpractice." *Id.* at *8. Given the starkly different fact pattern at issue in the *O'Shea* case, the Court does not find *O'Shea* to be particularly illuminating as a point of comparison to the instant case.

The Court is unable to determine the mechanism of the injury in another case cited by Defendants, *Robinson v. New York City Dep't of Educ.*, 941 N.Y.S.2d 123 (1st Dep't 2012). In that

84

case, a teenager "caught his middle finger on a V-shaped pinch point" near a basketball backboard and "lost the tip of the middle finger." *Id.* at 124-25. The jury awarded the plaintiff in *Robinson* $868,000 in past and future pain and suffering, which the Appellate Division reduced to $300,000. *Id.* at 124. The Court does not read the injury description in *Robinson*, vague as it is, as being akin to Mr. Boateng's crush injury, and unlike Mr. Boateng, the plaintiff in *Robinson* had "resumed most of his pre-accident activities." *Id.* at 125. By contrast, Dr. Hoschander testified that Mr. Boateng's ability to play tennis or lift weights "would be significantly limited [] in perpetuity," by contrast. (Tr. at 497.)

The Court finds more instructive the New York case cited by Plaintiff's opposition memorandum because it involves a *crush* injury, similar to the instant case. (Pl. Opp. at 35.) In *Class v. Steering Wheel Rentals, Inc.*, JVR No. 378343, 2000 WL 1515708 (N.Y. Kings County Sup. Ct. 2000), the plaintiff suffered a "finger amputation when the cargo door slammed shut on his hand" and was awarded $1.5 million in pain and suffering, which would approximate $2.7 million when adjusted for inflation[12] as of June 2024. Although the plaintiff in *Class* was

---

[12] The Court utilizes the Bureau of Labor Statistics' ("BLS") Consumer Price Index ("CPI") Inflation Calculator to perform the calculation. *See* CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl; *see also Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 97 n.11 (E.D.N.Y. 2020) (utilizing the BLS CPI inflation calculator to adjust for inflation).

much younger than Mr. Boateng, the Court finds the mechanism of injury to be quite similar. Defendants' argument that Mr. Boateng did not suffer a "finger amputation" similar to *Class*, because Mr. Boateng "merely" lost the "tip" of his thumb, (Def. Reply at 17), is not persuasive given Dr. Hoschander's description of the injury as a crush injury with "partial amputation," (Tr. at 476).

The Court also conducted its own inquiry into awards from similar cases and summarizes additional cases that it finds instructive. One such case is *Ramos v. City of New York*, 891 N.Y.S.2d 385 (1st Dep't 2009), in which a plaintiff brought an action against New York City to recover for injuries he sustained while the police were pursuing a stolen vehicle driven by another individual. *Id.* at 386. The *Ramos* plaintiff had injuries to his nondominant hand, including severance of his left pinky finger, and the Appellate Division determined that remittitur of the pain and suffering award from $4 million to $1.35 million was appropriate. *Id*. Adjusted for inflation, the reduced award would be approximately $1.9 million as of June 2024.

Another case the Court finds instructive is *McKeon v. Sears, Roebuck & Co.*, 690 N.Y.S.2d 566 (1st Dep't 1999), in which the plaintiff had "four fingers of his dominant hand fully

Unless otherwise noted, all future inflation adjustments are calculated in the same manner.

amputated and reattached." *Id.* at 566. The Court notes that the *McKeon* plaintiff appears to have had a more favorable prognosis than Mr. Boateng, given the *McKeon* plaintiff's fingers were able to be reattached where the injury was a "sharp injury" caused by a radial arm saw. *Id.* Nonetheless, the Appellate Division affirmed an award of $1.35 million for pain and suffering, which would be approximately $2.6 million adjusted for inflation as of June 2024.

The aforementioned cases provide instructive benchmarks for the Court's evaluation of pain and suffering damages awarded in this matter and prompt this Court's conclusion that the amount awarded to Mr. Boateng does not deviate materially from reasonable compensation. Mr. Boateng suffered a crush injury and partial amputation when his thumb was caught in the Subject Vehicle's door, and the nature of his injury therefore exacerbated both the inability of the treating physician to reattach any portion of Mr. Boateng's thumb, his ability to use his thumb, and his resulting nerve pain from the injury. (Tr. at 465-66.) Dr. Hoschander also testified at trial that he and "most authorities would say" the thumb is the most important finger, given it is "the one that allows for grip and opposition so you can grab things, and strength of course." (*Id.* at 491.) Mr. Boateng's injury was also to his right thumb, which was on his dominant hand. (*Id.* at 458.)

Furthermore, Dr. Rauchwerger testified in detail about his extensive efforts to manage Mr. Boateng's pain from his thumb over more than seven years and testified that Mr. Boateng's pain is permanent. (*Id.* at 720-22, 760-61.) Dr. Rauchwerger testified that Mr. Boateng's pain after the accident was initially at an "eight out of ten" and that Mr. Boateng was experiencing "sharp shooting throbbing" in his thumb that would "linger." (*Id.* at 721.) Dr. Rauchwerger diagnosed Mr. Boateng with "complex regional pain syndrome II," which occurs when an individual "get[s] nerve damage" and subsequently "develops an inflammation and that inflammation spreads to all the nerves in the region." (*Id.*) Dr. Rauchwerger further testified that this pain was "on top of" the "stump neuroma" and required a "more aggressive" intervention in order to manage Mr. Boateng's pain. (*Id.* at 722.) Dr. Rauchwerger offered testimony regarding the treatment for Mr. Boateng's pain, including, among other things, injecting the stellate ganglion nerve with local anesthetic, and conducting a brachial plexus block. (*Id.* at 732, 752.) Dr. Rauchwerger testified that he most recently saw Mr. Boateng "a couple of months" before trial, and Mr. Boateng was continuing to experience pain at that time, despite the numerous interventions. (*Id.* at 760.)

The Court finds Mr. Boateng's injuries to be at least as severe as those suffered by the plaintiffs in *Class* and *Ramos*.

*Class* is instructive because it involves a very similar mechanism of injury as in the instant case – a crushing injury from an automobile door. It is not possible to determine the precise mechanism of injury in *Ramos*, but the Court notes that the *Ramos* plaintiff suffered an injury to the pinky finger on his non-dominant hand, as compared to Mr. Boateng's crush and amputation injury to his dominant thumb. Accordingly, the Court does not find the jury's award of $1.65 million, which is well below both the inflation-adjusted amount awarded by the jury in *Class* and the remittitur suggestion in *Ramos*, to be excessive under New York law.

In conclusion, the Court finds that Defendants have failed to establish that a new trial is warranted in the instant case, either as to liability or damages and, therefore, the Defendants' Rule 59 motion for a new trial is denied. Finally, as the Court has concluded that the jury's verdict was not excessive, BMW's request for remittitur also is denied. *Lore*, 670 F.3d 127, 177 (2d Cir. 2012) (standard for new trial and remittitur the same).

## III. Plaintiff's Request for Pre-judgment Interest

The Court explicitly did not include pre-judgment interest in the Judgment, explaining that the "judgment [was] entered on the same date as the determination of liability." (*See* Judgment.) Plaintiff later submitted a letter to the Court on

July 3, 2024, requesting that the Judgment "be amended or modified" to include pre-judgment interest. (ECF No. 182.) The Court subsequently provided Plaintiff multiple opportunities to set forth the legal authority upon which his request was based, and Plaintiff submitted additional letters on July 12, 2024, and July 17, 2024, with further argument. (ECF Nos. 184, 185.) The Court also provided Defendants with an opportunity to respond, and Defendants submitted a letter in opposition on July 23, 2024. (ECF No. 189.) The Court now denies Plaintiff's request for pre-judgment interest, finding it to be inconsistent with binding Second Circuit precedent.

As the Second Circuit has explained, "the 'awarding of prejudgment interest is considered a question of substantive law.'" *Rhodes v. Davis*, 628 F. App'x 787, 792 (2d Cir. 2015) (quoting *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999)). As the Court has previously explained, and no party contests, substantive New York law applies in this diversity action. "Under New York law, in personal injury cases, prejudgment interest is added from the 'date of the liability determination.'" *Schwimmer*, 176 F.3d at 650 (quoting *Love v. State of New York*, 583 N.E.2d 1296, 1299 (N.Y. 1991)). The Second Circuit explained further that "in personal injury actions, the damages are continuing and may even reach beyond the time of trial, [and therefore] no interest is recoverable

prior to the verdict." *Id.* (internal quotation marks and citation omitted).

Furthermore, as the Court noted in its July 15, 2024, Docket Order to Plaintiff, a review of Practice Commentaries to CPLR § 5001--the statute which governs recovery of pre-judgment interest--similarly notes: "The language of CPLR 5001(a) clearly applies to actions sounding in breach of contract; the [deprivation] or interference with the title, possession, or enjoyment of property; and equity. Conspicuously absent from the list are actions for personal injury. The reason is that pre-verdict interest under CPLR 5001 is not awardable to plaintiffs on damages awards for personal injury." McKinney's CPLR Rule 5001, Practice Commentaries, Editor's Notes, Hon. Mark C. Dillon. The New York Court of Appeals has also addressed this issue in *Gillespie v. Great Atl. & Pac. Tea Co. & O'Neil*, 235 N.E.2d 911 (N.Y. 1968), finding that not even a viable warranty claim entitles injured plaintiffs to an award of pre-verdict interest under CPLR 5001 where personal injury is involved.

In light of the above precedent, Plaintiff "concede[d] that there is no available precedent to warrant prejudgment interest for Mr. Boateng's past pain and suffering, as previously argued." (ECF No. 185 at 2.) Nonetheless, Plaintiff requested that pre-judgment interest be awarded on the jury's award of

lost earnings.  (*Id.* at 1-2.)  Plaintiff has cited no authority suggesting the Court can award pre-judgment interest on Plaintiff's lost earnings in this personal injury case, and the Court declines to do so.

The two cases cited by Plaintiff for the proposition that pre-judgment may be awarded on lost earnings in a personal injury case arising under New York law are inapposite.  As noted by the Defendants, in the first case cited by Plaintiff, *Percy v. Townsend,* the district court *declined* to award pre-judgment interest to compensatory damages awarded under the New York State Human Rights Law.  *Percy v. Townsend*, No. 16-CV-5304, 2024 WL 2846688, at *2 (S.D.N.Y. May 30, 2024).  The second case, *Lutnick v. New York City Health & Hosps. Corp.*, "arose under the Federal Rehabilitation Act of 1973" and not under New York state law.  No. 89-CV-4217 (JFK), 1994 WL 704804, at *1 (S.D.N.Y. Dec. 16, 1994) (earlier opinion ruling on post-trial motions following trial).  As such, Plaintiff has offered no precedent or authority to suggest it is appropriate to award pre-judgment interest in the instant case as of the date of injury, instead of the date of the liability determination, and the Court declines to do so.

## IV.  Plaintiff's Bill of Costs

Plaintiff seeks taxation of $69,524.43 in costs against BMW.  (ECF No. 183, Bill of Costs.)  The Bill of Costs may be

organized into four broad categories: (1) docket and miscellaneous fees: $3,560.00; (2) trial and deposition transcripts: $23,027.93; (3) witness fees: $41,446.00; and (4) costs of interpretation services: $1,490.50. (*Id.*) Defendants object to a portion of the miscellaneous fees and the trial and deposition transcripts, as well as to all witness fees and costs of interpretation. (*See* ECF No. 186, Defendants' Opposition; ECF No. 201, Defendants' Letter of Supplemental Authority.)

### A.    Applicable Law

Rule 54 of the Federal Rules of Civil Procedure provides that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "Construing this provision, the Supreme Court has held that the term 'costs' includes only the specific items enumerated in 28 U.S.C. § 1920." *Whitfield v. Scully*, 241 F.3d 264, 269 (2d Cir. 2001), *abrogated on other grounds by Bruce v. Samuels*, 577 U.S. 82 (2016) (citation omitted). Pursuant to § 1920, the court, or the Clerk of Court, may tax as costs the following:

> (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees . . .; [and] (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and

costs of special interpretation services. 28 U.S.C. § 1920.

Local Civil Rule 54.1(c) enumerates ten items taxable as costs, clarifies which items are, and are not taxable without an order of the court, *see* Committee Note to Local Civ. R. 54.1, and will control insofar as it addresses a particular cost. *See Balance Point Divorce Funding, LLC v. Scrantom*, 305 F.R.D. 67, 70 (S.D.N.Y. 2015). The court is also aware that the Local Rules bar taxation of costs during the pendency of a new trial motion. Local Civ. R. 54.1(a). This Memorandum and Order contemporaneously resolves Defendants' motion for a new trial, however, and so the Local Rules do not inhibit taxation of costs.[13]

### B. Docket and Miscellaneous Fees and Interpreter Services

Plaintiff seeks $3,560.00 in docket and filing fees. (Bill of Costs; ECF No. 183-1, Exhibits D and E to the Bill of Costs (electronic docket excerpts reflecting filing fees for Complaint and costs of translating and serving summons on German

---

[13] Local Rule 54.1(a) also provides that "[w]ithin thirty (30) days after the determination of any ... motion for a new trial, the party seeking [to] tax costs shall file a new notice of taxation of costs." Defendants' opposition does not refer to this provision, or the Local Rules' prohibition against taxing costs during the pendency of a new trial motion. The court construes this silence as a waiver and exercises its inherent authority to waive its Local Rules because strict adherence here would result in unnecessarily duplicative filings. *See Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1048 (2d Cir. 1991) ("The district court's inherent discretion to depart from the letter of the Local Rules extends to every Local Rule regardless of whether a particular Local Rule specifically grants the judge the power to deviate from the Rule."), *superseded by rule on other grounds*, Fed. R. Civ. P. 5(d)(4) & 83(a)(2).

defendants).)    Under   Local   Civil   Rule   54.1(c)(10),   "[d]ocket fees, and the reasonable and actual fees of the Clerk and of a marshal, sheriff, and process server, are taxable unless ordered otherwise by the court."  *See also* 28 U.S.C. § 1920(1) (stating the court may tax "[f]ees of the clerk and marshal").

Defendants object only to the $1,885 cost of translating documents into German for service on the German defendants. (ECF No. 201 at 2.)  As noted by Defendants, the Supreme Court has  held  that,  in  the  context  of  28  U.S.C.  §  1920, "'compensation of interpreters' is limited to the cost of oral translation  and  does  not  include  the  cost  of  document translation."  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 562 (2012).  The Local Rules have subsequently been amended to provide that "[t]he reasonable fee of a competent interpreter is taxable if the fee of the witness involved is taxable."  Local Rule  54.1(c)(4).   Because  the  German  translation  fee  for documents  is  not  taxable  pursuant  to  the  Supreme  Court's holding, and because it is distinct from the separate service fee, the Court reduces Plaintiff's docket and filing fees award by $1,885.00, resulting in costs of **$1,675.00.**

Separately,  Plaintiff's  request  for  $1,490.50  for translation fees, listed as "compensation of interpreters" on the Bill of Costs is denied for the same reasons set forth above.  (*See* Bill of Costs.)  A review of the invoice shows that

the expenses were related to document translation, and not the cost of interpreters at trial, which were paid by Defendants. (*See* ECF No. 183-1 at 45; ECF No. 201.)  As a result, Plaintiff will not be awarded any fees for the cost of interpretation services.

### C.  Trial and Deposition Transcripts

Plaintiff seeks $23,027.93 in costs for "transcripts services, including video deposition services, physical and electronic deposition transcripts, and trial transcripts."[14] (ECF No. 183-1, Letter in Support of Bill of Costs, at 1; *see also* Exhibits B (invoices for deposition and trial transcripts and videography).)  BMW asserts that two sub-categories of costs in this group are non-taxable: (1) deposition transcripts not used or received at trial; and (2) videotapes of depositions. (ECF No. 186 at 1-2.)  BMW does not object to the remaining costs.

Local Civil Rule 54.1(c)(2) provides that, unless the court orders otherwise:

> the original transcript of a deposition, plus one copy, is taxable if the deposition was used or received in evidence at the trial, whether or not it was read in its entirety. Costs for depositions are also taxable if they were used by the court in ruling on a motion for summary judgment or other dispositive substantive motion. Costs for depositions taken solely

---

[14]  Plaintiff erroneously included duplicate invoices for deposition and videography expenses in his letter in support, but clarified in a subsequent August 1, 2024, letter that the error did not carry over into the calculation, which only included each claimed expense once.  (ECF No. 197.)

for discovery are not taxable. Notwithstanding Rule 54.1(c)(2)'s "clear and unequivocal" wording, "cases have established the sensible rule that the costs of depositions not used at the trial may nevertheless be taxed for costs where they appear to have been reasonably necessary to the litigation at the time they were taken." *Palm Bay Int'l, Inc. v. Marchesi Di Barolo S.P.A.*, 285 F.R.D. 225, 235 (E.D.N.Y. 2012) (internal quotation marks and citations omitted) (collecting cases); *accord Bauta v. Greyhound Lines, Inc.*, No. 14-CV-3725 (RER), 2019 WL 8060181, at *4 (E.D.N.Y. June 17, 2019) ("Courts have not limited the meaning of the word 'use' to only include deposition transcripts that were admitted at trial.").

The "sensible" interpretation of Local Rule 54.1(c)(2), to allow the original and one copy of a deposition transcript to be taxable as a cost, is the "general practice" in the Eastern District, *see Bauta*, 2019 WL 8060181, at *5, and defeats BMW's objection to taxing deposition transcripts not used or received at trial. With the exception of Dr. Choueka, every transcript BMW contests relates to a witness who either testified at trial, or whose deposition testimony was cited at summary judgment. (ECF No. 186 at 1-2; see ECF No. 183-1 Exhibit B (Deposition Invoices)); *see also Boateng v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17-CV-209 (KAM)(SIL), 2022 WL 4357555,

at *3 (E.D.N.Y. Sept. 20, 2022) (citing Peter Baur's deposition testimony).    Although Dr. Choueka did not testify at trial, Plaintiff cited his deposition transcript in his Rule 56.1 Counter-Statement.    (*See* ECF No. 115-1, Exhibit 1 to Plaintiff's Counter-Statement.)    Courts in this District generally consider such costs taxable.    *See, e.g., Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 638 (E.D.N.Y. 2020) (awarding costs related to a "witness who either testified at trial, or whose video testimony was played at trial, or whose testimony was cited in Plaintiffs' summary judgment motion").    So too here, and Plaintiff may recover the costs of the deposition transcripts plus one copy.

BMW's objection to costs associated with video testimony likewise fails.    "In [the Second Circuit], video fees have been deemed taxable where there was an expectation among the parties that the video of the testimony might be presented at trial." *Endo Pharms. Inc. v. Amneal Pharms., LLC*, 331 F.R.D. 575, 583 (S.D.N.Y. 2019) (internal quotation marks, citations, and brackets omitted); *but see Citigroup Glob. Markets, Inc. v. Abbar*, 63 F. Supp. 3d 360, 362 (S.D.N.Y. 2014) (finding costs for videotaped depositions duplicative, given court's taxation of costs for original transcripts plus one copy, notwithstanding use of video at trial).    Plaintiff has explained that there was an expectation prior to trial that the video testimony of Mr.

Peter Baur and Mr. Guthrie might be required, either due to the unavailability of Mr. Baur, or in order to impeach Mr. Guthrie's trial testimony. Although Plaintiff was not required to use either video, the Court nonetheless finds there was a reasonable expectation that both instances of video testimony might be required.

Accordingly, the Court overrules Defendants' objections. The Court independently calculates the costs taxable to Plaintiff under this category, given the presence of "several duplicative invoice pages" in the supporting documents for the Bill of Costs, which Plaintiff acknowledged.[15] (ECF No. 197.) The Court therefore independently calculates the costs awardable as follows, with reference to the page of Plaintiff's exhibits, (ECF No. 183-1), on which each invoice or receipt may be found:

| Deposition | Cost | Page | | Videography | Cost | Page |
|---|---|---|---|---|---|---|
| Pugh | $897.90 | 24 | | Guthrie | $2,895.24 | 31 |
| Pugh (Trial) | $607.42 | 25 | | Baur | $2,903.99 | 37 |
| Baur | $2,556.10 | 26 | | **Total:** | **$5,799.23** | |
| Dorris | $1,182.50 | 28 | | | | |
| Perry | $239.05 | 34 | | | | |
| Boateng | $494.50 | 35 | | | | |
| Choueka | $1,222.55 | 39 | | | | |
| Parker | $1,913.15 | 40 | | | | |
| Guthrie | $2,827.45 | 43 | | | | |
| Greenston | $1,424.60 | 42 | | | | |

---

[15] The Court encourages, indeed admonishes, Plaintiff's counsel to exercise more care in the future, and also notes that the duplicative documents and calculation errors might have been discovered if Plaintiff provided a table showing the calculations supporting the requested costs. Plaintiff's failure to do so necessitated the Court instead conducting its own independent calculations.

| Bruecklmeier | $3,751.27 | 41 | █ | | | |
|---|---|---|---|---|---|---|
| **Total:** | **$17,116.49** | | | | | |

Accordingly, the Court awards Plaintiff a total of **$22,915.72** for the costs of deposition transcripts, trial transcripts, and video recording.

**D.   Witnesses, Travel Expenses, and Subsistence**

Plaintiff seeks $41,446.00 in witness fees – specifically $15,000.00 for Dr. Hoschander, $7,500.00 for Dr. Rauchwerger, and $13,500.00 for Dr. Pugh, along with additional expenses related to expert fees charged in connection with the deposition testimony of Drs. Choueka, Parker, Greenston, and Dorris. (*See* ECF No. 183-1, Exhibit A (invoices for expert witness services).)  BMW objects to the entirety of the line item, arguing that only fees for ordinary witnesses may be recovered. (ECF No. 186 at 2.)

Witness costs are taxable under 28 U.S.C. § 1920(3). Local Civil Rule 54.1(c)(3) permits taxation of witness fees and travel expenses authorized by 28 U.S.C. § 1821, so long as the witness testifies, as well as subsistence pursuant to § 1821, if the witnesses testify and it is impractical for them to return to their residence day to day.

Pursuant to 28 U.S.C. § 1821(a)(1), "a witness in attendance at any court of the United States . . . or before any person authorized to take his deposition pursuant to any rule or

100

order of a court of the United States, shall be paid fees and allowances provided by this section." The witness's fees and allowances include: (1) $40 per day for each day's attendance; (2) actual travel expenses to and from the deposition or trial, assuming the witness utilized a reasonable means of transportation; and (3) a subsistence allowance at the applicable per diem rate. *Id.* §§ 1821(b), (c)(1), (d)(1).

BMW correctly notes that Local Civil Rule 54.1(c)(3) states: "Fees for expert witnesses are taxable only to the extent of fees for ordinary witnesses unless prior court approval was obtained." Accordingly, because the Court is unaware of any prior court approval in the instant case for the taxation of expert witness fees, Plaintiff is only entitled to statutory witness fees. Plaintiff argues that the expert fees charged for the deposition testimony of Drs. Choueka, Parker, Greenston, and Dorris should be taxable because Magistrate Judge Locke ordered a fee swap of deposition expert witnesses. (ECF No. 187 at 3.) Although Plaintiff is correct that he may now request ordinary witness's fees for the aforementioned experts, the Court is unaware of any precedent or authority to suggest that a fee swap, in and of itself, constitutes "prior court approval" for the taxation of expert witness fees. Accordingly, the Court will only award the witness fees authorized by 28 U.S.C. § 1821 for each of the witnesses included in the Bill of

Costs, resulting in total costs of **$320.00**[16] being awarded.

## CONCLUSION

For the foregoing reasons, the Court rules on the Parties' pending post-trial motions as follows:

(1) Defendants' Motion for Judgment as a Matter of Law or, alternatively, for a New Trial or Remittitur of Damages, is DENIED in its entirety.

(2) Plaintiff's Motion to Amend the Judgement to include Pre-Judgment Interest is DENIED in its entirety.

(3) Plaintiff's Motion for Taxation of Costs is GRANTED in part and DENIED in part.

The court taxes costs and awards Plaintiff as follows: (1) Docket and Miscellaneous Fees: **$1,675.00,** comprised of the filing fee for the Complaint and the cost of serving the German Defendants with process; (2) Trial and Deposition Transcripts: **$22,915.72** for deposition and trial transcripts and videography; (3) Witnesses: **$320.00** in witness attendance fees.

**SO ORDERED.**

Dated:      October 11, 2024
            Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York

---

[16] Dr. Pugh testified both on June 20 and June 21, 2024, so Plaintiff is entitled to two days of witness's fees. (*See generally* Tr.)